Kevin J. Holl, SBN 124830
**GORDON-CREED, KELLEY,**
**HOLL, ANGEL & SUGERMAN, LLP**
50 California Street, 34th Floor
San Francisco, California 94111
Tel:  (415) 421-3100
Fax:  (415) 421-3150
holl@gkhs.com

Attorneys for Defendant
CHARMING CHARLIE MARKET, INC.

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BROADSTONE LAND, LLC, a California limited liability company, | Case No. |
| Plaintiff, | **NOTICE OF REMOVAL OF CIVIL ACTION** |
| vs. | |
| CHARMING CHARLIE MARKET, INC., a Delaware corporation; and DOES 1 – 10, inclusive, | |
| Defendants. | |

Defendant Charming Charlie Markets, Inc. ("Defendant" or "Charming Charlie") files this Notice of Removal of Civil Action brought against it by Plaintiff Broadstone Land, LLC ("Plaintiff" or "Broadstone"). The grounds in support of this Notice of Removal are as follows:

1.     **Procedural Background.** On April 21, 2022, Plaintiff filed its Complaint for Breach of Contract and Fraud (the "Complaint") against Defendants in the Superior Court for the County of Sacramento, California, under Case No. 34-2022-00318917 (the "State Court Action"). A true and correct copy of Plaintiff's Complaint is attached as **Exhibit A**. In the Complaint, Plaintiff asserts claims against Defendant Charming Charlie and against unnamed Does.  Plaintiff alleges claims for Breach of Contract and Fraud surrounding a Lease Agreement entered into by Plaintiffs and Defendant Charming

Charlie.

2.      Defendant was not served but received a copy of the Complaint on May 27, 2022. **This Notice is Timely Pursuant to 28 U.S.C. § 1446(b)(1).** This Notice of Removal of Civil Action is being filed prior to the expiration of the thirty (30) day period after receipt by Charming Charlie, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based.

3.      **Jurisdiction**.  Removal is proper as there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. Therefore, this is a civil action in which the district courts of the United States have original diversity jurisdiction pursuant to 28 U.S.C. § 1332 and is one which may be removed to this Court pursuant to 28 U.S.C. § 1441(a).

4.      Specifically, Broadstone Land, LLC is a California corporation with its principal place of business in California.

5.      Defendant Charming Charlie Markets, Inc. is a Delaware corporation with its principal place of business in Houston, Texas.

6.      Since the remaining defendants, the Does, are unnamed, they have no domicile, nor have they been properly served such that consent is not necessary for the purposes of this removal.

7.      The amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, in that the Plaintiff seeks damages in excess of $300,000.00 which is greater than the minimum jurisdictional requirements of 28 U.S.C. § 1332.

8.      **Notice Filed in the State Court.** Promptly after filing this Notice of Removal, Defendant Charming Charlie will provide written notice of removal to Plaintiff and will file a copy of this Notice of Removal with the Clerk for the Superior Court for Sacramento County, California as provided by law. A true and correct copy of the Notice being filed with the Clerk of the Superior Court for Sacramento County, California is attached hereto as **Exhibit B**.

9.      **Jury Demand.** Plaintiff has not demanded a jury in the state court action.

10.     By filing this Notice of Removal, Defendants do not waive any defense that may be available.

11.     As Defendant Charming Charlie is the only Defendant who has been properly joined and

1    served, consent of all Defendants is not required.  28 U.S.C. §1446(b)(2)(A).

2          WHEREFORE, for the reasons stated above, this action is removable to this Court pursuant to 28

3    U.S.C. §§ 1332, 1441, and 1446 under this Court's diversity jurisdiction.

5    Dated: June 24, 2022                              GORDON-CREED, KELLEY,
6                                                      HOLL, ANGEL & SUGERMAN, LLP

8                                          By:        _____/s/ Kevin J. Holl_____
9                                                     Kevin J. Holl
                                                      Attorneys for Defendant
10                                                    CHARMING CHARLIE MARKET, INC.



# EXHIBIT A

Superior Court Of California,
Sacramento
04/21/2022
Iromo2
By_____ , Deputy
Case Number:
34-2022-00318917

1  `HEFNER, STARK & MAROIS, LLP
Kirk E. Giberson (CA BAR ASSN NO 125155)
2  2150 River Plaza Drive, Suite 450
Sacramento, CA 95833-4136
3  Telephone:    (916) 925-6620
Fax No:        (916) 925-1127
4  Email:         kgiberson@hsmlaw.com

5  Attorneys for Plaintiff
Broadstone Land, LLC
6

7

8

9

10                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                                 COUNTY OF SACRAMENTO

12

| | |
|---|---|
| 13  BROADSTONE LAND, LLC, a California limited liability company, | Case No. |
| 14        Plaintiff, | **COMPLAINT FOR BREACH OF CONTRACT; FRAUD** |
| 15  v. | |
| 16  CHARMING CHARLIE MARKETS INC., a Delaware corporation; and DOES 1 - 10, | |
| 17  inclusive, | |
| 18        Defendants. | |

19

20        Broadstone Land, LLC, a California limited liability company ("Plaintiff"), alleges as

21  follows:

22        1.     At all times mentioned within this complaint, Plaintiff was a California limited

23  liability company authorized to do business and doing business in California.

24        2.     Plaintiff is the current landlord and owner of the property which is the subject

25  of this complaint and hold all rights under the documents alleged below.

26        3.     At all times relevant herein, defendant Charming Charlie Markets Inc.

27  ("Defendant"), was a Delaware corporation conducting business in Folsom, California.

28  ///

Hefner, Stark & Marois, LLP
Sacramento, CA

BY FAX

1    4.    All contracts alleged herein were made and called for performance in the
2  County of Sacramento. The real property which is the subject of this complaint is commonly
3  known as 330 Palladio Parkway, Suite 2001, Folsom, Sacramento County, California
4  95630 ("the Premises") and is part of a large shopping center.

5    5.    The true names and capacities of Does 1 through 10, inclusive, are unknown
6  to Plaintiff, who therefore sues these defendants under such fictitious names (the "Doe
7  Defendants"). Plaintiff will amend this complaint to allege their true names and capacities
8  when they have been ascertained.

9    6.    Unless otherwise indicated, the Doe Defendants and Defendants shall be
10  referred to collectively within this Complaint as "Defendants."

11    7.    Plaintiff is informed and believes, and on that basis alleges, that each of the
12  Defendants is in some manner responsible for the occurrences alleged in this complaint,
13  and that Plaintiff's damages as alleged in this complaint were proximately caused by each
14  of the Defendants. Plaintiff is informed and believes, and on that basis alleges, that each
15  of the Defendants claim some right, title or interest in or to the real property described
16  above. Further, each reference to one defendant herein shall be deemed to be a reference
17  to every other defendant.

18                    **FIRST CAUSE OF ACTION**

19                        **(Breach of Lease)**

20    8.    Plaintiff incorporates by this reference each allegation of the preceding
21  paragraphs of this complaint as though fully set forth here.

22    9.    On or about June 1, 2021, Plaintiff leased the Premises to Defendant by a
23  written lease (the "Lease"). A true and correct copy of the Lease is attached hereto as
24  Exhibit "A," and its terms are incorporated by this reference.

25    10.    Defendant took possession of the Premises pursuant to the Lease for the
26  retail sale and marketing of women's fashion accessories and apparel, beauty aids, and
27  gift items. Defendant subsequently defaulted on its Lease obligations by, among other

28

Hefner, Stark & Marois, LLP
Sacramento, CA

---

1 things, failing to pay rent due under the Lease and abandoning the Premises. Defendant
2 abandoned the Premises on or about April 15, 2022.

3      11.    Prior to Defendant's forfeiture of its rights under the Lease, by virtue of its
4 defaults under the Lease and abandonment of the Premises, Plaintiff had performed all
5 covenants, conditions, and promises required on its part to be performed thereunder.
6 Nothing in the Lease relieves Defendant from its obligations and duties under the Lease.

7      12.    Under the terms of the Lease, base rent due from Defendant was percentage
8 rent based on the percentage rate of Defendant's net sales. For November 2021, this
9 percentage rent was $4,635.15. For December 2021, this percentage rent was $6,581.13.
10 A good faith estimate of fair market percentage rent due from Defendant for the period after
11 its defaults is the midway point between these two amounts, which is $5,608.50 per month.
12 In addition, under the terms of the Lease, Defendant owed as rent its proportionate share
13 of common area expenses ("CAMs") for the Premises, which is $700.86 per month. The
14 monthly base rent and CAMs Defendant owes under the Lease, through lease expiration,
15 total $6,309.36.

16      13.    Defendant failed to pay rent for April 2022 and has paid no rent since then.
17 For the 50 months from April 2022 through lease expiration on May 31, 2026, Defendant's
18 rental obligation totals $315,468.

19      14.    The Lease provides at section 28 that in the event legal proceedings are
20 brought to enforce the terms of the Lease, the prevailing party shall be entitled to recover
21 from the other party all costs and expenses of such proceeding, including reasonable
22 attorneys' fee.

23      15.    Plaintiff paid a leasing commission of $62,500 in connection with the Lease,
24 which sum Plaintiff is entitled to recover under the terms of the Lease and the terms of
25 California Civil Code section 1951.2.

26      16.    As a result of Defendant's breach of the Lease, and pursuant to the terms in
27 section 23 of the Lease and section 1951.2 of the California Civil Code, Plaintiffs are entitled
28 to recover from Defendant the following:

Hefner, Stark & Marois, LLP
Sacramento, CA

1        a.    The worth at the time of the award of the unpaid rent which had been

2 earned at the time of termination;

3        b.    The worth at the time of the award of the amount by which the unpaid

4 rent which would have been earned after termination until the time of the award exceeds

5 the amount of such rental loss that the defendants prove could have reasonably been

6 avoided;

7        c.    The worth at the time of the award of the amount by which the unpaid

8 rent for the balance of the term after the time of award exceeds the amount of such rental

9 loss that the defendants prove could be reasonably avoided;

10        d.    Taxes, fees, costs, expenses, interest, late charges, and other charges

11 due under the Lease; and

12        e.    All other consequential damages permitted by law, including, but not

13 limited to, brokerage commissions, free rent, tenant improvements, and other expenses

14 incurred or to be incurred in re-leasing the Premises to mitigate Plaintiff's damages.

15        WHEREFORE, Plaintiff prays for judgment as set forth below.

16 **SECOND CAUSE OF ACTION**

17 **(Fraud – False Promise)**

18    17.    Plaintiff incorporates by this reference each preceding allegation of this

19 complaint as though fully set forth here.

20    18.    Defendant was a previous tenant of Plaintiff which filed bankruptcy in

21 approximately October 2017 (under the name "Charming Charlie Holdings, Inc.").

22 Defendant closed all its locations and shut down its website. Plaintiff took possession of

23 Defendant's space and removed Defendant's signage but left Defendant's furniture,

24 fixtures, and equipment in the space.

25    19.    In 2020, Plaintiff learned Defendant was reopening stores under new

26 ownership, and Defendant approached Plaintiff about reopening a store in the same space

27 previously occupied. Plaintiff and Defendant entered negotiations for a letter of intent in

28 approximately April 2021. Defendant sought a larger-than-normal tenant improvement

Hefner, Stark & Marois, LLP
Sacramento, CA

1  allowance ("TIA") of $300,000 and also wanted Plaintiff's agreement there would be no
2  restrictions on for what Defendant could use the TIA. Defendant assured Plaintiff the TIA
3  request was in good faith, and that the money was necessary for Defendant to successfully
4  re-launch its store. With Defendant's assurance, Plaintiff agreed to the requested terms
5  related to the TIA, and the parties executed the Lease. Plaintiff in fact paid Defendant the
6  TIA of $300,000 under the terms of the Lease.

7       20.    Defendant's process regarding the tenant improvement process was a
8  problem. Among other things, Defendant retained people to work who could not read plans
9  and follow simple rules. The tenant improvement process took far longer than necessary.
10  There was little work to be done at the Premises, as Defendant only did minor cosmetic
11  work.

12       21.    Defendant finally opened for business on September 6, 2021 - without even
13  having a permanent sign (which took a month to install after Defendant opened). When
14  Defendant opened, the store was only two-thirds to three-quarters filled with merchandise.
15  Defendant eventually stocked more merchandise - two months after its opening – but the
16  store was never as full as it had been in its prior occupancy. Defendant immediately opened
17  with constant sales, such as "buy one, get one half off." Defendant did essentially no
18  marketing to attract customers. Further, Defendant's products were not the same as
19  previously, with cheapened inventory and without high-quality displays (for which
20  Defendant was once known).

21       22.    On February 3, 2022, with no notice to Plaintiff, Defendant began hanging
22  "liquidation" signs in the windows of the Premises. When Plaintiff contacted Defendant
23  about this, Defendant informed Plaintiff that Defendant was unable to make the store work,
24  and that Defendant would be vacating the Premises and returning the keys to Plaintiff.
25  Defendant informed Plaintiff that Defendant would be liquidating but not filing bankruptcy.
26  Defendant in fact closed and returned its keys on or about April 15, 2022.

27  / / /

28  / / /

Hefner, Stark & Marois, LLP
Sacramento, CA

1    23.    It is now evident that when Defendant executed the Lease and committed to
2 run its business at the Premises for 60 months, it had no intention of keeping its promise.
3 Defendant knew it lacked the financial backing, skill, and commitment to perform under the
4 Lease. Defendant demanded, and received, the $300,000 TIA under false pretenses,
5 based on its promise which it knew to be false.

6    24.    Defendant continues to sell merchandise online and has given no indication
7 it plans to shut down as a business.

8    25.    In fact, when Defendant executed the Lease and promised to perform the
9 obligations of the tenant thereunder, Defendant had no intention of performing on its
10 promise. Defendant knew its promise to be false and knew Plaintiff would rely on the
11 promise. By contrast, Plaintiff did not know, and could not have reasonably known, the
12 promise to be false.

13    26.    By making this false promise, Defendant wrongfully procured from Plaintiff
14 the $300,000 TIA, which sum Defendant now owes to Plaintiff as damages. Defendant
15 knew it was obtaining the $300,000 TIA under false pretenses.

16    27.    In making the false promise as alleged, Defendant acted with willful and
17 conscious disregard of Plaintiff's rights and of its duty to Plaintiff, while advancing its own
18 economic interests above the interests of Plaintiff. Furthermore, Defendant perpetrated this
19 scheme to deprive Plaintiff of its property – specifically the $300,000 TIA – and obtain an
20 unfair and unconscionable advantage over Plaintiff, so as to constitute oppression, fraud
21 and malice, entitling Plaintiff to an award of exemplary and punitive damages in an amount
22 to be determined at trial.

23    WHEREFORE, Plaintiff prays for judgment as set forth below.

24                                **PRAYER**

25    Based on the foregoing, Plaintiffs request judgment against Defendant as follows:

26    1.    For damages of at least $315,468 for unpaid rent under the Lease, plus
27 $62,500 for the commission Plaintiff paid in connection with the Lease;

28    / / /

Heller, Stark & Marois, LLP
Sacramento, CA

1    2.    For $300,000 to reimburse Plaintiff for the TIA fraudulently procured by
2   Defendant;

3    3.    For punitive and exemplary damages in an amount sufficient to punish
4   Defendant and discourage Defendant from similar actions in the future;

5    4.    For attorney's fees;

6    5.    For costs of suit; and

7    6.    For such other and further relief as the court may deem just and proper.

8   Dated: April 21, 2022                                    HEFNER, STARK & MAROIS, LLP

9

10                                           By   _____
11                                                Kirk E. Giberson
                                                 Attorneys for Plaintiff
12                                                Broadstone Land, LLC

Hefner, Stark & Marois, LLP
Sacramento, CA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# PALLADIO AT BROADSTONE

## *CHARMING CHARLIE*
### SPACE NO. 2001

#### TABLE OF CONTENTS

#### REFERENCE PROVISIONS

ARTICLE 1 - Leased Premises, Term and Use
ARTICLE 2 - Original Construction
ARTICLE 3 - Rental Commencement Date
ARTICLE 4 - Rental
ARTICLE 5 - Definition of Net Sales
ARTICLE 6 - Records and Audits
ARTICLE 7 - Taxes
ARTICLE 8 - Subordination and Attornment
ARTICLE 9 - Additional Construction
ARTICLE 10 - Condition of Premises
ARTICLE 11 - Repairs and Maintenance
ARTICLE 12 - Alterations
ARTICLE 13 - Fixtures and Personal Property
ARTICLE 14 - Liens
ARTICLE 15 - Laws and Ordinances
ARTICLE 16 - Environmental Services
ARTICLE 17 - Joint Use Areas and Operating Expenses
ARTICLE 18 - Damage to Premises
ARTICLE 19 - Insurance
ARTICLE 20 - Indemnification
ARTICLE 21 - Assignment, Subletting and Ownership
ARTICLE 22 - Access to Premises
ARTICLE 23 - Default by Tenant
ARTICLE 24 - Surrender of Premises
ARTICLE 25 - Tenant's Conduct of Business
ARTICLE 26 - Rules and Regulations

ARTICLE 27 - Eminent Domain
ARTICLE 28 - Attorneys' Fees
ARTICLE 29 - Sale of Premises by Landlord
ARTICLE 30 - Notices
ARTICLE 31 - Remedies
ARTICLE 32 - Successors and Assigns
ARTICLE 33 - Representations
ARTICLE 34 - Waiver
ARTICLE 35 - Holding Over
ARTICLE 36 - Interpretation
ARTICLE 37 - Advertising and Promotional Service
ARTICLE 38 - Quiet Enjoyment
ARTICLE 39 - Waiver of Redemption
ARTICLE 40 - Fees
ARTICLE 41 - Tenant's Property
ARTICLE 42 - Lease Status
ARTICLE 43 - Recording
ARTICLE 44 - Force Majeure
ARTICLE 45 - Construction of Lease
ARTICLE 46 - Security Deposit
ARTICLE 47 - Captions
ARTICLE 48 - Severability
ARTICLE 49 - Objection to Statements
ARTICLE 50 - Liability of Landlord
ARTICLE 51 - No Option
ARTICLE 52 - Execution of Documents
ARTICLE 53 - Corporate Tenant
ARTICLE 54 - Printed Provisions

ARTICLE 55 - Entire Agreement
ARTICLE 56 - No Third-Party Rights
ARTICLE 57 - Financial Statements
ARTICLE 58 - Other Locations
ARTICLE 59 - Tenant's Failure
ARTICLE 60 - Ownership
ARTICLE 61 - Special Provisions
ARTICLE 62 - Counterparts
ARTICLE 63 – Landlord Waiver of Lien

## EXHIBITS

**EXHIBIT A**            Plans of Leased Premises

**EXHIBIT B**            Site Plan

**EXHIBIT C-L**          Description of Landlord/Tenant Work

**EXHIBIT D**            Use Restrictions

**EXHIBIT E**            [INTENTIONALLY DELETED]

**EXHIBIT L-W**          Landlord Work Letter

**EXHIBIT P**            [INTENTIONALLY DELETED]

**EXHIBIT Q**            Lease Confirmation Certificate

**EXHIBIT R**            Confirmation of Delivery and Punch List

## PALLADIO AT BROADSTONE

**THIS LEASE** is between BROADSTONE LAND, LLC, a California limited liability company ("Landlord"), and CHARMING CHARLIE MARKETS INC, a Delaware corporation ("Tenant"). The date of this Lease is June __/__, 2021 ("Commencement Date"). The Leased Premises are located in the **Palladio at Broadstone** ("Shopping Center") in the City of Folsom, County of Sacramento, and State of California. Landlord and Tenant shall be sometimes referred to herein, individually, as a "Party" and together as the "Parties".

## REFERENCE PROVISIONS

The following references define terms used in the specified Articles and elsewhere in this Lease and shall be construed in accordance with the provisions and conditions in this Lease:

| | | |
|---|---|---|
| 1.01 | Leased Premises: Space 2001 containing approximately 6,995 square feet of floor area. The street address of the Leased Premises is 330 Palladio Parkway, Suite 2001, Folsom, CA 95630. | [ARTICLE 1(a)] |
| 1.02 | Expiration Date: The term of this Lease ("Term") shall be for a period of sixty (60) months commencing on the Rental Commencement Date (as defined in ARTICLE 3). The Term shall expire on the date ("Expiration Date") that is the last day of Month 60 (as defined below); provided, however, if Tenant has the right to exercise any of the Options (as defined in ARTICLE 61(b) below) and does timely exercise any such Options in accordance with the terms of this Lease, the Expiration Date shall be the last day of the applicable Option Period (as defined in ARTICLE 61(b) below). "Month 1" shall be the period that commences on the Rental Commencement Date and ends on the last day of the first full calendar month thereafter; provided, however, if the Rental Commencement Date is the first day of a calendar month, then "Month 1" shall be the period that commences on the Rental Commencement Date and ends on the last day of the calendar month in which the Rental Commencement Date occurs; "Month 2" shall be the full calendar month immediately following Month 1; "Month 3" shall be the full calendar month immediately following Month 2, and so on. For the avoidance of doubt, "Month 60" shall be the full calendar month immediately following Month 59. | [ARTICLE 1(b)] |
| 1.03 | Permitted Use: Only for the retail sale and marketing of women's (and at Tenant's option, girls'): (i) fashion accessories, including handbags, fashion jewelry, scarves, belts, sunglasses, hats, hair accessories, apparel, intimate apparel and shoes; and (ii) the incidental sales of cosmetics, fragrances, beauty aids, and gift items (including, but not limited to, frames, candles, and holiday gift food items such as nuts, chocolates and candies, and other items sold in other Charming Charlie stores). For the purposes of this Reference Provision 1.03, the term "incidental" shall mean that less than fifty percent (50%) of the gross area of the sales area of the Leased Premises in total is devoted to or used for the sale or display of lines of merchandise *and/or* items permitted on an incidental basis under this clause. In no event shall the Leased Premises be used in violation of any of the use restrictions set forth on EXHIBIT "D" hereto. | [ARTICLE 1(c)] |
| 1.04 | Final Plans and Specifications: The plans ("Final Plans") for Tenant's Work (as defined in ARTICLE 2(c) below) prepared by Tenant and approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed. Tenant shall deliver to | [EXHIBIT C-L] |

Landlord for Landlord's approval Tenant's proposed plans and specifications ("Initial Plans") for Tenant's Work prior to the commencement of Tenant's Work, provided that Landlord and Tenant acknowledge and agree that plans shall not be required to Tenant's initial work, notwithstanding what it says elsewhere in this Lease or any related design criteria due to the fact that Tenant is only performing a cosmetic remodel at the Leased Premises.

1.05     Beginning Work Date: The date that Landlord delivers the Leased Premises to Tenant in accordance with this Lease. For the avoidance of any doubt, the Leased Premises shall be delivered to Tenant in their "AS-IS, WHERE-IS" condition and Landlord shall have no obligation to make any improvements or repairs the Leased Premises, except as otherwise expressly provided in this Lease. The Beginning Work Date is estimated to be five (5) days following the Commencement Date.     [ARTICLE 2(e)]

1.06     Opening Date: The 120th day following the Beginning Work Date.     [ARTICLE 3]

1.07     Minimum Annual Rental:     [ARTICLE 4(a)]

| Months 1 through 60 | $0.00 per year | $0.00 per month |
|---|---|---|

Option Period 1:

| Months 61 through 120 | Option Period 1 Rental, per year. The term "Option Period 1 Rental" means 105% of the amount of Percentage Rental payable by Tenant with respect to the twelve (12) month period that commences on the first day of Month 49 through the last day of Month 60, subject to ARTICLE 4(c) below. | 1/12th of the Option Period 1 Rental, per month |
|---|---|---|

Option Period 2:

| Months 121 through 180 | Option Period 2 Rental, per year. The term "Option Period 2 Rental" means 105% of Option Period 1 Rental. | 1/12th of the Option Period 2 Rental, per month |
|---|---|---|

Option Period 3:

| Months 181 through 240 | Option Period 3 Rental, per year. The term "Option Period 3 Rental" means 105% of Option Period 2 Rental. | 1/12th of the Option Period 3 Rental, per month |
|---|---|---|

1.08     [Intentionally Deleted]

1.09     Percentage Rental

| | Annual Sales Base | Percentage Rate |
|---|---|---|
| Months 1 – 60 | $0.00 | 10% for first $1,000,000 in Net Sales in a calendar year; 12.5% for Net Sales exceeding $1,000,000 but less than $1,250,000 in such calendar year; and 15% for Net Sales equal to or more than $1,250,000 in such calendar year. |

| Option Period 1: | Annual Sales Base | Percentage Rate |
|---|---|---|
| Months 61 through 120 | The natural breakpoint of Option Period 1 Rental, determined by dividing (x) Option Period 1 Rental, by (y) 12.5%. | 12.5% |

| Option Period 2: | Annual Sales Base | Percentage Rate |
|---|---|---|
| Months 121 through 180 | The natural breakpoint of Option Period 2 Rental, determined by dividing (x) Option Period 2 Rental, by (y) 12.5%. | 12.5% |

| Option Period 3: | Annual Sales Base | Percentage Rate |
|---|---|---|
| Months 181 through 240 | The natural breakpoint of Option Period 3 Rental, determined by dividing (x) Option Period 3 Rental, by (y) 12.5%. | 12.5% |

1.10    Address of Landlord:                                                    [ARTICLE 30]

Landlord's Notice Address:              Landlord's Payment Address:
Broadstone Land, LLC                    Broadstone Land, LLC
340 Palladio Parkway, Suite 521         2209 Plaza Drive, Suite 100
Folsom, CA 95630-8574                   Rocklin, CA 95765

1.11    Address of Tenant:                                                     [ARTICLE 30]

Charming Charlie Markets Inc
7700 San Felipe
Suite 520
Houston, Texas 77063
Attn: President

1.12    [Intentionally Deleted]                                                [ARTICLE 4(d)]



1.13    Trade Name: "Charming Charlie" or such other trade name as utilized by Tenant.          [ARTICLE 25]

1.14    Advertising and Promotional Fee:  None.          [ARTICLE 37]

1.15    Security Deposit:  None          [ARTICLE 46]

1.16    Radius:  None          [ARTICLE 58]

1.17    Intentionally Omitted          [ARTICLE 7, 17]

1.18    Construction Allowance: $300,000.00          [ARTICLE 2]

Landlord agrees to pay to Tenant, if Tenant is not then in default beyond any applicable notice and cure period provided for in this Lease, insolvent or bankrupt, $300,000.00 for the cost of Tenant's Work ("Construction Allowance"), as follows:

A.      33.33% (i.e. $100,000) of the Construction Allowance upon the Commencement Date.

B.      33.33% (i.e. $100,000) of the Construction Allowance upon the Beginning Work Date and the Beginning Work Date shall be delayed on a day for day basis for every day the Landlord is late with this installment of the Construction Allowance.

B.      33.34% (i.e. $100,000) of the Construction Allowance within ten (10) days after the fulfillment of all of the following requirements:

1.      Presentation to Landlord, in form and detail reasonably satisfactory to Landlord, of:

a.      Tenant's general contractor's original and notarized affidavit of completion of Tenant's Work showing that the amount requested by Tenant has been spent by Tenant on the opening of a Charming Charlie branded store at the Leased Premises, and listing all subcontractors, sub-subcontractors and material suppliers and amounts which they were to be paid and were paid for work, performed for or on the Leased Premises or for materials supplied for Tenant's Work who have either: (i) supplied material or labor in excess of $10,000.00; or (ii) filed a preliminary notice of lien with respect to material or labor provided to the Leased Premises;

b.      Tenant's general contractor's original and notarized final waiver of lien indicating that Tenant's general contractor has been paid in full for all work performed in connection with the Leased Premises; and

c.      For Tenant's contractor's, subcontractors', sub-subcontractors' and material suppliers' who have supplied material or labor in excess of $10,000.00, original and notarized final waiver of lien indicating that the foregoing have been paid in full.

2.      Presentation to Landlord of temporary or permanent Certificate of Occupancy from all applicable governmental authorities; and

3.      Tenant has opened for business to the public at the Leased Premises.



If Landlord fails to pay any portion of the Construction Allowance within ten (10) days after the same becomes due, then in addition to all other rights and remedies that Tenant may have against Landlord (but without duplication in recovering the amounts due Tenant), Tenant shall be entitled to deduct the unpaid and overdue portion of the Construction Allowance from Rent otherwise becoming due hereunder, together with interest on the unpaid balance thereof at the Interest Rate from the date originally due.

Notwithstanding anything contained herein to the contrary, while Tenant shall not be obligated to expend the entire amount of the Construction Allowance for the construction of improvements to the Leased Premises or for completion of Tenant's Work (and Landlord agrees that payment of the Construction Allowance to Tenant shall not be conditioned upon the use of the Construction Allowance solely for such purposes; provided, however, Tenant represents and warrants that: (a) it shall use the Construction Allowance only for Tenant's business operations in, or associated with, the Leased Premises, including inventory; (b) no less than fifty percent (50%) of the total Construction Allowance shall be used for preparations for the opening of a Charming Charlie branded store in the Leased Premises, including, but not limited to, painting, wiring, contractor's fees, lighting, furniture, trade fixtures (both movable and permanently affixed), signage, equipment and improvements to the Leased Premises. Tenant represents and warrants that no portion of the Construction Allowance shall be used for the personal use of any officer, agent, or employee of Tenant or for any use not directly related to the opening of a Charming Charlie branded store in the Leased Premises.

1.19   Kiosk Restriction:  Notwithstanding anything to the contrary contained in this Lease, Landlord shall not at any time during the Term of this Lease permit the existence of any (a) kiosk that sells jewelry located within 75 feet of the demising walls of the Leased Premises (the "No Jewelry Kiosk Zone"), as shown on EXHIBIT "A-1" attached hereto, and (b) kiosk or permanently installed improvements (other than trees, landscaping, street lights, and any other improvements that exist within the No Kiosk Zone (defined below) as of the Commencement Date, including any substantially similar replacements of any of the foregoing) within the area (the "No Kiosk Zone"), as shown on EXHIBIT "A-1" attached hereto, that adversely impact access to or visibility of the Leased Premises. Tenant acknowleeges and agrees that portions of the No Jewlery Kiosk Zone and the No Kiosk Zone serve as a venue for public events ("Public Events") such as concerts, festivals and fairs. Landlord shall have the right to install temporary improvements in the No Jewlery Kiosk Zone and the No Kiosk Zone, in connection with Public Events, and such actions shall not constitute a violation of restrictions contained in this Reference Provision 1.19; provided that such temporary improvements during Public Events shall not materially and adversely affect the visibility of, access to or use of the Leased Premises. In the event that either of the foregoing restrictions is violated and not cured within 10 days of written notice thereof from Tenant, then so long as no uncured event of default on the part of Tenant is occurring hereunder, Rent shall abate until the obstruction that causes such violation is removed.

1.20   [Intentionally Deleted]

1.21   Options to Extend: Tenant shall have the Options to extend the Term as described in ARTICLE 61 below.

1.22   Brokers: Landlord is represented by Scott Reynolds Commercial Real Estate ("Landlord's Broker").  Tenant is represented by Shop Concepts, LLC ("Tenant's Broker").



1.23    Confidentiality: The terms, conditions, identities of the parties and all other information contained in this Lease (collectively, the "Confidential Information") shall be deemed confidential and proprietary to Landlord. Tenant shall hold the Confidential Information in strict confidence and shall not disclose any of such Confidential Information to any third party unless such disclosure is (i) required by law; or (ii) to Tenant's brokers, agents, representatives, employees, contractors, successors or assigns (each a "Tenant Entity"), and is reasonably required in connection with the negotiation, execution or performance of this Lease, and such Tenant Entity agrees to be similarly bound by the foregoing covenant of confidentiality.  Tenant acknowledges and agrees that any breach of the promises contained in this Reference Provision 1.23 by Tenant or any Tenant Entity shall be deemed a breach of the Lease, beyond any and all applicable notice and cure periods provided for in this Lease, and that all remedies at law or equity will be available to Landlord for any such breach.

References to articles are for convenience and designate some of the other provisions where references to the particular Reference Provisions appear.  If there is a conflict between a Reference Provision and the other provisions of this Lease, the Reference Provision shall control.



## ARTICLE 1 - Leased Premises, Term and Use

(a)      Landlord leases to Tenant and Tenant takes from Landlord in consideration of the covenants and agreements in this Lease, the premises ("Leased Premises") being that portion of the building measured to the center of common walls and the outside faces of exterior walls, on the drawings attached to this Lease and made a part of this Lease as EXHIBIT "A". The Leased Premises shall include corridors and passageways for the exclusive use of the Leased Premises, columns, stairs, elevators and any construction or equipment located in the Leased Premises, as well as pipes, conduits, electrical wires and drainage lines that directly serve the Leased Premises. The Leased Premises are described further in the Reference Provisions. If the square footage of the Leased Premises is different than the amount set forth in Reference Provision 1.01, all rental and additional rental and amounts based upon the square footage of the Leased Premises shall be proportionately adjusted, and the Parties shall execute an amendment to this Lease memorializing the adjustments. A mezzanine shall not be permitted in the Leased Premises unless Landlord has approved same, which approval shall not be unreasonably withheld, conditioned or delayed, and shall not be permitted in Leased Premises located on an upper level. Any mezzanine approved by Landlord shall be used solely for storage of merchandise being sold at the Leased Premises or office use supporting the Leased Premises, and shall not be accessible by the general public. If Tenant constructs a mezzanine to use as a sales floor in the Leased Premises, the square footage of the Leased Premises shall be increased in an amount equal to the square footage of the mezzanine, and all rental, additional rental and amounts based upon the square footage of the Leased Premises shall be proportionately adjusted. The Parties shall execute an amendment to this Lease memorializing the adjustment. The Leased Premises are located in a Shopping Center known as "The Palladio at Broadstone" as generally shown on EXHIBIT "B". The Shopping Center includes all buildings, land, improvements, additions, extensions and deletions which may be made from time to time, and may include adjacent parcels of land not owned, leased or controlled by Landlord but which are operated as an integral part of the Shopping Center.

EXHIBITS "A" and "B" are for informational purposes only, and are not a warranty, representation or agreement that the Leased Premises, Shopping Center or other areas will be as shown on the Exhibits, or that other occupants if shown on the Exhibits will be in the Shopping Center. Tenant has not been granted any easements of light, air or access. Tenant's rights are limited to the use and occupancy of the Leased Premises and the license to use the Joint Use Areas as they may exist from time to time, all subject to the terms, covenants, conditions and provisions of this Lease.

Notwithstanding anything herein contained to the contrary, within one hundred eighty (180) days after the Beginning Work Date, Tenant may have the gross leasable area of the Leased Premises remeasured by Tenant's architect or general contractor in accordance with this Lease, including the definition of gross leasable area. Tenant shall give Landlord written notice of such remeasurement. If Landlord disagrees with Tenant's remeasurement, Landlord and Tenant shall mutually agree on the selection of an engineer or architect who will make a final determination thereof. The cost of such engineer or architect shall be shared equally by Landlord and Tenant. If such remeasurement reveals that the gross leasable area of the Leased Premises is less than that specified in Reference Provision 1.01, then any amounts set forth in this Lease that are directly calculated as a function of the square footage of the Leased Premises, shall be adjusted on the basis of such remeasurement. The parties hereto shall promptly execute a supplemental instrument evidencing the revised amounts. The gross leasable area of the Leased Premises stated in Reference Provision 1.01 is Landlord's good faith calculation of the actual gross leasable area of the Leased Premises, and Tenant has relied upon such calculation in negotiating the financial components of this Lease. Therefore, there shall be no adjustment to Rent if such remeasurement reveals that the actual gross leasable area of the Leased Premises is greater than that specified Reference Provision 1.01. If Tenant made any payments to Landlord prior to final determination of the actual gross leasable area of the Leased Premises, Landlord shall promptly return any overpayment, retroactive to the Rental Commencement Date.

(b)      The term of this Lease ("Term") shall begin on the Rental Commencement Date and end on the Expiration Date in the Reference Provisions; provided, however, if Tenant has the right to exercise and does timely exercise any of the Options in accordance with the terms of this Lease, including, but not limited to ARTICLE 61(b), then the Term shall include the applicable Option Period and shall expire on the last day thereof.

(c)      The Leased Premises shall be used and occupied only for the Permitted Use in the Reference Provisions, and for no other use or purpose whatsoever. Unless specifically noted in the Reference Provisions, Tenant does not have exclusive rights to sell any particular merchandise or provide any particular services in the Shopping Center.



### ARTICLE 2 - Original Construction

(a)     Subject to Article 17(b), Landlord may make changes, reductions and additions without restriction in the Shopping Center (including all Joint Use Areas [as that term is defined in ARTICLE 17 below] and all buildings and other improvements), whether the changes are requested by other tenants or deemed reasonably desirable by Landlord, including, without limitation, the development and use of certain of the Joint Use Areas as multi-story parking areas or the development thereon of a mixed or single use hotel, residential, office and/or retail building in the Joint Use Areas.

(b)     Intentionally omitted.

(c)     The Leased Premises shall be delivered to Tenant in their "AS-IS, WHERE-IS" condition, and Landlord shall have no obligation to make any improvements or repairs the Leased Premises, except as otherwise expressly provided in this Lease. Except as otherwise expressly provided in this Lease, all work on the Leased Premises required for Tenant to open for business shall be done by Tenant, at Tenant's expense ("Tenant's Work") and in accordance with the Tenant Criteria Manual (a copy of which Tenant acknowledges it has received prior to the Commencement Date), EXHIBIT "C-L" and EXHIBIT "L-W". All signs shall be installed by Tenant and shall be of such character, design, size and at such locations as Landlord may approve, which approval shall not be unreasonably withheld, conditioned or delayed, and shall comply with the Tenant Signage Criteria Manual approved by the City of Folsom on June 15, 2011, as amended.

(d)     Approval of the plans and specifications by Landlord shall not create any responsibility by Landlord for their accuracy, sufficiency or compliance with laws or rules and regulations. Tenant shall be solely responsible for the plans and specifications. When Landlord has approved Tenant's plans and specifications, Landlord shall return one set of approved plans to Tenant. Such approved plans shall show the date of Landlord's approval and shall be made a part of this Lease as EXHIBIT "P", whether or not physically attached hereto. Tenant agrees not to begin Tenant's Work until Landlord has approved the plans and specifications, which approval shall not be unreasonably withheld, conditioned or delayed.

(e)     Tenant shall begin Tenant's Work by the Beginning Work Date specified in the Reference Provisions, proceed with it diligently and complete it in strict accordance with EXHIBIT "P". Upon completion of Tenant's Work, Tenant shall provide a certificate furnished by Tenant's contractor, in a form satisfactory to Landlord, stating that no asbestos-containing materials or other Hazardous Materials as defined in ARTICLE 15 were used in the construction of the Leased Premises. Tenant shall complete the installation of its fixtures, trade fixtures, improvements, equipment, stock and inventory no later than the Opening Date.

NOTWITHSTANDING ANYTHING CONTAINED IN THIS LEASE TO THE CONTRARY, SUBJECT TO FORCE MAJEURE, TENANT IS REQUIRED TO OPEN FOR BUSINESS TO THE PUBLIC IN THE LEASED PREMISES ON OR BEFORE THE OPENING DATE SPECIFIED IN THE REFERENCE PROVISIONS.

If Tenant has not completed Tenant's Work and opened its store for business to the public within thirty (30) days following the Opening Date, Landlord shall be entitled to declare the same a default, beyond any and all applicable notice and cure periods provided for in this Lease.

### ARTICLE 3 - Rental Commencement Date

The rental payments shall begin to accrue on the date ("Rental Commencement Date") that is the earlier to occur of: (a) the Opening Date; and (b) the date that Tenant opens for business to the public from the Leased Premises. Within thirty (30) days after the Rental Commencement Date, Tenant shall execute a written statement in the form attached hereto as EXHIBIT "Q" (the "Lease Confirmation Certificate"), setting forth (i) the Rental Commencement Date and the Expiration Date of the initial Term; and (ii) the other matters referenced in such Lease Confirmation Certificate. The enforceability of this Lease shall not be affected if Tenant fails or refuses to execute such Lease Confirmation Certificate.



Notwithstanding anything in this Lease contained to the contrary, if the Opening Date falls between November 15th and March 1st ("Tenant's Blackout Period") Tenant, at Tenant's sole discretion, may elect to postpone the Opening Date to a date no later than the March 1st first occurring after the Beginning Work Date. In the event Tenant elects to open during the Tenant's Blackout Period, Tenant shall pay all Rent due under the Lease.

### ARTICLE 4 - Rental

Tenant shall pay Landlord as rental for the use and occupancy of the Leased Premises, at the times and in the manner provided, the following sums of money per annum without deduction, counterclaim or set-off, except as specifically provided for in the Lease, and without prior demand:

(a)     MINIMUM ANNUAL RENTAL: The Minimum Annual Rental shall be payable in 12 equal monthly installments in advance, upon the 1st day of each and every month during the periods of time specified in the Reference Provisions.

Tenant's failure to pay all rental, additional rental, and other sums due Landlord under this Lease within ten (10) days following Tenant's receipt of written notice from Landlord thereof, shall bear interest from the due date until paid by Tenant, at the rate of 2% above the Prime Rate (as defined below), not to exceed the maximum rate of interest allowed by law in the state where the Shopping Center is located (the "Interest Rate"). The interest shall be deemed to be additional rental. All rental provided for in this Lease shall be paid to Landlord at the address in the Reference Provisions or to another payee or address that Landlord designates, upon prior written notice to Tenant. Notwithstanding the foregoing, unpaid amounts shall not bear interest until Landlord has provided Tenant with two (2) notices of failure to receive payment in any consecutive 12-month period, and following the delivery of such second notice of failure to receive payment, interest shall be payable for all unpaid amounts from the original due date, including unpaid amounts then in existence at the time of delivery of such second notice, and any unpaid amounts that later come into existence.

"Prime Rate" wherever it appears in the Lease means the prime rate (or base rate) reported in the Money Rates column or section of The Wall Street Journal as being the base rate on corporate loans at large U.S. money center commercial banks (whether or not that rate has been charged by any bank). If The Wall Street Journal ceases publication of the prime rate, Prime Rate shall mean the highest rate charged by Bank of America (or its successor) on short term unsecured loans to its most creditworthy large corporate borrowers. If The Wall Street Journal (i) publishes more than one prime rate or base rate, the higher or highest of the rates shall apply, or (ii) publishes a retraction or correction of that rate, the rate reported in that retraction or correction shall apply.

(b)     PERCENTAGE RENTAL: Tenant shall pay Landlord as "Percentage Rental" at the times and in the manner provided below, an amount equal to the Percentage Rate of all Net Sales (defined in ARTICLE 5) in excess of the Annual Sales Base specified in the Reference Provisions. With respect to each calendar year from and after the Rental Commencement Date, Percentage Rental shall be paid beginning in the month immediately following the month in which the Net Sales for such calendar year shall exceed the Annual Sales Base. Thereafter, Percentage Rental shall be paid on all additional Net Sales made during the remainder of that calendar year (or partial calendar year, as the case may be). Payments shall be made no later than the thirtieth (30th) day of the next following month, except that payments for Net Sales in January shall be made on or before the twenty-eighth (28th) day of the immediately following February. The Annual Sales Base shall be prorated for any partial calendar year upon the basis of 1/12th for each full month of the partial calendar year, plus an amount equal to 1/360ths for each day if the Rental Commencement Date is other than the first day of the month. Each calendar year shall be considered as an independent accounting period for the purpose of computing the amount of Percentage Rental due. The amount of Net Sales of any calendar year shall not be carried over into any other calendar year.

(c)     Solely for purposes of determining the amount of Option Period 1 Rental, if Tenant has not continuously and without interruption conducted its business from the first day of Month 49 through the last day of Month 60, then with respect to any calendar month during such period in which Tenant has not continuously and without interruption conducted its business, Percentage Rental payable for any such calendar month shall equal the Percentage Rate based upon the greater of: (i) actual Net Sales during that calendar month; or (ii) the Net Sales achieved during the same calendar month during the Term in the prior calendar year.



(d)     Intentionally deleted.

(e)     Intentionally omitted.

(f)     In addition to Minimum Annual Rental, Tenant shall pay, as additional rental, all sums of money required to be paid pursuant to ARTICLE 4(b) (Percentage Rental), 7 (Taxes), 16 (Utility Services), 17 (Joint Use Areas and Operating Expenses), 19 (Insurance), and all other sums of money or charges required to be paid by Tenant under this Lease (collectively referred to in this Lease as "additional rental"). All amounts shall be paid to Landlord's Payment Address as shown in Reference Provision 1.10. If the amounts or charges are not paid at the time provided in this Lease, they shall nevertheless be collectible as additional rental with the next installment of Minimum Annual Rental falling due, but nothing in this Lease shall be deemed to suspend or delay the payment of any amount of money or charge at the time it becomes due and payable or to limit any other remedy of Landlord. All amounts of Minimum Annual Rental, Percentage Rental and additional rental payable in a given month (also collectively referred to in this Lease as "rent" or "rental") shall be deemed to be a single rental obligation, and shall survive the expiration of the Term or the earlier termination of this Lease. Any payment by Tenant or acceptance by Landlord of a lesser amount than shall be due from Tenant to Landlord at the time of such payment shall be treated as a payment on account. The acceptance by Landlord of a check for a lesser amount with an endorsement or statement thereon, or any letter accompanying such check stating that such lesser amount is payment in full shall be given no effect, and Landlord may accept such check on account without prejudice to any other rights or remedies which Landlord may have against Tenant.

## ARTICLE 5 - Definition of Net Sales

"Net Sales" means the gross selling price of all merchandise or services sold or rented in or from the Leased Premises by Tenant, its subtenants, licensees and concessionaires, whether for cash or on credit or by the redemption of a gift certificate, gift card or other similar voucher, excluding therefrom the following: (1) sums collected at the Leased Premises for any sales, use, luxury or excise tax, or any other tax, collected from customers by Tenant or any subtenant, licensee or concessionaires; (2) the exchange or transfer of merchandise between the Leased Premises and other stores or warehouses of Tenant, between stores or warehouses of any subtenant, licensee or concessionaire, or between stores or warehouses of Tenant or any subtenant, licensee or concessionaire and stores or warehouses of their respective Affiliates (including any parent, subsidiary or controlling corporation) (as such term is defined in ARTICLE 21 below), when such exchange is made solely for the convenient operation of the business of Tenant or such subtenant, licensee, concessionaire or their respective Affiliate and not for the purpose of consummating a sale at, in, from or upon the Leased Premises; (3) returns of merchandise at the Leased Premises to suppliers, manufacturers, wholesalers or distributors, for credit; (4) cash or credit refunds transacted at the Leased Premises; (5) proceeds from sales of fixtures or equipment at the Leased Premises which are not a part of the stock in trade of Tenant or any subtenant, licensee or concessionaire; (6) any sale at the Leased Premises at a discount pursuant to the employee discount program of Tenant or its Affiliates or concessionaires, to the extent that such sales do not exceed three percent (3%) of the total Net Sales in any calendar year; (7) proceeds of vending machines accessible by employees only and proceeds of pay telephones; (8) interest or carrying charges on any merchandise or services sold or rented at the Leased Premises, (9) uncollectible credit accounts and checks for merchandise or services sold or rented at the Leased Premises; (10) fees paid to third-party charge card and credit-debit card issuers or servicers and for check, debit or charge authorization fees in connection with merchandise or services sold or rented at the Leased Premises; (11) bulk sales of inventory at the Leased Premises not in the regular course of business; (12) proceeds of sales of gift certificates, gift cards or similar vouchers, until such time as the same has been converted into a sale by redemption at the Leased Premises; (13) [deleted]; (14) any penalties or charges imposed by Tenant on its customers for return checks in connection with merchandise or services sold or rented at the Leased Premises; (15) sums and credits received in the settlement of claims for losses of or damage to merchandise at the Leased Premises; (16) returns from customers at the Leased Premises; (17) layaways in connection with merchandise or services sold or rented at the Leased Premises until the sale is complete; (18) postage, parcel post freight, express or other delivery charges; (19) [deleted]; (20) catalog sales and internet sales; and (21) merchandise that is not in stock at the Leased Premises but is shipped to a customer from another store if such transaction is credited as a sale at such other store.

### ARTICLE 6 - Records and Audits

Tenant agrees to deliver to Landlord a statement of each month's Net Sales on or before the 30th day of the following month, and by March 31 of each calendar year of the Term an annual statement certified by a Certified Public Accountant or by a financial officer, owner or partner of Tenant, of the Net Sales made during the preceding calendar year. If the Term expires or is terminated on a date other than December 31, then a like statement for the partial calendar year in which expiration or termination occurs shall be delivered within 90 days after expiration or termination, which obligation shall survive the expiration or earlier termination of this Lease. For at least twenty-four (24) months after Tenant's delivery to Landlord of its final reconciliation statement of Net Sales for any calendar year, including any partial calendar year, Tenant shall keep and maintain in the main financial office of Tenant within the United States (and Tenant shall cause all subtenants, concessionaires and licensees to keep and maintain in their respective main offices) full and accurate books of account and records from which the Net Sales can be determined. Landlord shall have the right from time to time at such office, upon fourteen (14) days written notice, no more than once in every twelve (12) month period, and not during the period from November 1st through March 31st, during such twenty-four (24) month period to inspect and audit all such books and records relating to Tenant's Net Sales. If any such inspection and audit discloses that the Net Sales were understated, then, subject to rebuttal by Tenant, Tenant shall forthwith pay to Landlord any additional Percentage Rental shown to be payable, and if the Net Sales for any calendar year or Partial Year were understated by more than five percent (5%) and resulted in an underpayment of Percentage Rental, Tenant shall also pay the reasonable cost of Landlord's inspection and audit. Landlord does not in any way, or for any purpose, become a partner or joint venturer with Tenant hereunder and Landlord shall have no voice or interest in Tenant's business. The parties hereto understand and agree that Tenant has made no representations nor promises of any kind with respect to whether or not Percentage Rental will be paid during any year of the term hereof, nor has Tenant warranted any amount of expected amounts with respect to, or the occurrence of, any Net Sales in the Leased Premises. Nothing contained herein shall be deemed to create, constitute or imply any obligation or duty upon Tenant to operate or conduct business operations of any type whatsoever upon the Leased Premises. Landlord agrees that all statements of Net Sales furnished to it under this Lease, if any, and any information obtained by Landlord as the result of an audit of Tenant's Net Sales as permitted hereunder, shall be held in strict confidence by Landlord and shall not be divulged by Landlord to any person or used for any purpose, except that Landlord shall be permitted to divulge such information (1) when necessary in connection with any bona fide prospective sale of the Leased Premises, (2) when necessary in connection with the trial of any action, proceeding or arbitration between Landlord and Tenant, (3) to any mortgagee or prospective mortgagee of the Leased Premises, (4) pursuant to a subpoena duly and validly served upon Landlord, and (5) in connection with any inquiry by Landlord to investigate a bona fide claim that Tenant has violated any of the use restrictions set forth on EXHIBIT "D" hereto.

### ARTICLE 7 - Taxes

(a)        Intentionally omitted.

(b)        Notwithstanding anything to the contrary in this ARTICLE 7 or elsewhere in this Lease, any excise, transaction, sales or privilege tax (except income, transfer, estate or inheritance tax) imposed upon Landlord on account of, attributed to, or measured by rental or other charges payable by Tenant shall be paid by Tenant to Landlord.

### ARTICLE 8 - Subordination and Attornment

(a)        Tenant's rights shall be subordinate to the interest of any ground lessor and to the lien of any mortgage or deed of trust in force or later placed against the Shopping Center, upon any building placed later upon the Shopping Center and to all advances made upon the security thereof. No ground lessor nor the mortgagee or beneficiary named in the mortgage or trust deed shall disturb Tenant's peaceable possession of the Leased Premises if Tenant is not in default under this Lease, beyond any and all applicable notice and cure periods provided for in this Lease. Any mortgagee or beneficiary of Landlord may, at its option, subordinate its mortgage or trust deed to this Lease. This ARTICLE 8(a) is self-operative, and no further documentation of Tenant's subordination and attornment is required; however, Tenant shall execute any reasonable subordination agreement requested by Landlord, any mortgagee or beneficiary of Landlord within thirty (30) days following Tenant's receipt of written notice from Landlord thereof.



Tenant shall accept performance of any of Landlord's obligations hereunder by any mortgagee or beneficiary of Landlord. If the lessor under any such ground lease or the holder or holders of any such mortgage or deed of trust shall advise Landlord that they desire or require this Lease to be prior and superior thereto, within thirty (30) days following Tenant's receipt of written notice of Landlord thereof, Tenant shall promptly execute, acknowledge and deliver to Landlord any and all reasonable documents or instruments which Landlord or such lessor, holder or holders deem necessary or desirable for purposes thereof.

(b)     If any proceedings are brought for foreclosure, or if the power of sale under any mortgage, deed of trust or deed to secure debt made by Landlord covering the Leased Premises is exercised, Tenant shall attorn to the purchaser upon the foreclosure or sale and recognize the purchaser as the Landlord under this Lease.

(c)     Landlord may be a party to a certain agreement or agreements with the anchors in the Shopping Center and Landlord has recorded a Declaration of Reciprocal Easements, Covenants, and Restrictions applicable to the Shopping Center (the "Agreements"), any of which may be amended from time to time, upon prior written notice to Tenant. In no event shall the Agreements prevent Tenant from using the Leased Premises for the purpose set forth in Reference Provision 1.03. This Lease shall be subject and subordinate to the Agreements and any amendments to or modifications of the Agreements, upon prior written notice to Tenant, and if requested by Landlord, Tenant shall promptly execute, acknowledge and deliver to Landlord any and all reasonable documents or instruments which Landlord deems necessary or desirable to confirm such subordination.

(d)     Intentionally omitted.

(e)     At Landlord's option, this Lease shall become subordinate to the lien of any Encumbrance placed on the Leased Premises after the date of this Lease, provided that Landlord has delivered to Tenant a recordable Non Disturbance Agreement in a mutually agreeable form typically used between Tenant and such future holder of the Encumbrance, duly executed by Landlord and the future holder of the Encumbrance.

## ARTICLE 9 - Additional Construction

Subject to ARTICLE 17(b), Landlord reserves the right at any time to make alterations or additions to, subdivide, change the building dimensions and storefront lines, build additional stories on the building in which the Leased Premises are contained or on any other building or buildings in the Shopping Center, and to build adjoining the Shopping Center. Subject to ARTICLE 17(b), Landlord also reserves the right at any time to construct other buildings, structures or improvements including, but not limited to, surface, elevated or double-deck parking facilities and to erect temporary scaffolds and other aids to construction.

## ARTICLE 10 - Condition of Premises

Except as otherwise expressly provided in this Lease, Tenant's taking possession of the Leased Premises shall be conclusive evidence of Tenant's acceptance of the Leased Premises in good order and satisfactory condition and "as-is". Except as otherwise expressly provided in this Lease, Tenant agrees that no representations about the condition of the Leased Premises, nor promises to decorate, alter, repair or improve the Leased Premises have been made by Landlord or its agents to Tenant. Tenant also agrees that no representations have been made to Tenant that any other tenants will lease space in the Shopping Center nor have any promises been made that Tenant has the exclusive right to sell any merchandise, goods or services, except to the extent expressly set forth in the Reference Provisions.

## ARTICLE 11 - Repairs and Maintenance

Except as otherwise provided in ARTICLE 15 below, Landlord shall, at its expense without reimbursement or contribution by Tenant (except to the extent permitted by this Lease), be responsible for all structural repairs to the Leased Premises, which shall include but not be limited to the exterior walls, the structural components of the foundation, and the structural components of the roof.   In addition, Landlord covenants and agrees, at its expense

without reimbursement or contribution by Tenant (except to the extent permitted by this Lease), to keep, maintain in first class condition, repair, and replace (if necessary), foundations, footings, exterior surfaces and paint, plumbing system to the point of distribution within the Leased Premises, electrical system to the point of distribution within the Leased Premises, utility lines and connections to the point of distribution within the Leased Premises, sprinkler mains and monitoring systems, if any, all structural systems, including without limitation, the roof structure, roof membrane, roof covering (for the avoidance of doubt, interior ceiling, inventory, and other personal property within the Leased Premises are Tenant's responsibility, and even if the same are damaged by leakage of the roof or roof membrance, such items shall be the responsibility of Tenant), load bearing walls, floors, slabs, and masonry walls. Landlord agrees that throughout the Term Landlord shall repair seismic, structural or latent defects in improvements installed by Landlord in the Leased Premises and the Shopping Center. Beginning on the Beginning Work Date, Tenant shall be liable for the repairs, replacements (if necessary) and maintenance of the interior, non-structural portions of the Leased Premises. Tenant shall keep the Leased Premises in good order and repair, clean, sanitary and safe. Tenant's repairs, replacements (if necessary) and maintenance obligations shall include, but not be limited to, its heating and cooling equipment exclusively serving the Leased Premises (including those portions outside of the Leased Premises such as roof top HVAC units); other equipment located within and exclusively serving the Leased Premises; trade fixtures; Tenant's alterations and improvements to the Leased Premises; floor covering; the exterior and interior portions of all doors, door locks, security gates, and windows; the storefront; plumbing and sewage facilities located within and exclusively serving the Leased Premises; interior walls; interior ceilings; and plate glass. Tenant shall be solely responsible for maintenance and repair costs related to the interior, non-structural portions of the Leased Premises. Tenant agrees to keep the interior of the Leased Premises in a clean and sightly appearance. Landlord has no obligation to do work which Landlord is not expressly required to perform under this Lease or which, under this Lease, Tenant is required to perform. The performance of that work by Landlord shall not constitute a waiver of Tenant's default. The provisions of this Lease are intended fully to govern the rights and obligations of Landlord and Tenant as they relate to the need for repairs to the Leased Premises.

The repairs required to be made under this Lease shall be completed by the responsible party as soon as is reasonably possible under the circumstances, but in any event within ten (10) days after receipt of notice from the noticing party of the need for such repair; provided, however, that if the nature of such repair is such that it cannot reasonably be completed within such 10-day period, then, upon notice to the other party, the responsible party shall have such additional time as is reasonably required to complete such repair, provided the responsible party commences to perform the repair within such 10-day period and proceeds to completion with diligence and continuity. In the event of an Emergency (as defined in ARTICLE 23 below), and only with respect to repairs that are immediately necessary for the preservation or protection of life or property, no prior notice shall be required, but either party may immediately make such repairs after diligent effort to first orally notify the on-site management of the responsible party. If the responsible party fails to make the required repairs within such period, the noticing party, in addition to any other rights it may have hereunder or at law or in equity, shall have the right to make such repairs on behalf of the responsible party (but the responsible party shall remain responsible for such work). If the noticing party undertakes such repairs, the responsible party shall reimburse the noticing party for the actual costs incurred within thirty (30) days after receipt of an invoice therefor. If Tenant fails to pay such costs within thirty (30) days after receipt of an invoice therefor, then in addition to all other rights and remedies that Landlord may have against Tenant (but without duplication in recovering the amounts due Landlord), Landlord shall be entitled to interest on the unpaid balance thereof at the Interest Rate from the date originally due. If Landlord fails to pay such costs within thirty (30) days after receipt of an invoice therefor, then in addition to all other rights and remedies that Tenant may have against Landlord (but without duplication in recovering the amounts due Tenant), Tenant shall be entitled to deduct the unpaid and overdue amount of such costs from Rent otherwise becoming due hereunder, together with interest on the unpaid balance thereof at the Interest Rate from the date originally due. Notwithstanding the foregoing, Tenant shall not have the right to make such repairs on behalf of Landlord outside of the Leased Premises. Notwithstanding the foregoing, Landlord shall not have the right to make such repairs on behalf of Tenant within the Leased Premises unless Tenant's failure to make such repairs has a material adverse physical effect on other tenants or occupants of the Shopping Center.

During the term of the Lease, Landlord shall comply with all applicable laws affecting the Premises, the Joint Use Areas, and the Shopping Center. Landlord shall be responsible for any improvements or modifications necessary in the Joint Use Area in order for the Joint Use Area to comply with all applicable laws, including, but not limited to, those which may be required in connection with or as a result of Tenant's Work or Tenant's use, provided that Tenant shall, at its sole cost and expense, promptly comply with all federal, state, county, municipal, governmental or quasi-



governmental laws, ordinances, codes, rules, regulations, directives, orders, and/or requirements, including without limitation with Americans with Disabilities Act (each an **"Applicable Law"** and collectively **"Applicable Laws"**) now in force or which may hereafter be in force with respect to the Premises due specifically to Tenant's use and occupancy of the Premises and Tenant's business conducted thereon. Tenant shall also be responsible for complying with Applicable Laws to the extent required only with respect to the improvements to the Premises and changes thereto constructed by Tenant. Tenant shall not be required to make any seismic or structural upgrades, repairs, improvements, or alterations to the Premises or the Shopping Center in order to comply with the requirements of this Section.

## ARTICLE 12 - Alterations

Except for any non-structural alterations that only impact the interior of the Leased Premises and that in the aggregate do not exceed a cumulative cost of more than $50,000 in any calendar year, Tenant shall not make any structural, electrical, plumbing, storefront, exterior, major interior or mechanical alterations to the Leased Premises without obtaining the written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. Tenant shall not interfere with any work in the Shopping Center, and shall not cause the closing, interruption or impairment of Tenant's normal conduct of business. All alterations, additions, improvements and Tenant's Work shall become, upon expiration of the Term, or the earlier termination of this Lease, the property of Landlord without any payment by Landlord. All such work by Tenant shall be made under the supervision of a competent architect or competent licensed structural engineer and shall be in accordance with plans and specifications approved in writing by Landlord before the start of the work. Landlord's approval of Tenant's plans and specifications shall not create a responsibility or liability of Landlord for their accuracy, sufficiency or compliance with laws or rules and regulations. Whenever Landlord's consent is required for any Tenant work, accompanying Tenant's written request for same, Tenant shall provide to Landlord all plans and specifications related to such Work. Tenant acknowledges that Landlord's review of the plans is for the sole benefit of Landlord, and Landlord's approval does not constitute any representation by Landlord as to the compliance of such plans with any law or fitness of such alterations for a particular purpose or use. Without limiting the generality of the foregoing, Tenant hereby covenants that, before commencing any Tenant work, Tenant shall: (i) give Landlord at least fifteen (15) business days' written notice of the proposed commencement of such work (to afford Landlord an opportunity to post appropriate notices of non-responsibility); (ii) [intentionally omitted]; and (iii) furnish Landlord with properly executed certificates of insurance in accordance with this Lease, evidencing the types and amounts of insurance coverage required to be carried by Tenant's general contractor for the benefit of the Landlord and Tenant. Tenant covenants and agrees that all alterations done by or pursuant to the direction of Tenant shall be performed expeditiously, in a good and workmanlike manner, in accordance with any plans and specifications related to such alterations that were approved by Landlord, subject to Article 15(a), in full compliance with all laws, rules, orders, ordinances, directions, regulations and requirements of all governmental agencies, offices, departments, bureaus and boards having jurisdiction. The work shall be in accordance with necessary governmental approvals and permits. Tenant shall obtain approvals and permits at its sole expense. The work shall be done in a good and workmanlike manner and diligently prosecuted to completion. The Leased Premises shall at all times be a complete unit except during the performance of work. Tenant shall have the right to select the contractors and subcontractors of its choice for Tenant's work, including alterations, and Landlord shall have no right to review or approve Tenant's contractors or subcontractors. Tenant and Tenant's agents (including its general contractor and subcontractors) shall not be required to post any type of security or performance bond or other security in connection with alterations or other work at the Shopping Center. Tenant and Tenant's agents shall not be required to pay or reimburse Landlord or Landlord's agents for any backcharges, fees, expenses or other costs in connection with the review or approval of Tenant's work, including alterations, or any plans relating thereto.

## ARTICLE 13 - Fixtures and Personal Property

(a)     Trade fixtures, signs and other personal property of Tenant not permanently affixed to the Leased Premises shall remain the property of Tenant. Tenant shall have the right to remove its trade fixtures, signs and other personal property. Tenant shall not however, during the Term, render the Leased Premises unsuitable for conducting the type of business specified in <u>Reference Provision 1.03</u> by removing personal property unless Tenant immediately replaces it with personal property of comparable or better quality. Tenant, at its expense, shall repair damage to the Leased Premises caused by the removal of such trade fixtures, signs and other personal property, reasonable wear and tear



and damage by casualty excepted. All trade fixtures, signs, and other personal property installed in or to the Leased Premises by Tenant must be new or like new when installed or attached.

(b)     Whenever Landlord shall re-enter the Leased Premises as provided in this Lease, any personal property of Tenant (or any person claiming through or under Tenant) not removed by Tenant (or such person claiming through or under Tenant) within ten (10) days following the expiration of the Term of this Lease shall be considered abandoned. Landlord shall give Tenant whatever notice may legally be required of its right to reclaim any abandoned property (currently, California Civil Code Section 1993, et seq.) and, thereafter, Landlord may remove any or all of such items and dispose of the same in any manner or store the same in a public warehouse or elsewhere for the account and at the expense and risk of Tenant.

(c)     Tenant shall pay before delinquency all taxes, assessments, license fees and public charges levied, assessed or imposed upon its business operation in the Leased Premises as well as upon its trade fixtures, leasehold improvements (including but not limited to merchandise and other personal property in, on or upon the Leased Premises). If Tenant's property is assessed with Landlord's property, the assessment shall be equitably divided between Landlord and Tenant. Landlord shall determine the basis of prorating the assessments and that determination shall be binding. No taxes, assessments, fees or charges referred to in this ARTICLE 13 shall be considered taxes under ARTICLE 7. Tenant's obligation to perform the provisions of this ARTICLE 13 shall survive the Expiration Date or the earlier termination of this Lease.

## ARTICLE 14 - Liens

Tenant shall not permit a lien or claim to attach to the Leased Premises and shall promptly cause the lien or claim to be released. If Tenant contests the lien or claim, Tenant shall indemnify, defend, protect, and hold Landlord harmless from all costs, liabilities and expenses (including without limitation, reasonable and actual attorneys' fees and costs) arising in connection with the creation, existence, contest, and removal of such lien, and, if requested, deposit with Landlord a cash or surety bond in a form and with a company satisfactory to Landlord in an amount equal to twice the amount of the contested lien or claim. If Tenant shall fail to cause a lien to be discharged or bonded, within thirty (30) days after being notified of the filing of the lien, in addition to any other right or remedy, Landlord may discharge the lien by paying the amount claimed to be due. The amount paid by Landlord, including reasonable and actual attorneys' fees incurred by Landlord, shall be due and payable by Tenant to Landlord as additional rental on the 1st day of the next following month. Tenant shall immediately give Landlord written notice of the recording of a lien against the Leased Premises or the Shopping Center arising out of work done by or at the direction of Tenant.

## ARTICLE 15 - Laws and Ordinances

(a)     Tenant shall, at its sole cost and expense, obtain and maintain all permits, authorizations and approvals from all governmental and quasi-governmental authorities necessary to construct and operate Tenant's business on the Leased Premises. Tenant shall comply with all laws, ordinances, codes, orders and regulations affecting the construction, use, occupancy, alteration, cleanliness, safety and operation of the Leased Premises, which are in force now or later. Tenant shall comply with the regulations, requirements and recommendations of any insurance underwriter, inspection bureau or similar agency. Tenant shall notify Landlord if Tenant has received notice of, or has knowledge of any condition or occurrence that might result in liability to Landlord. Tenant shall give Landlord, upon Landlord's request, information regarding the environmental condition of the Leased Premises so Landlord can determine if Landlord must comply with any rule, regulation, order, act, law or statute pertaining to the environmental condition of the Leased Premises or the Shopping Center, and for Landlord to accurately complete a form or otherwise provide information required under any rule, regulation, order, act, law or statute. Tenant shall permit Landlord to comply with those recommendations and requirements. In addition, Tenant agrees to comply, to the extent that the same may be applicable to the Leased Premises and as same may be amended from time to time, with the standards and requirements of the Williams-Steiger Act (PL91-596), known as the "Occupational Safety and Health Act of 1970," notwithstanding the fact that Tenant may otherwise be exempted from the provisions of said Act, and the Americans with Disabilities Act of 1990. Tenant shall make its energy use information at the Leased Premises available to Landlord and shall provide any other information that Landlord shall reasonably require in order to make energy use disclosures required by any applicable law. Pursuant to California Civil Code Section 1938, Landlord

Charming Charlie Lease v7                              9                                          

hereby discloses, and Tenant hereby acknowledges, that the Leased Premises have not been inspected by a Certified Access Specialist ("CASp"). California Civil Code Section 1938 also requires that this Lease contain the following statement:

"A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of the construction-related accessibility standards within the premises."

In accordance with the foregoing, Tenant, upon at least 30 days' prior written notice to Landlord, shall have the right to require a CASp inspection of the Leased Premises. If Tenant requires a CASp inspection of the Leased Premises, then: (i) Landlord and Tenant shall mutually agree on the arrangements for the time and manner of the CASp inspection during such 30-day period; provided, however, that Landlord shall have the right to be present during such CASp inspection; (ii) Tenant shall be solely responsible to pay the cost of the CASp inspection as and when required by the CASp and to deliver to Landlord a copy of the findings of such CASp inspection, including, any reports issued as a result of the CASp inspection; and (iii) Tenant shall pay to Landlord, as and when required by Landlord, the cost of making any repairs to correct violations of the construction-related accessibility standards within or relating to the Leased Premises, or at Landlord's option, Tenant shall make at Tenant's sole cost and expense any repairs to correct violations of the construction related accessibility standards within or relating to the Leased Premises. Any CASp inspection report obtained by or provided to Tenant shall be confidential, and Tenant shall not disclose such report, or findings in the report, to any other party without the prior written consent of Landlord, which may be withheld in Landlord's reasonable discretion, except to the extent such disclosure is required to such other parties on a need to know basis only for Tenant to complete repairs and corrections of violations of construction-related accessibility standards that Tenant is required to make.

For the avoidance of doubt, Tenant shall be responsible for complying with all Legal Requirements within the Leased Premises that are Tenant Generated, whether structural or nonstructural. "Legal Requirements" means all applicable current or future statutes, ordinances, orders, rules, regulations, judgments and requirements of public authorities with jurisdiction. "Tenant Generated" means that the Legal Requirement was made necessary by any act or work performed by Tenant or Tenant's agents or by the particular nature of Tenant's use (i.e. "apparel sales" as distinguished from "general retail") or by the particular manner in which Tenant conducts its permitted use, an omission of Tenant or a default by Tenant of any of the terms of this Lease. Tenant shall have the right to contest the validity of any Legal Requirement at the expense of the party responsible for compliance, unless such contest would result in any criminal liability imposed upon the other party.

(b)     Tenant shall not: (i) permit an immoral practice in the Leased Premises; (ii) use or allow the Leased Premises to be used or occupied in a manner that might invalidate or increase the rate of or make inoperative an insurance policy carried on the Leased Premises or on property, buildings or improvements in the Shopping Center; (iii) keep, use or permit in the Leased Premises inflammable fluids or explosives without the prior written permission of Landlord, or engage in hazardous activities; (iv) use the Leased Premises for a purpose which might create a nuisance or injure the reputation of the Leased Premises or the Shopping Center; (v) deface or injure the Leased Premises or any portion of the Shopping Center; (vi) overload the floors; (vii) commit or suffer waste; (viii) install electrical equipment that overloads lines; or (ix) conduct any sampling, testing, or drilling to locate any Hazardous Material without Landlord's prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed. Tenant shall, within thirty (30) days following Tenant's receipt of written notice from Landlord thereof, reimburse Landlord its proportionate share for extra premiums caused by Tenant's use or occupancy of the Leased Premises, whether or not Landlord has consented to the use and occupancy. If and for so long as Tenant is conducting only the business specifically authorized herein, Landlord agrees that Tenant's business operations in the Leased Premises shall not, in and of themselves, be grounds for requiring Tenant to pay its share of any increase in Landlord's insurance rates referred to above, provided such business activities are not hazardous or result in an undue accumulation of waste or trash within the Leased Premises, or otherwise violate the terms of this Lease.



(c)     Tenant shall not have a claim against Landlord, and Landlord shall not be liable for damages, demands, expenses, fees, fines, penalties, suits, proceedings, claims, actions and causes of action arising out of or in any way connected with Tenant's use or occupancy of the Leased Premises, if the use or occupancy is prohibited or substantially impaired by any law, ordinance, regulation or by legal, governmental or other public authority.

(d)     Tenant shall not cause or permit any Hazardous Material (defined below) to be brought upon, transported through, stored, kept, used, discharged or disposed in or about the Leased Premises or the Shopping Center (collectively "Property") by Tenant, its agents, employees or contractors. Tenant shall notify Landlord as soon as reasonably possible of the presence of or disposal of Hazardous Material on or near the Leased Premises, and of any notice by a party alleging the presence of Hazardous Material on or near the Leased Premises. However, Hazardous Materials brought upon, transported, used, kept or stored in or about the Property which is necessary for Tenant to operate its business for the use permitted under Reference Provision 1.03 of this Lease shall be brought upon, transported, used, kept and stored only in the quantities necessary for the usual and customary operation of Tenant's business and in a manner that complies with: (i) all laws, rules, regulations, ordinances, codes or any other governmental restriction or requirement of all federal, state and local governmental authorities having jurisdiction and regulating the Hazardous Material; (ii) permits (which Tenant shall obtain prior to bringing the Hazardous Material in, on or about the Property) issued for the Hazardous Material; and (iii) all producers' and manufacturers' instructions and recommendations, to the extent they are stricter than laws, rules, regulations, ordinances, codes or permits. If Tenant, its agents, employees or contractors, in any way breaches the obligations in the preceding sentence; or if the presence of Hazardous Material on the Property caused or permitted by Tenant results in the release or threatened release of Hazardous Material on, from or under the Property; or if the presence on, from or under the Property of Hazardous Material otherwise arises out of the operation of Tenant's business then, without limitation of any other rights or remedies available to Landlord under this Lease or at law or in equity, Tenant shall indemnify, defend, protect and hold harmless Landlord (and Landlord's parents, subsidiaries, affiliates, employees, partners, agents, mortgagees or successors to Landlord's interest in the Leased Premises) (collectively "Indemnity") from any and all claims, sums paid in settlement of claims, judgments, damages, clean-up costs, penalties, fines, costs, liabilities, losses or expenses (including, without limitation, reasonable and actual attorneys', consultants' and experts' fees and any fees by Landlord to enforce the Indemnity) which arise during or after the Term as a result of Tenant's breach of the obligations or the release or contamination of the Property, including, without limitation: diminution in value of the Property; damages for the loss of, or the restriction on the use of, rentable or usable space or any amenity of the Property; damages arising from any adverse impact on the sale or lease of the Property; and damage and diminution in value to the Property or other properties, whether owned by Landlord or by third parties. This Indemnity includes, without limitation, costs incurred in connection with any investigation of site conditions or any clean-up, remedial, removal or restoration work required by any federal, state or local governmental agency or political subdivision because of Hazardous Material present in the soil or groundwater on, under or originating from the Property. Without limiting the foregoing, if the presence of Hazardous Material on the Property caused or permitted by Tenant results in the contamination, release or threatened release of Hazardous Material on, from or under the Property or other properties, Tenant shall promptly take all actions at its sole cost and expense which are necessary to return the Property and other properties to the condition existing prior to the introduction of the Hazardous Material; provided that Landlord's written approval of the actions shall be obtained first (which approval shall not be unreasonably withheld, conditioned or delayed) and so long as such actions do not have or would not potentially have any material, adverse long-term or short-term effect on Landlord or on the Property or other properties. This Indemnity shall survive the Expiration Date or earlier termination of this Lease and shall survive any transfer of Landlord's interest in the Property. "Hazardous Material" means any hazardous, radioactive or toxic substance, toxic molds & bio toxins, material or waste, including, but not limited to, those substances, materials and wastes (whether or not mixed, commingled or otherwise combined with other substances, materials or wastes) listed in the United States Department of Transportation Hazardous Materials Table (49 CFR 172.101) or by the Environmental Protection Agency as hazardous substances (40 CFR Part 302) and amendments thereto, or substances, materials and wastes which are or become regulated under any applicable local, state or federal law including, without limitation, any material, waste or substance which is (i) a petroleum product, crude oil or any fraction thereof, (ii) asbestos, (iii) polychlorinated biphenyls, (iv) designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act, 33 U.S.C. Section 1251, et seq. (33 U.S.C. Section 1321) or listed pursuant to Section 307 of the Clean Water Act (33 U.S.C. Section 1317), (v) defined as a "hazardous waste" pursuant to Section 1004 of the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq. (42 U.S.C. Section 6903) or (vi) defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. Section 9601, et seq. (42 U.S.C. Section 9601), as all of the foregoing may be amended from time to time.



Notwithstanding anything in this Lease contained to the contrary, Landlord represents and warrants that, to the best of Landlord's knowledge, there are no Hazardous Materials present in the Joint Use Areas or the Leased Premises. Landlord represents, warrants and covenants that any Hazardous Materials in or around the Leased Premises existing prior to the Beginning Work Date shall be removed at no cost to Tenant at least fifteen (15) days prior to the Beginning Work Date. The removal of any Hazardous Materials shall be at the sole cost of Landlord, other than Hazardous Materials installed by Tenant or its contractors. The removal of any Hazardous Materials installed by Tenant or its contractors shall be at the sole cost of Tenant. Landlord and Tenant agree that neither Landlord nor Tenant shall cause any Hazardous Materials to exist on, or to escape, seep, leak, spill or be discharged, emitted or released from the Shopping Center during the Term in violation of any applicable Legal Requirements.

Tenant shall have the right, prior to taking possession of the Leased Premises, to perform inspections and otherwise test for the presence of Hazardous Materials in the Leased Premises. If Hazardous Materials are discovered in the Joint Use Areas or the Leased Premises, and such Hazardous Materials were not placed therein by Tenant or Tenant's agents, then Landlord shall, at its sole cost and expense, promptly remove the Hazardous Materials from the Leased Premises, and to the extent required by applicable law remove the Hazardous Substances from the Joint Use Areas and, with respect to any removal of Hazardous Substances from the Leased Premises, deliver to Tenant (1) a certificate from a state certified asbestos consultant or state licensed industrial hygienist certifying as to the removal thereof, and (2) a clean air certificate from a state certified asbestos consultant or state licensed industrial hygienist certifying that the ambient air in the Leased Premises is within all applicable regulatory levels for use without protective measures, and repair or replace all improvements damaged thereby (the "Environmental Remediation"). Rent shall equitably abate to the extent that the Leased Premises cannot be used, in Tenant's reasonable business judgment. If such Hazardous Materials, Environmental Remediation or repairs interfere with the conduct by Tenant of its business to such an extent that Tenant, in the exercise of its reasonable business judgment, closes the Leased Premises for business, then Rent shall totally abate until such time that tenant can reasonably reopen the Leased Premises for business. If the Environmental Remediation is not commenced within thirty (30) days after the date (the "Notification Date") that Tenant notifies Landlord of Hazardous Materials or if the Environmental Remediation is not completed within ninety (90) days after the Notification Date (or such additional period as may reasonably be required given the nature of the work, provided that Landlord diligently pursues same to completion), then Tenant shall have the right to terminate this Lease by giving written notice to Landlord, which termination shall be effective ten (10) days after Landlord's receipt of the termination notice; provided, however, that Landlord may nullify such termination by completing the Environmental Remediation prior to the expiration of such 90-day period. If Tenant terminates the Lease pursuant to this paragraph, Landlord shall reimburse Tenant for the unamortized cost of Tenant's leasehold improvements, amortized on a straight-line basis over five (5) years from the date of installation.

Landlord shall indemnify, defend and hold Tenant and Tenant's agents harmless from and against any and all indemnified costs relating to any Hazardous Materials used or placed or located at the Shopping Center and any Environmental Remediation related thereto, provided that such Hazardous Materials were not placed thereon by Tenant or Tenant's agents. Landlord shall be solely responsible for and shall comply with all Legal Requirements with respect to Hazardous Materials on the Shopping Center, provided that such Hazardous Materials were not placed thereon by Tenant or Tenant's agents.

## ARTICLE 16 - Environmental Services

(a)     Tenant shall pay for all utilities used in the Leased Premises during the Term. Tenant shall, if required by Landlord or applicable code, provide and pay for its own meters for heat, air conditioning, water, gas, electricity and all other utilities, and shall pay all water and sewage charges (and all connection fees and other charges for utilities used or accessed in the Leased Premises), rentals and taxes imposed by governmental authority or otherwise. Landlord may at its election provide Tenant with or designate a third party provider to provide Tenant with any or all of the utilities used in the Leased Premises. If Landlord or its designee provides Tenant with the utilities used in the Leased Premises, Tenant shall purchase such utilities from Landlord or its designee and may not purchase such utilities from any other source. Landlord agrees, however, that the charge to Tenant for utilities furnished by Landlord shall not exceed that which Tenant would be required to pay for if Tenant purchased such utilities, with a comparable level and quality of service and equipment, directly from the local public utility company. Notwithstanding anything herein contained the contrary, Tenant shall have no obligation to use any utilities offered by Landlord, including, without limitation, electrical or data transmission services, and shall have the right to select the utility companies serving the



Leased Premises. Landlord shall be responsible for and shall pay all utility connection fees (including without limitation sewer and water connection fees), hook-up fees, tap fees, traffic impact fees, and any other extraordinary fees in connection with Tenant's initial use of and improvements to the Leased Premises, provided that Tenant shall pay any costs incurred to set up the utility accounts in Tenant's name.

(b) Heating, ventilation and air conditioning for the Leased Premises will be in accordance with <u>EXHIBIT "C-L"</u>.

(c) Tenant shall be responsible for completing the installation of the heating, ventilation and air conditioning system within the Leased Premises, as provided for in <u>EXHIBIT "C-L"</u>. Tenant, at Tenant's expense, shall maintain, repair and replace (if necessary) the heating, ventilation and air conditioning equipment which exclusively serve or are within the Leased Premises. Tenant shall enter into a service contract with a professional heating, ventilation and air conditioning service provider to maintain the same, which service shall be performed no less than quarterly. Tenant shall use best efforts to conserve energy in the operation of its heating, ventilation and air conditioning. Tenant shall upon request by Landlord supply Landlord with evidence satisfactory to Landlord that Tenant is fulfilling Tenant's obligations under <u>ARTICLE 16</u> of this Lease to maintain the heating, ventilation and air conditioning equipment within the Leased Premises.

(d) Landlord has, at its cost and expense, preinstalled a potable water distribution system and a sewer system which will provide water and sewer service to the Leased Premises in accordance with <u>EXHIBIT "C-L"</u>, and a prior occupant completed the installation of the water and sewer systems within the Leased Premises in accordance with <u>EXHIBIT "C-L"</u>.

(e) If Tenant shall require natural gas for the normal operation of Tenant's business, such utility service shall be available in accordance with <u>EXHIBIT "C-L"</u>. All natural gas service shall be arranged by Tenant and all such work shall be done in accordance with <u>EXHIBIT "C-L"</u>.

(f) Intentionally omitted.

(g) Notwithstanding anything to the contrary contained herein, if any utilities are interrupted, which interruption is attributable to the acts or omissions of Landlord, its employees or agents, and Tenant is thereby precluded from opening for business, then Tenant's obligation to pay all Rent shall abate until such time as Tenant is able to reopen for business upon the Leased Premises or the condition is remedied, whichever shall first occur.

(h) Landlord shall keep in good order and repair and shall maintain the telephone raceway and interface wiring system and shall make any necessary repairs to or replacements of such telephone raceway and/or interface wiring system (except that Landlord's obligation shall not include repair or replacement of service extensions, wiring or other telephone systems exclusively servicing the Leased Premises and that Tenant shall reimburse Landlord for any and all repairs thereto necessitated by any acts, omissions to act or negligence of Tenant or Tenant's agents, employees and contractors).

(i) Tenant agrees that garbage and refuse shall be kept in an adequate container so as not to be visible to the public, within the Leased Premises, for collection at reasonable times specified by Landlord and at Tenant's cost. In lieu and instead of the foregoing provisions of this <u>subsection (i)</u>, Landlord, or a contractor selected by the Landlord, at its option, may purchase or lease a garbage compactor for the use of tenants and occupants of the Shopping Center. If Landlord, or a contractor selected by the Landlord, purchases or leases said garbage compactor for the use of tenants in the Shopping Center, then Tenant agrees to use the same for the disposal of its garbage and refuse to the exclusion of all other garbage collection companies. Tenants shall pay monthly, in advance, the charges therefor, based upon Landlord's, or a contractor selected by Landlord, reasonable estimate of the amount of the refuse and garbage generated and the frequency of use by Tenant. Tenant shall cause its garbage and refuse to be taken to such garbage compactor within the Shopping Center; and it is understood and agreed that Tenant's monthly charge as aforementioned will not include pick-up service. The aforementioned monthly charge as reasonably estimated by Landlord, or a contractor selected by Landlord, shall be adjusted from time to time based upon the garbage generated by Tenant and/or changes in rates for refuse collection. Tenant shall store soiled or dirty linen in approved fire rating organization metal containers with self-closing fusible link covers. In addition to the foregoing, Landlord may cause the removal of all



debris, rubbish, material and equipment during the construction of Tenant's store and/or during the time preceding the initial opening date of the Shopping Center, and charge the cost thereof to Tenant as provided in EXHIBIT "C-L".

(j)     During the Term, Landlord shall keep in good order and repair and shall maintain the sprinkler system in the Leased Premises, including checking, testing and servicing thereof, and shall make any necessary repairs to or replacements of such sprinkler system except that Tenant shall pay any and all charges billed by Landlord in connection with all repairs and replacements thereto necessitated by any acts, omissions to act or negligence of Tenant or Tenant's agents, employees and contractors. All modifications to such sprinkler system that Tenant may desire shall be performed as provided in EXHIBIT "C-L". Should the utility company furnishing water to the Shopping Center levy, assess or impose upon Landlord a sprinkler system backup charge, then Tenant shall pay to Landlord its proportionate share thereof, which shall be in an amount equal to the product obtained by multiplying said charge by a fraction, the numerator of which shall be the gross leasable area of the Leased Premises and the denominator of which shall be the gross leasable area in the Shopping Center served by such sprinkler system determined as of the date such charge is billed to Tenant; and shall be paid by Tenant within 30 days after Tenant's receipt of billing by Landlord.

## ARTICLE 17 - Joint Use Areas and Operating Expenses

(a)     The "Joint Use Areas" shall consist of all parking areas, parking facilities, approaches, streets, sidewalks, driveways, loading platforms, canopies, elevators, escalators, ramps, storm drainage facilities, exits, entrances, sprinkler mains, landscaped areas, comfort stations, light facilities, computer facilities, cable facilities, telecommunications facilities, washrooms, lounges and shelters, utility lines, roofs, roadways and other facilities available for joint use or benefit designated by Landlord, as they may from time to time exist and be available to the tenants in the Shopping Center, their employees, officers, agents, customers, licensees and invitees.

(b)     Landlord shall, subject to events beyond its reasonable control, maintain or cause to be maintained the Joint Use Areas in good order and repair. The Joint Use Areas and other facilities in and about the Shopping Center shall at all times be subject to the control and management of Landlord and other parties that Landlord may designate. Landlord shall have the right at any time to re-designate, modify, alter, close, restrict, expand, reduce and change the Joint Use Areas. Landlord shall also have the right to permit entertainment events, the placement of kiosks, carts, advertising and other displays in the Joint Use Areas, and to convert the Joint Use Areas into retail areas. The activities and uses may be temporary or permanent.

Notwithstanding anything in this Lease contained to the contrary, Landlord shall not make any changes, modifications or alterations to the existing parking areas, approaches, exits, entrances, roadways, and other structures in the No-Build/No Change Area (defined below), nor shall Landlord construct any additional structures or increase the size or height of any existing structures within that area identified on EXHIBIT "B-1" as the "No-Build/No Change Area", except to the extent, if any, that the same are specifically indicated on EXHIBIT "B-1". In addition, the Landlord covenants and agrees that it will not permit any projections either vertical or horizontal to be erected or maintained (other than Tenant's signs or identifications) which will project along the front or rear of the Leased Premises in such a manner as to obstruct the view of Tenant's signs or its storefront in any manner, except to the extent any such projection existed prior the Commencement Date.

## ARTICLE 18 - Damage to Premises

(a)     If the Leased Premises are damaged, destroyed or rendered partially untenantable by fire or other insured casualty, Landlord shall promptly repair and restore the Leased Premises in accordance with EXHIBIT "L-W". From the date of the fire or casualty until the Leased Premises are repaired and restored, Minimum Annual Rental and additional rental, except for Tenant's proportionate share of Property Taxes due under ARTICLE 7 and any additional rental due under ARTICLE 17, shall abate in the proportion that the part of the Leased Premises destroyed or rendered untenantable bears to the total Leased Premises. Landlord shall not be required to repair or restore the Leased Premises or any part of the Shopping Center as the result of an uninsured casualty. If 50% or more of the Leased Premises or 20% or more of the Shopping Center is destroyed or rendered untenantable by fire or other casualty during the last 3



years of the Term (based upon the replacement cost compared with the market value of the improvements immediately prior to the fire or other casualty as shown by the certificate of Landlord's architect), either Party shall have the right to terminate this Lease. The termination shall be effective on the date of casualty by Landlord or Tenant giving the other, within ninety (90) days after the casualty, written notice of termination. If the notice is given within the ninety (90) day period, this Lease shall terminate and Minimum Annual Rental and additional rental shall abate from the date of the casualty. Landlord shall promptly repay Tenant any rental paid in advance which had not been earned at the date of the casualty through the Lease termination date. If the notice is not given and Landlord is required or elects to repair or rebuild the Leased Premises, Tenant shall repair and replace its improvements, merchandise, signs, goods, trade fixtures, furnishings, equipment, furniture and other personal property to a condition at least equal to its condition prior to its damage or destruction and, if Tenant has closed, Tenant shall promptly reopen for business. Landlord shall not be required to expend more for repair or restoration of the Leased Premises or the Shopping Center than the amount of insurance proceeds paid Landlord (or, if Landlord is self-insured, the amount of insurance proceeds which would have been paid Landlord if Landlord was not self-insured). Except as expressly provided to the contrary, this Lease shall not terminate nor shall there be an abatement of Minimum Annual Rental or additional rental as the result of a fire or other casualty.

(b)      Intentionally omitted.

If the provisions of this ARTICLE 18 shall become applicable, all Rent shall be abated or reduced proportionately during any period in which, by reason of such damage or destruction, or disruption of service, there is interference with the operation of business in the Leased Premises, taking into account the extent of such interference. If Tenant exercises its reasonable business judgment to discontinue the operation of its business in the Leased Premises, there shall be a full abatement of Rent until the first to occur of (A) the date upon which Tenant reopens for business to the public in the Leased Premises, or (B) the expiration of a period of ninety (90) days after Landlord shall have completed such restoration work as Landlord is obligated to perform hereunder or any disrupted service has been restored, as applicable, and the interference with the operation of business in the Leased Premises has ceased. In the event of the termination of this Lease pursuant to this ARTICLE 18, this Lease and the Term hereof shall cease and come to an end as of the date of such damage or destruction. Any Rent paid in advance by Tenant shall be promptly refunded by Landlord.

Notwithstanding anything to the contrary contained herein, if the Leased Premises shall be substantially damaged or destroyed by fire, windstorm, or other casualty within the last three (3) years of the Term, either party shall have the right to terminate this Lease, provided that notice thereof is given to the other party not later than sixty (60) days after such damage or destruction. If said right of termination is exercised, this Lease and the Term hereof shall cease and come to an end as of the date of such damage or destruction.

Notwithstanding the foregoing, Landlord shall not have the right to terminate this Lease pursuant to the terms of this ARTICLE 18 unless it terminates the leases of all similarly situated tenants in the Shopping Center that were similarly affected by such casualty.

## ARTICLE 19 - Insurance

(a)      Throughout the Term, Landlord shall maintain or cause to be maintained "All Risk" property insurance at least as broad as the Insurance Services Office's Causes of Loss Special Form, insuring the buildings and improvements of the Shopping Center, excluding the Premises and excluding any leasehold improvements thereto. The Special Form insurance shall be in the amounts sufficient to avoid the effect of the co-insurance provisions of the applicable policy or policies and shall be in an amount equal to the full replacement value of the improvements insured. In addition, said insurance shall be effected under valid and enforceable policies issued by insurers of recognized responsibility licensed to do business in the state in which the Shopping Center is located and rated by Best's Insurance Report or any successor publication of comparable standing and carrying a rating of A-VIII or better or the then equivalent of such rating. Landlord may also maintain any other forms and types of insurance, which Landlord shall deem reasonable in respect to the Shopping Center.

Throughout the Term, Landlord shall maintain or cause to be maintained Commercial General Liability insurance coverage, written on an occurrence and not a claims made basis, containing provisions adequate to protect



Landlord and Tenant from and against claims for bodily injury, including death and personal injury (and with the employee exclusion deleted as to all such claims for personal injury), and claims for property damage, occurring upon the Shopping Center (or occurring on the Leased Premises due to the acts, omissions or negligence of Landlord, or its employees, independent contractors, architects or engineers or due to Landlord's failure to comply with or default or other breach of the provisions of this Lease), such insurance having bodily injury and property damage combined limits of liability of not less than $5,000,000.00 per occurrence. Said policy of insurance shall include contractual liability insurance, non-owned automobile liability insurance and, if applicable, owned automobile liability insurance. In addition, such policy shall be effected under valid and enforceable policies issued by insurers of recognized responsibility licensed to do business in the state in which the Shopping Center is located and rated by Best's Insurance Report or any successor publication of comparable standing and carrying a rating of A-VIII or better or the then equivalent of such rating. Certificates evidencing same shall be furnished to Tenant within thirty (30) days of demand.

Notwithstanding anything contained in this Lease to the contrary, the limits of such insurance as set forth above shall not limit Landlord's liability hereunder. Further, Landlord agrees that proceeds of insurance payable under any policy or policies of property insurance carried by Landlord, which proceeds are applicable to the Leased Premises, shall be applied to restoration of the Leased Premises.

(b)

(i)     Tenant shall keep in force with an insurance company authorized to do business in the state where the Shopping Center is located and which has a general policy rating of A- or better and a financial class of VII or better by A.M. Best Company, Inc. (or if a rating of A.M. Best Company Inc. is no longer available, a similar rating from a similar or successor service), a policy of commercial general liability insurance (1986 ISO Form or its equivalent), including property damage, with respect to the Leased Premises and the business operated by Tenant and any other occupant of the Leased Premises, and in which the limits of coverage shall not be less than $1,000,000.00 per occurrence with a $2,000,000 umbrella (combined single limit bodily injury and property damage) and "All Risk" property insurance at least as broad as the Insurance Services Office's Causes of Loss Special Form, insuring the Leased Premises and of Tenant's property contained in the Leased Premises in an amount equal to the full replacement value of the items insured. This insurance must include all of Tenant's Work, improvements and betterments, Tenant's inventory, merchandise, signs, goods, trade fixtures, furnishings, equipment, furniture, wall coverings, floor coverings, and other personal property. Tenant shall also maintain plate glass insurance therefor, or shall self-insure this obligation. If the nature of Tenant's operations are such as to place any of its employees under the coverage of worker's compensation or similar laws, Tenant, at its expense, shall maintain, during the Term hereof, worker's compensation, employer's liability, or similar insurance with limits of liability of not less than the minimum amount provided by law. Tenant shall furnish Landlord with certificates of insurance evidencing the foregoing coverage. Tenant shall give Landlord at least 30 days written notice prior to any lapse, cancellation of or material change in the insurance. Tenant shall procure and pay for renewals of such insurance from time to time before the expiration thereof, and Tenant shall make available to Landlord certificates therefor within thirty (30) days after written request by Landlord. All such policies shall be issued by companies of recognized responsibility, having a Best Key Rating of not less than A - Class VII, licensed to do business in the state where the Leased Premises is located, and Tenant shall endeavor to cause all such policies to contain a provision whereby the same cannot be canceled unless Landlord is given at least thirty (30) days' prior written notice of such cancellation. The certificates of insurance for the commercial general liability insurance to be made available to Landlord by Tenant shall name Landlord as an additional insured. All such policies may be carried under so-called blanket policies.

(c)     Each party, on behalf of itself and on behalf of anyone claiming under or through it by way of subrogation or otherwise, waives all rights and causes of action against the other party and such party's agents for any liability arising out of any loss or damage in or to the Leased Premises, the Shopping Center and the contents therein caused by: (A) any peril normally covered under "All Risk" Special Form policies described in subsection (a) above (whether or not such party actually carries such insurance policies); or (B) if the scope of coverage is broader than in (A) above, then any peril actually covered under the property insurance maintained by such party. This release and waiver shall be complete and total even if such loss or damage may have been caused by the negligence of the other party or such party's agents and shall not be affected or limited by the amount of insurance proceeds available to the waiving party, regardless of the reason for such deficiency in proceeds. Each party covenants that, from and after the Beginning Work Date, its insurance policies will contain the waiver of subrogation endorsements described above. Any limitation on the scope of a party's waiver of its rights pursuant to this Section shall in no event be deemed to apply to, nor shall



the other party's rights and benefits under such waiver be impaired or diminished by, a deficiency in insurance proceeds caused by (1) a party's failure to carry the insurance required by this Lease or election to self-insure (to the extent permitted); (2) a party's election to carry insurance in an amount less than one hundred percent (100%) of replacement cost; (3) any deductible, or (4) any amount of insurance proceeds appropriated by such party's mortgagee or holder of a superior interest in such proceeds.

## ARTICLE 20 - Indemnification

(a)     Tenant agrees to indemnify, defend, protect and hold Landlord and its respective partners joint ventures, directors, officers agents, servants, employees and contractors harmless from and against any and all injury, loss, damage, liability, costs or expenses (including without limitation, reasonable attorney fees, reasonable investigative and discovery costs), of whatever nature, to any person or property caused or claimed to be caused by or resulting from any negligent or intentionally wrongful act or omission of Tenant or its agents, employees or contractors. Landlord shall promptly notify Tenant of any actions, proceedings, claims or demands for which Landlord requests indemnification from Tenant. Tenant shall have the right to assume the entire control of the defense thereof, and Landlord and Landlord's agents shall cooperate fully with Tenant in such defense at Tenant's cost.

(b)     Landlord agrees to indemnify, defend, protect and hold Tenant or its parent, Affiliates, subsidiaries, shareholders, directors, officers, agents, employees and contractors harmless from and against any and all injury, loss, damage, liability, costs or expenses (including, without limitation, reasonable attorneys' fees, reasonable investigation and discovery costs), of whatever nature, to any person or property caused or claimed to be caused by or resulting from any negligent, grossly negligent or intentionally wrongful act or omission of Landlord or its agents, employees or contractors and sustained within the Joint Use Areas, so long as same is not caused by or resulting from any negligent act or omission of Tenant or its agents, employees or contractors. Tenant shall promptly notify Landlord of any actions, proceedings, claims or demands for which Tenant requests indemnification from Landlord. Landlord shall have the right to assume the entire control of the defense thereof, and Tenant and Tenant's agents shall cooperate fully with Landlord in such defense at Landlord's cost.

## ARTICLE 21 - Assignment, Subletting and Ownership

(a)     Tenant acknowledges that its agreement to operate in the Leased Premises for the use permitted in the Reference Provisions for the Term was a primary inducement and precondition to Landlord's agreement to lease the Leased Premises to Tenant. Additionally, the Parties agree that the successful commercial profitability of the Shopping Center is based on the appropriate mix of retail and nonretail activity and that Landlord has leased the Leased Premises to Tenant because, in Landlord's opinion, Tenant's presence and commercial activity during the Term will significantly contribute to the profitability, viability and success of the Shopping Center. Accordingly, Tenant shall not transfer, assign, sublet, enter into license or concession agreements, change ownership or hypothecate this Lease or Tenant's interest in and to the Leased Premises in whole or in part, or otherwise permit occupancy of all or any part of the Leased Premises by anyone with, through or under it without first receiving the written consent from Landlord which consent, which consent shall not be unreasonably withheld, conditioned or delayed. Any of these acts shall be considered a "transfer" for the purposes of ARTICLE 21. Any attempt at a transfer in violation of this ARTICLE 21 shall be null and void and confer no rights upon a third person. These prohibitions shall be construed to refer to events occurring by operation of law, legal process, receivership, bankruptcy or otherwise. Notwithstanding any permitted transfer, the Leased Premises shall be used and operated as a single store.

(b)     In determining whether or not to consent to the proposed assignment or subleasing, Landlord may consider, among other factors, whether the proposed sublessee or assignee will use the Leased Premises for any use other than the use set forth in the Reference Provisions, whether the proposed sublessee or assignee will violate the right of any other tenant or occupant of the Shopping Center, including, without limitation, an exclusive use right, the experience of the proposed sublessee or assignee in operating a business in a shopping center similar to the Shopping Center, whether the proposed sublessee or assignee is likely to generate as much Percentage Rental as Tenant, whether the proposed sublessee or assignee has a net worth that is adequate in the circumstances and, in any event, not less than that of Tenant, and whether the proposed sublessee or assignee is a regional or national retailer typically found in shopping centers similar to the Shopping Center.



(c)     Tenant shall submit the request for a transfer, in writing, a minimum of 30 days prior to the effective date of transfer with sufficient information for Landlord to make an informed decision regarding the qualifications of the proposed transferee, including, but not limited to, information relating to the factors described in Paragraph 21(b) above. In any event, Landlord may upon receipt of a request to transfer, instead of consenting to or denying the proposed transfer, terminate Tenant's obligations under the Lease and regain possession of the Leased Premises. Tenant may, within 15 days of receipt of the notice of termination, withdraw its request for the transfer by written notice to Landlord, and continue in possession under the terms of the Lease. Landlord's right to terminate the Lease because of that request shall in that event be inoperable. If Landlord exercises its termination right, Tenant shall surrender possession of the Leased Premises on the termination date specified in Landlord's notice, which shall not be less than 30 nor more than 60 days of receipt of the notice of termination in accordance with the provisions of this Lease.

(d)     Landlord's consent to a transfer shall not constitute a waiver of Landlord's right not to consent to a subsequent transfer. The receipt of rental or additional rental from any party other than Tenant shall not be deemed to be a consent to a transfer, nor shall that receipt relieve Tenant of its obligation to pay rental or additional rental for the Term.

(e)     Each transfer to which Landlord has consented shall be in writing, in a form reasonably satisfactory to Landlord and executed by the transferor and transferee. The transferee shall agree, in writing, to assume, be bound by and perform the covenants and conditions of this Lease.

(f)     If Tenant (or a guarantor of the Lease) is a nonpublic corporation and the control of the corporation changes, Tenant shall notify Landlord. If the control changes (whether or not Tenant has notified Landlord), Landlord may declare the change to be a default, beyond any and all applicable notice and cure periods provided for in this Lease, effective sixty (60) days from the date of the notice from Tenant, or the date on which Landlord first has knowledge of the change, whichever occurs first. The provisions of the preceding sentence shall not be applicable if control of the corporation changes as the result of a public offering which occurs on a major security exchange. If Tenant (or a guarantor of the Lease) is a partnership or entity other than a corporation (including, but not limited to, a sole proprietorship) and if the control changes (if Tenant is a partnership, a change shall include, but not be limited to, the withdrawal of a partner or partners from the partnership or the dissolution of the partnership), Tenant shall notify Landlord. If the control changes (whether or not Tenant has notified Landlord), Landlord may declare the change a default, beyond any and all applicable notice and cure periods provided for in this Lease, effective sixty (60) days from the date of the notice from Tenant, or the date on which Landlord first has knowledge of the change, whichever occurs first. The receipt by Landlord of rental from a party other than Tenant shall not be deemed notice of change in control or ownership of Tenant.

(g)     Intentionally omitted.

(h)     If Landlord is not permitted to terminate this Lease because of the provisions of Title 11 of the United States Code relating to Bankruptcy, as amended ("Bankruptcy Code"), Tenant agrees, as a debtor in possession or any trustee for Tenant, within fifteen (15) days after Landlord's request to the Bankruptcy Court, to assume or reject this Lease. Tenant, on behalf of itself and any trustee, agrees not to seek or request an extension or adjournment of the application to assume or reject this Lease. In no event after the assumption of this Lease shall an existing default remain uncured for a period more than the earlier of ten (10) days or the time period specified in this Lease. If a filing of a petition under the Bankruptcy Code occurs, Landlord shall not have an obligation to provide Tenant with services or utilities unless Tenant has paid and is current in all payments of rental and additional rental.

(i)     Intentionally omitted.

(j)     Any assignment, mortgage, pledge, hypothecation, encumbrance, subletting or license of this Lease, the leasehold estate hereby created, or the Leased Premises or any portion thereof, either voluntarily or involuntarily, whether by operation of law or otherwise, or any other action by Tenant in violation of the restrictions set forth in this ARTICLE 21, without the prior written consent of Landlord first had and obtained therefor, shall be null and void .

(k)     (i) Tenant may assign this Lease or any interest therein or sublet the Leased Premises or any portion thereof, without Landlord's consent, in any of the following transactions ("Permitted Transactions"): (1) to a Related Party;



(2) in connection with a transfer of fifteen (15) or more of Tenant's stores (a "Multi Store Transaction"); and (3) to a concessionaire, franchisee or licensee for the operation of any portion of the business to be conducted at the Leased Premises, provided that no concessionaire or licensee shall occupy more than twenty-five percent (25%) of the gross leasable area of the Leased Premises or have a separate exterior entrance.

(ii) "Related Party" means: (1) an Affiliate of Tenant; or (2) a successor to Tenant by merger or consolidation or acquisition of substantially all of the assets or stock of Tenant or an Affiliate thereof.

(iii) "Affiliate" of Tenant means an entity that controls, is controlled by, or is under common control with Tenant. "Affiliate" of Landlord means an entity that controls, is controlled by, or is under common control with Landlord.

(l)       Notwithstanding anything contained in this ARTICLE 21 to the contrary, in the event of an assignment of this Lease, a subletting of the Leased Premises, or any other transfer of Tenant's interest in and to the Premises or the Lease, Tenant shall remain liable for the performance of Tenant's obligations hereunder; provided however, that, if Tenant's assignee or any subsequent assignee has, at the time of the assignment, or subsequently attains a net worth of at least Twenty-Five Million Dollars ($25,000,000.00), determined as of the end of the most recent fiscal year of such assignee prior to such intended release (unless more current figures are available), then the Tenant that assigned its interest in and to the Lease shall be released and discharged from any further liability under this Lease, except any obligations that accrued pursuant to this Lease prior to the effective date of such intended release.

All of the other obligations, covenants and conditions shall remain unamended.

## ARTICLE 22 - Access to Premises

Tenant shall permit Landlord and its representatives to enter the Leased Premises at all reasonable times for the purpose of inspection, making repairs required to be made by Landlord pursuant to this Lease and to comply with Legal Requirements. All rights of Landlord hereunder shall be exercised in a reasonable manner and so as to cause as little interference with Tenant's business as is reasonably possible, and in accordance with this Section. Subsequent to Beginning Work Date, Landlord's right of access to the Leased Premises shall also be subject to the following conditions:

(A)       Landlord shall give Tenant at least forty-eight (48) hours prior written notice of the need for such entry, except in the case of emergencies with respect to which no prior notice shall be required, and shall specify the estimated time required for such work.

(B)       No change or alteration may be made to the storefront of the Premises or the size, area, height, dimensions or configuration of the Leased Premises. No columns, beams, girders, braces, supports (collectively, "Supports") or shafts of any kind may be installed in the Premises except to replace existing Supports or shafts in the same location and no larger in size or dimensions than such replaced item.

(C)       Such work shall be performed during hours that Tenant is not open for business (except in emergencies) without the prior approval of Tenant, which approval shall not be unreasonably withheld. If Landlord's work is expected to exceed two (2) days, then such work may not be performed during the period from October 1 through January 31 of any given year except for emergencies, fire or other casualty, eminent domain or to comply with specific deadlines imposed by Legal Requirements.

(D)       Any restoration work or alteration work at the Leased Premises which is necessitated by or results from Landlord's entry, including, without limitation, any work necessary to conceal any element whose presence is permitted hereunder, shall be performed by Landlord at its expense or, at Tenant's election, by Tenant on Landlord's behalf and at Landlord's sole cost and expense.

(E)       If Landlord's entry into the Leased Premises pursuant to this Lease or performance of any work within the Joint Use Areas interferes with the conduct by Tenant of its business, then rent shall equitably abate

to the extent to which such actions by Landlord interfere with the conduct by Tenant of its business. If such actions interfere with the conduct by Tenant of its business to such an extent that Tenant, in the exercise of its reasonable business judgment, closes the Leased Premises for business, then rent shall totally abate for each day or portion thereof that such interference continues. If Tenant remains closed for business by reason of such interference for more than twenty (20) days (which period shall be subject to extension by reason of Force Majeure) or Landlord fails to diligently pursue completion of its work, Tenant shall have the continuing right thereafter and prior to the cessation of such interference to terminate this Lease upon ten (10) days' prior written notice to Landlord, provided that Landlord may nullify such termination by completing its work prior to the expiration of such 10-day period.

(F)     At any time within the six (6) months immediately preceding the expiration of the Term, Landlord may, upon five (5) days' prior written notice to Tenant, show the Leased Premises to bonafide prospective tenants, lenders and purchasers during hours that Tenant is not open for business, on strict condition that neither Landlord nor the prospective tenant indicates to Tenant's onsite employees that Tenant's lease will expire in the near future.

## ARTICLE 23 - Default by Tenant

(a)     The following shall be a default by Tenant:

(i)     The failure to pay when due an installment of rental, or any other payment required to be made in whole or in part pursuant to this Lease, if the failure shall continue for more than ten (10) days after Tenant's receipt of written notice from Landlord that same is past due; and/or

(ii)     The abandonment or vacation of the Leased Premises or any part of it in violation of the terms of this Lease for a period of thirty (30) consecutive days; and/or

(iii)     The failure to observe or perform any other provision of this Lease, if the failure continues for thirty (30) days after Tenant's receipt of written notice from Landlord thereof; if the default cannot reasonably be cured within thirty (30) days, Tenant shall not be in default if Tenant begins to cure the default within thirty (30) days and diligently cures the default, and to the extent such notice satisfies the requirements of any notice required by applicable law, then such notice shall be in lieu of, and not in addition to, any notice required by applicable law; and/or

(iv)     The making by Tenant of a general assignment for the benefit of creditors; the filing by or against Tenant of a petition to have Tenant adjudged a bankrupt, or of a petition for reorganization or arrangement under any law relating to bankruptcy (unless a petition filed against Tenant is dismissed within 60 days); the appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located at the Leased Premises or of Tenant's interest in this Lease if possession is not restored to Tenant within 30 days; or the attachment, execution or other judicial seizure of substantially all of Tenant's assets located at the Leased Premises, or of Tenant's interest in this Lease, if the seizure is not discharged within 30 days; and/or

(v)     [Intentionally omitted]; and/or

(vi)     Intentionally omitted.

(b)     In addition to any other remedies available to Landlord at law or in equity for default, Landlord shall have the immediate option to terminate this Lease and the rights of Tenant by written notice to Tenant. If Landlord elects to terminate, Landlord shall have the right to recover from Tenant as damages:

(i)     The worth at the time of the award of any unpaid rental which has been earned at the time of termination; plus

(ii)     The worth at the time of the award of the amount by which the unpaid rental which would have been earned after termination until the time of award exceeds the amount of rental loss Tenant proves could have been reasonably avoided; plus



(iii)    The worth at the time of award of the amount by which the unpaid rental for the balance of the Term after the time of award exceeds the amount of rental loss Tenant proves could be reasonably avoided; plus

(iv)    Any other amount necessary to compensate Landlord for the detriment proximately caused by Tenant's failure to perform its obligations (including the costs and expenses of recovering the Leased Premises and reasonable and actual attorneys' fees) or which would be likely to result from Tenant's failure; and plus

(v)    At Landlord's election, other amounts as may be permitted from time to time by applicable law.

(c)    The word "rental" shall mean the Minimum Annual Rental and all other sums required to be paid by Tenant under this Lease. The word "award" means a judgment issued or rendered in favor of Landlord in a proceeding or action to recover damages from Tenant. The phrase "at the time of the award" means the date of entry of such a judgment. All sums, other than Minimum Annual Rental, shall be computed based on the average monthly amount accruing during the 24 month period preceding the default. However, if it becomes necessary to compute the rental before the 24 month period has occurred, the rental shall be computed on the basis of the average monthly amount accruing during that shorter period. As used in paragraphs (i) and (ii) above, the "worth at the time of the award" is computed by allowing interest at the Interest Rate. As used in paragraph (iii) above, the "worth at the time of the award" is computed by discounting that amount at the discount rate of the Federal Reserve Bank of San Francisco, at the time of award, plus 1%.

(d)    Landlord shall also have the right if Tenant defaults under this Lease to terminate Tenant's right to possession of the Leased Premises (without terminating this Lease) and reenter the Leased Premises and remove all persons and property from the Leased Premises. The property may be stored at Tenant's cost. Landlord shall not be liable to Tenant for loss or damage resulting from an entry by Landlord. Tenant shall pay as additional rental, within thirty (30) days following Tenant's receipt of written notice from Landlord thereof, reasonable expenses incurred or paid by Landlord because of Landlord's entry. If two (2) or more or any combination of individuals, corporations, partnerships or other business associations ("Individuals") sign this Lease as Tenant or guarantee this Lease as Guarantors, the liability of each individual group to pay rental and perform the obligations under this Lease shall be joint and several. The failure or refusal by Landlord to proceed against all the (or any combination of the) Individuals comprising Tenant or against Tenant or against one (1) or more of the Guarantors shall not be a release or waiver of rights which Landlord may possess against the others, nor shall the granting by Landlord of a release of or execution of a covenant not to sue any one (1) or more of the (or any combination of the) Individuals comprising the Tenant or the Guarantors be a release or waiver in whole or in part of rights which Landlord may possess against the others. If either Party institutes legal suit or action for enforcement of an obligation, Landlord may determine the venue.

(e)    If Landlord does not terminate this Lease, this Lease shall continue in full force and effect. In that event, Landlord may enforce all of its rights and remedies hereunder and at law, including the remedies described in California Civil Code Section 1951.4 and the right to recover rental charges as they come due. However, Tenant shall continue to have the right to possession of the Leased Premises, and Tenant shall have the right to sublet the same with Landlord's written consent which consent (for the purposes of this ARTICLE 23(e)) shall not unreasonably be withheld. If Tenant abandons the Leased Premises, no re-entry or taking possession of the Leased Premises by Landlord shall be construed as an election to terminate this Lease, nor shall it cause a forfeiture of Rent or other charges remaining to be paid during the balance of the term herein, unless a written notice of such intention to terminate be given to Tenant by Landlord.

(f)    If Landlord elects to relet, rental received by Landlord from reletting shall be applied: first (1st), to the payment of indebtedness other than rental due Landlord from Tenant; second (2nd), to the payment of the cost of reletting; third (3rd), to the payment of the cost of alterations and repairs to the Leased Premises; fourth (4th), to the payment of rental due and unpaid; and the remainder, if any, shall be applied to the payment of future rental that may become due. If the rental received from reletting during any month which is applied to the payment of rental is less than the rental payment during that month by Tenant, Tenant shall pay the deficiency to Landlord. The deficiency shall be calculated and paid monthly. Tenant shall also pay Landlord, as soon as ascertained, the costs and expenses incurred by Landlord to relet or make alterations and repairs not covered by the rental received from the reletting of the Leased Premises.

(g)       A reentry or taking possession of the Leased Premises by Landlord shall not be construed to be an election to terminate this Lease, nor shall it cause a forfeiture of rental remaining to be paid during the balance of the Term, unless a written notice of that intention is given to Tenant or the termination is decreed by a court of competent jurisdiction.  Notwithstanding a reletting without termination by Landlord because of default by Tenant, Landlord may at any time after reletting elect to terminate this Lease for any default.

(h)       Intentionally omitted.

(i)       Nothing in this ARTICLE 23 shall be deemed to affect or waive Landlord's rights to indemnification for liability or liabilities arising prior to termination of this Lease for personal injury or property damage under or any other indemnification provision contained in this Lease.

(j)       Intentionally omitted.

(k)       Landlord covenants to mitigate its damages in the event of any default by Tenant under this Lease, except that no such obligation to mitigate damages shall require Landlord to lease the Leased Premises before any other premises available for lease at the Shopping Center or to accept below market terms.

(l)       Landlord shall be in default of this Lease if Landlord fails to perform any of its obligations under this Lease within ten (10) days (or such greater period as otherwise expressly provided in this Lease) after receipt of written notice from Tenant specifying such failure in the case of monetary obligations owed by Landlord to Tenant or thirty (30) days after receipt of written notice from Tenant specifying such failure in the case of non-monetary obligations, provided however that if the nature of such default is such that it cannot reasonably be cured within such period, then, upon notice to Tenant, Landlord shall have such additional time as is reasonably required to cure such default provided that Landlord commences to cure the default within such period and proceeds to complete such cure with diligence and continuity. In the event of an Emergency where prior notice to Landlord is not practical in light of the circumstances, Tenant may, at its option, in addition to any other remedies at law or equity, incur any reasonable expense necessary to perform the obligations of Landlord specified in such notice to the extent required to prevent any immediate injury or damage to persons within the Leased Premises, or property within the Leased Premises or the immediate imposition of a civil or criminal fine or penalty with respect to the Leased Premises, in which event Landlord shall reimburse Tenant for the actual costs incurred by Tenant within thirty (30) days after receipt of an invoice therefor. If Landlord fails to pay such costs within thirty (30) days after receipt of an invoice therefor, then in addition to all other rights and remedies that Tenant may have against Landlord (but without duplication in recovering the amounts due Tenant), Tenant shall be entitled to deduct the unpaid and overdue amount of such costs from Rent otherwise becoming due hereunder, together with interest on the unpaid balance thereof at the Interest Rate from the date originally due.  An "Emergency" means the threat of immediate injury or damage to persons or property or the immediate imposition of a civil or criminal fine or penalty.

## ARTICLE 24 - Surrender of Premises

Tenant shall, upon expiration of the Term, or the earlier termination of this Lease, surrender to Landlord, without damage, injury, disturbance or payment, the Leased Premises including, without limitation, all apparatus, equipment, alterations, improvements and additions by either Party to, in, upon or about the Leased Premises and in broom-clean condition, free of all refuse, trash, garbage, personal property and merchandising fixtures.   Tenant shall leave all utility systems servicing the Leased Premises and any HVAC system in the Leased Premises in good operating condition, reasonable wear and tear and damage by casualty excepted. Tenant, at its sole expense, shall repair damage to the Leased Premises caused by Tenant vacating the Leased Premises or by Tenant's removal of trade fixtures, signs and other personal property, reasonable wear and tear and damage by casualty excepted. Subject to Article 15(a), Tenant shall comply with all laws and governmental regulations applicable to the removal and repair of the property. Tenant shall not create a disturbance or health problem for customers, agents, invitees or other parties in the Shopping Center as result of the removal or repair.  Any property not removed within ten (10) days following the expiration of the Term or the earlier termination of this Lease, may be deemed by Landlord to be abandoned by Tenant and may be retained by Landlord or may be removed and stored for Tenant, at Tenant's sole cost. Subject to Article 15(d), Tenant shall surrender the Leased Premises to Landlord free of Hazardous Material and free of any violation of any



environmental rule or regulation. Tenant's obligation to observe and perform the provisions of this <u>ARTICLE 24</u> shall survive the expiration of the Term or earlier termination of this Lease.

## <u>ARTICLE 25 - Tenant's Conduct of Business</u>

(a)      It is specifically understood and agreed that Tenant may remain open for business beyond the closing hours of other tenants in the Shopping Center, and may, if not otherwise prohibited by Legal Requirements, remain open for business on days other than the regular business days and the normal hours of operation of the Shopping Center; provided, however, that Tenant shall pay Landlord for its proportionate share of all additional costs reasonably incurred by Landlord resulting from Tenant being open for such hours other than normal hours of operation and on such days other than regular business days to provide lighting and security costs and other required services. Tenant's proportionate share of the additional costs described in the immediately preceding sentence shall be calculated by dividing the gross leasable area of the Leased Premises by the total gross leasable area of all tenants (including Tenant) which are open for business during such hours and on such days. Such costs shall be a separate charge to Tenant and others, as the case may be, and shall not be included as Operating Expenses. Except when and to the extent that the Leased Premises shall be untenantable by reason of damage of fire or other casualty, or due to Force Majeure or closures for inventory, remodeling or nationally recognized holidays, or any other exception as allowed under this Lease, Tenant shall (1) continuously keep the Leased Premises open for business and adequately stocked, and keep Tenant's display windows and signs illuminated, provided at least ninety percent (90%) of the other Tenants are open and operating during the same day and hours, and (2) use for office, storage or other non-selling purposes only such space as is reasonably required for proper operation of Tenant's business in the Leased Premises. In no event shall Tenant be obligated to open, and Tenant shall not be in default under this Lease for failing to open, on Easter Sunday, Christmas Day, New Year's Day, Rosh Hashanah, Yom Kippur, or any other Jewish holiday (not to exceed five (5) days per calendar year), or when Tenant is taking inventory (no to exceed three (3) days per calendar year). Further, in no event shall Tenant be obligated to open the Leased Premises for business earlier than 9:00 A.M. or close later than 9:00 P.M., nor shall Tenant be in default under this Lease for failing to open for business earlier or later than said hours.

(b)      Notwithstanding anything in this Lease to the contrary, Tenant may, in its sole discretion, and at any time, cease to conduct business in the Leased Premises. Such closing shall not release Tenant from any of its obligations provided herein. However, in the event Tenant shall cease to operate its business in the Leased Premises for more than thirty (30) days (other than by reason of Force Majeure or for repairs, restoration, renovation or remodeling) then Landlord may, but shall be under no obligation, terminate this Lease by providing notice to Tenant of Landlord's election to do so (the "<u>Landlord Termination Notice</u>"). If Landlord gives Tenant such Landlord Termination Notice and Tenant does not (x) advise Landlord within thirty (30) days after Tenant's receipt of the Landlord Termination Notice that it will cause the Leased Premises to be reopened within thirty (30) days after Landlord's submission of the Landlord Termination Notice, and (y) cause the Leased Premises to be reopened for business within thirty (30) days of Tenant's receipt of the Landlord Termination Notice (such 30 day period to be deemed extended to the extent Tenant is delayed by Force Majeure), then, this Lease shall automatically terminate on the date stated in the Landlord Termination Notice as if such date were the date originally fixed as the expiration date of this Lease. In no event shall Tenant's failure to operate its business in the Leased Premises be deemed a default under this Lease entitling Landlord to exercise any other remedy other than to recapture the Leased Premises as set forth in this Section. Upon the second (2nd) or any subsequent delivery of the Landlord Termination Notice during any consecutive 12-month period, Landlord shall have the right to terminate this Lease without regard to any Tenant reopening.

(c)      Intentionally omitted.

(d)      Tenant shall not, without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed, sell merchandise from or allow in or upon the Leased Premises, any vending machines or any coin-or token-operated music, amusement, or gaming machines. Tenant shall not use, or permit the use of, the Leased Premises, or any part thereof, for the sale or display of pornography, drug-oriented paraphernalia, obscene material or any goods or services that, in the reasonable judgment of Landlord, are inconsistent with the image of a first-class shopping and entertainment center. Tenant shall not operate a discount, off-price or outlet store/facility nor shall Tenant offer for sale from the Leased Premises any "knock-off", counterfeit or other merchandise that is not genuine, of the highest quality and whose sale is not specifically authorized by the owner/manufacturer of the



merchandise. Nothing contained in this Lease shall be construed to indicate any intent or attempt on the part of Landlord to restrict the price or prices at which Tenant may sell any merchandise that are permitted to be sold at or from the Leased Premises pursuant to this Lease.

(e)    Except during the last thirty (30) days of the Term of this Lease, Tenant shall not use or permit the Leased Premises, or any part thereof, to be used for the conduct of a second-hand store, auction, or distress, fire, bankruptcy or going-out-of-business sale, or any use or purpose in violation of any federal, state of municipal laws, ordinances, regulations and requirements.

### ARTICLE 26 - Rules and Regulations

Tenant shall require its employees, agents and contractors to comply with the reasonable and non-discriminatory rules and regulations made by Landlord from time to time, upon prior written notice to Tenant, regarding the operation of the Shopping Center or the Leased Premises including, but not limited to, the following:

(a)    Tenant shall not put on the glass and supports of the windows (nor within 24 inches of any window), doors or exterior walls of the Leased Premises any signs, advertising placards, names, insignias, trademarks or descriptive material except to the extent permitted by the terms of the Tenant Signage Criteria Manual. No signs or other items shall be placed within the Leased Premises if they materially obstruct a view of the Leased Premises. Tenant shall not place vents, structures, improvements or obstructions on the exterior of the Leased Premises without Landlord's written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Landlord shall have the right, with prior written notice to Tenant and without liability, to restore the Leased Premises and remove property from the Leased Premises unless the size, type, color, location, copy, nature and display qualities of the property were approved by Landlord in writing. The cost of the restoration and removal of property shall be paid for by Tenant promptly upon receipt of a bill. Tenant shall not place a sign on the roof of the Leased Premises notwithstanding anything in this Lease to the contrary.

(b)    No awning or other projections shall be attached to the outside walls of the Leased Premises or the Shopping Center without the written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.

(c)    Loading and unloading of goods shall be done only at the times, in the areas and through the entrances designated by Landlord.

(d)    Garbage shall be kept in the kind of container approved by Landlord's fire and casualty consultants and shall be removed and deposited daily in mass disposal containers in the manner prescribed from time to time by Landlord. Landlord shall provide or designate a service for collection of garbage from designated mass disposal containers.

(e)    Except solely for Tenant's own internal operations use within the Leased Premises, no radio or television aerials or other receivers and/or equipment, infrared transmitters/receivers, cabling, telecommunications systems (including but not limited to switching, relay, hub or booster systems) shall be erected or placed within the Leased Premises, or on the roof or walls (interior or exterior) of the Leased Premises or the Shopping Center without the written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. If Landlord's consent is not received, anything erected or placed on the roof or elsewhere within the Shopping Center may be removed, without notice, and any damage to the walls or roof or elsewhere within the Shopping Center shall be the responsibility of Tenant. Tenant's access to the roof is limited to the maintenance of equipment installed with Landlord's approval and inspections for damage. Tenant shall not go on the roof without the written approval of Landlord, which approval shall not be unreasonably withheld, conditioned or delayed.

(f)    No loudspeakers, televisions, phonographs, radios, flashing lights, machinery or other devices shall be heard or seen outside of the Leased Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.



(g)      Except during the last thirty (30) days of the Term of this Lease, no auction, fire, bankruptcy or selling-out sales shall be conducted without the written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.

(h)      Tenant shall keep its display windows and signs illuminated during the hours Tenant is open for business unless prevented by causes beyond the control of Tenant.

(i)      Areas immediately adjoining the Leased Premises shall be kept clear by Tenant, and Tenant shall not place or permit obstructions, garbage, refuse, improvements, merchandise or displays in those areas.

(j)      Tenant and its employees shall not park motor vehicles in parts of the parking area which may be designated only for customer parking, and in no event shall Tenant's employees park in any of the parking spaces located on the internal streets within the Shopping Center (Via Terra, Via Sole, Via Serena, Via Fiori, Via Felice, Via Campagna and Via Mercato). Landlord may, at any time during the Term, designate certain parking areas within the Shopping Center as the only areas within which employee parking is permitted, upon prior written notice to Tenant. If Tenant or Tenant's employees continue to park in areas designated by Landlord as only customer parking or in any of the parking spaces located on the internal streets within the Shopping Center and/or fail to park in any specific areas designated as employee parking areas, after notice is given to Tenant by Landlord, Landlord may, in addition to any other remedies Landlord may have, charge Tenant $25.00 per day, for each day or partial day, per vehicle parked in the customer parking areas, attach violation stickers or notices to the vehicles and have the vehicles removed at Tenant's expense.

(k)      Tenant shall use the pest extermination contractor of its choice. Tenant shall not keep or permit any animals in the Leased Premises, unless expressly allowed by in this Lease, or unless used by disabled persons.

(l)      If Landlord installs a central music system in the Shopping Center, and Tenant desires to purchase another music system, Tenant may, at Tenant's option, purchase the system from Landlord (provided Landlord's charge is competitive with any similar service available to Tenant).

(m)      Tenant shall not carry on any trade or occupation or operate any instrument, apparatus or equipment which emits an odor or causes a noise outside the Leased Premises or which is offensive.

(n)      Tenant shall not put temporary signs or fixtures (including portable trade fixtures, displays and folding tables) for the display of merchandise within 2 feet of either side of any entrance to the Leased Premises. Merchandise displays shall not extend beyond the frontage line of the Leased Premises.

(o)      Tenant shall store and stock in the Leased Premises only goods, wares, merchandise and other property necessary for the conduct of Tenant's business.

(p)      Tenant shall not use or permit the Leased Premises to be used for living, sleeping, residential or lodging purposes.

(q)      Tenant shall not use the plumbing for a purpose other than that for which it is constructed. No grease or foreign substance shall be put in the plumbing, and the expense of any resulting breakage, stoppage or damage (whether on or off the Leased Premises) shall be borne by Tenant.

(r)      Tenant shall not in the Joint Use Areas:

        (i)      vend, peddle or solicit orders for sale or distribution of any merchandise, device, service, periodical, book, pamphlet or other matter;

        (ii)     exhibit any sign, placard, banner, notice or other written material;

        (iii)    distribute any circular, booklet, handbill, placard or other material;



(iv)    solicit membership in any organization, group or association or contribution;

(v)    parade, patrol, picket, demonstrate or engage in conduct that might interfere with or impede the use of the Joint Use Areas by any customer, invitee or employee, create a disturbance, attract attention or harass, annoy, disparage or be detrimental to the interest of any of the other tenants;

(vi)    use the Joint Use Areas for any purpose when none of the retail establishments within the Shopping Center are open for business;

(vii)    panhandle, beg or solicit funds; nor

(viii)    solicit business.

(s)    Tenant shall have the responsibility for protecting the Leased Premises from theft, robbery and pilferage, and shall keep non-customer doors locked.

(t)    No symbol, design, name, mark or insignia adopted for or used by Landlord in the Shopping Center shall be used by Tenant without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.

(u)    In the event Tenant requires the use of telecommunication, high-speed network or data transmission services from the Leased Premises, Landlord may require Tenant to contract for such services through Landlord or one of Landlord's designated service providers, provided that the cost thereof is comparable to that available to Tenant from another provider, given a comparable level and quality of service and equipment. Landlord's liability relative to such services shall be the same as that for provision of utilities as set forth in ARTICLE 16(g).

Notwithstanding anything in this Lease contained to the contrary, any additional rules and regulations promulgated by the Landlord under any provision of this Lease (including its exhibits) (A) shall be reasonable and uniformly enforced against all tenants and occupants of the Shopping Center, (B) shall neither materially increase the obligations nor materially diminish the rights of Tenant under this Lease, (C) those rules pertaining to the Leased Premises shall be strictly limited to matters of health, safety, sanitation or the operation of utilities and shall in no other manner affect the conduct by Tenant of its business in the Leased Premises, and (D) shall be instituted in writing and with at least thirty (30) days prior notice

## ARTICLE 27 - Eminent Domain

(a)    If the entire Leased Premises is appropriated or taken under eminent domain by any public or quasi-public authority, this Lease shall terminate on the date of the taking. Landlord and Tenant shall be released from liability accruing after that date. If more than 25% of the square footage of floor area (excluding a mezzanine) of the Leased Premises is taken under eminent domain by any public or quasi-public authority, or if because of the appropriation or taking, regardless of the amount taken, the remainder of the Leased Premises is not usable for the purposes specified in Reference Provision 1.03, either Landlord or Tenant shall have the right to terminate this Lease as of the date Tenant is required to vacate a portion of the Leased Premises which has been taken, by giving notice to the other in writing within 60 days after the date of the taking. Landlord and Tenant shall be released from liability accruing after that date.

(b)    If (i) more than 50% of the square footage of the floor area of the Shopping Center (even if the Leased Premises is not included in such taking), (ii) 50% of the square footage of the building, if any, in which the Leased Premises is located (even if the Leased Premises is not included in such taking), or (iii) 25% of the Joint Use Areas are taken under eminent domain by any public or quasi-public authority, then Landlord shall have the right to terminate this Lease as of the date such portions of the Shopping Center, building and/or Joint Use Areas have been taken by giving written notice of such election to terminate within sixty (60) days of such taking.



(c)      In the event of a partial taking of the Leased Premises under the power of eminent domain (or by deed in lieu of condemnation) which does not result in a termination of this Lease, the Minimum Annual Rental shall be reduced by a fraction, the numerator of which shall be the square footage of the Leased Premises so taken and the denominator of which shall be the total square footage of the Leased Premises prior to such taking.

(d)      No temporary taking of the Leased Premises and/or of Tenant's rights therein or under this Lease shall terminate this Lease or give Tenant any right to any abatement of rental hereunder. Any award made to Tenant by reason of any such temporary taking shall belong entirely to Tenant, and Landlord shall not be entitled to share therein; provided, however, that if such award is paid in one or more lump sums, Tenant shall, at Landlord's option, immediately deliver such award as a prepayment of rental, in which case Tenant's obligation to pay rental will be equitably adjusted to reflect the time value of money.

(e)      Except as provided in subparagraph (d) above, whether or not this Lease is terminated, Landlord shall be entitled to the entire award or compensation and any portion of any compensation awarded for the diminution in value of the leasehold interest or fee of the Leased Premises, but Tenant's right to receive compensation or damages for Tenant's fixtures and tangible personal property shall not be affected. If this Lease is terminated, rental, additional rental and other charges for the last month of Tenant's occupancy shall be prorated, and Landlord shall refund to Tenant rental, additional rental or other charges paid in advance.

(f)·     If Landlord and Tenant elect not to terminate this Lease, Tenant shall remain in the portion of the Leased Premises which has not been appropriated or taken. Landlord agrees, at Landlord's cost and expense, to restore the remaining portion of the Leased Premises to the quality and character that existed prior to the appropriation or taking as soon as reasonably possible. The Minimum Annual Rental shall be adjusted, on an equitable basis, taking into account the relative value of the portion taken compared to the portion remaining. A voluntary sale or conveyance in lieu of condemnation, but under threat of condemnation, shall be an appropriation or taking under eminent domain. Tenant shall not have a claim against Landlord because of a taking.

(g)      Landlord and Tenant hereby waive the provisions of Code of Civil Procedure Section 1265.130 allowing either party to petition the Superior Court to terminate this Lease in the event of a partial taking of the Leased Premises.

Notwithstanding anything in this Lease contained to the contrary, in the event of a taking, if this Lease is not terminated, then Landlord, at its sole cost and expense, shall promptly restore the Shopping Center to a complete unit of like quality and character as existed prior to the taking and, if necessary, Landlord shall·promptly restore the remaining portion of the Leased Premises to an architectural unit in the condition that existed prior to such taking. In addition, Rent shall be abated or reduced proportionately during any period in which, by reason of such taking, there is interference with the operation of business in the Leased Premises, taking into account the extent of such interference. If Tenant exercises its reasonable business judgment to discontinue the operation of its business in the Leased Premises, there shall be a full abatement of Rent until the first to occur of (A) the date upon which Tenant reopens for business to the public in the Leased Premises, or (B) the expiration of a period of ninety (90) days after Landlord shall have completed such restoration work as Landlord is obligated to perform hereunder and the interference with the operation of business in the Leased Premises has ceased.

## ARTICLE 28 - Attorneys' Fees

If, during the Term or afterwards, either Party institutes an action, proceeding or counterclaim against the other relating to this Lease, or a default, the unsuccessful Party shall·reimburse the prevailing Party for the total amount of court costs, expenses and reasonable attorneys' fees actually incurred by the prevailing party, including, without limitation, court costs, expenses and reasonable and actual attorneys' fees for any appeal incurred by the prevailing party or in connection with enforcing any judgment awarded to the prevailing party. The giving of a notice of default by Landlord shall constitute part of an action or proceeding under this Lease, entitling Landlord to reimbursement of its reasonable expenses of attorneys' fees and disbursements, even if an action or proceeding is not commenced in a court of law and whether or not the default is cured. This ARTICLE 28 shall survive the expiration or termination of this Lease.



## ARTICLE 29 - Sale of Premises by Landlord

In the event of the sale or exchange of the Leased Premises or the Shopping Center and the assignment by Landlord of this Lease, Landlord shall be relieved of all liability for the covenants and obligations in or derived from this Lease, or arising out of any act, occurrence or omission relating to the Leased Premises or this Lease, except for any ongoing default of Landlord in existence prior to the effective date of assignment by Landlord of this Lease. The covenants, representations and obligations of Landlord shall be binding on Landlord only during the period that Landlord has an ownership interest in the part of the Shopping Center of which the Leased Premises is a part.

## ARTICLE 30 - Notices

Notices and demands shall be given in writing by personal delivery or sent by certified mail or by nationally recognized overnight courier service, addressed to Landlord or to Tenant, as applicable, at the addresses specified in the Reference Provisions or at the addresses which were last specified by notice by Landlord or Tenant. Notices or demands shall be deemed to have been given, made or communicated on the date they were received or receipt refused when deposited in the United States mail as certified mail, with postage fully prepaid, as evidenced by the return receipt, or if sent by reputable overnight courier service, the next business day.

## ARTICLE 31 - Remedies

All rights and remedies of Landlord and Tenant under this Lease or at law are cumulative, and the exercise of one or more rights or remedies shall not exclude or waive the right to the exercise of any others. All rights and remedies may be exercised and enforced concurrently, whenever and as often as desirable.

## ARTICLE 32 - Successors and Assigns

Subject to the terms and conditions of ARTICLE 21, all covenants, promises, conditions, representations and agreements shall be binding upon, apply and inure to Landlord and Tenant and their heirs, executors, administrators, successors and assigns.

## ARTICLE 33 - Representations

Tenant agrees that Landlord, its employees and agents have made no representations, inducements or promises about the Leased Premises, the Shopping Center or this Lease, or about the characteristics or conditions regarding or pertaining to the Leased Premises or the Shopping Center, unless the representations, inducements and promises are set forth in this Lease. Tenant has independently investigated the potential for the success of its operations in the Shopping Center. Therefore, no claim or liability, or cause for termination, shall be asserted by Tenant against Landlord, its employees and agents, for, and they shall not be liable because of, the breach of any representations, inducements or promises not expressly in this Lease, including, without limitation, whether any or all of the buildings or other improvements in the Shopping Center are ever constructed and if constructed, are located as shown on the Site Plan.

## ARTICLE 34 - Waiver

The failure by Landlord or Tenant to insist upon strict performance by the other of any of the covenants, conditions, provisions, reasonable and non-discriminatory rules and regulations and agreements in this Lease, or to exercise a right, shall not be a waiver of any rights or remedies and shall not be a waiver of a subsequent breach or default. A surrender of the Leased Premises shall not occur by Landlord's acceptance of rental or by other means unless Landlord



accepts the surrender in writing. A payment by Tenant or receipt by Landlord of an amount less than the monthly rental shall not, nor shall the endorsement, statement, check, letter accompanying a check or payment of rental, be an accord and satisfaction. Landlord may accept a check or payment without prejudice to its right to recover the balance of rental due and pursue any other remedy. A waiver by Landlord for one tenant shall not constitute a waiver for another tenant.

### ARTICLE 35 - Holding Over

If Tenant remains in possession of the Leased Premises after the expiration of the Term without a new lease (even if Tenant has paid and Landlord has accepted rental), Tenant shall be deemed to be occupying the Leased Premises as a tenant from month to month, subject to the covenants, conditions and agreements of this Lease. The Minimum Annual Rental in effect shall be an amount equal to one hundred fifty percent (150%) of the Minimum Annual Rental during the last month of the Term, and such tenancy may be terminated at the end of any month thereafter by either party by giving at least thirty (30) days' notice thereof to the other party. Notwithstanding anything to the contrary herein, provided Landlord and Tenant are engaged in good-faith negotiations for a renewal or extension of this Lease, as evidenced by an exchange of letters of intent or other correspondence between the parties expressing a mutual desire to renew or extend the term of this Lease, Tenant shall continue to pay Minimum Annual Rental which was due and payable under the Lease at the end of the Term until such time that the negotiations are terminated by either party.

### ARTICLE 36 - Interpretation

Only the relationship of Landlord and Tenant is created by this Lease. No provision of this Lease or act of either Party shall be construed to create the relationship of principal and agent, partnership, or joint venture or enterprise.

### ARTICLE 37 - Advertising and Promotional Service

[Intentionally Deleted]

### ARTICLE 38 - Quiet Enjoyment

Landlord has the right, power and authority to enter into this Lease. Tenant, or any permitted assignee or sublessee of Tenant, upon the payment of the rental and performance of Tenant's other covenants, shall and may peaceably and quietly have, hold and enjoy the Leased Premises during the Term. This covenant shall be construed as a covenant running with the land. It shall not be construed as a personal covenant of Landlord.

### ARTICLE 39 - Waiver of Redemption

Intentionally omitted.

### ARTICLE 40 - Fees

Landlord and Tenant warrant that they have had no dealings with any broker or agent in connection with the negotiation or execution of this Lease, other than Landlord's Broker and Tenant's Broker (collectively, the "Broker"), and Landlord is solely responsible for any commissions and fees payable to Broker in connection with this Lease. Landlord and Tenant agree to indemnify and hold each other harmless from and against any and all claims, losses, costs or expenses (including reasonable and actual attorneys' fees and expenses) for commissions or other compensation or charges claimed by any other broker or agent with respect to this Lease.



### ARTICLE 41 - Tenant's Property

Intentionally omitted.

### ARTICLE 42 - Lease Status

Within 30 days of Tenant's receipt of Landlord's written request, Tenant shall, without charge, execute, acknowledge and deliver to Landlord an instrument required under this Lease or an instrument prepared by Landlord containing the commencement and termination dates of this Lease, the Rental Commencement Date, and if true, that (a) this Lease is a true copy of the Lease between the Parties, (b) there are no amendments (or stating the amendments), (c) the Lease is in full force and effect and that, to the best of Tenant's knowledge and belief, there are no offsets, defenses or counterclaims of rental or in the performance of the other covenants and conditions to be performed by Tenant (and if any are claimed by Tenant, specifying the nature of such offsets, defenses, or counterclaims), (d) to the best of Tenant's knowledge and belief, no default has been declared by either Party and that Tenant, to the best of its knowledge and belief, has no knowledge of any facts or circumstances which it believes would constitute a default by either Party (or if such defaults are alleged to exist, a description of such alleged defaults) and (e) any other matters reasonably requested by Landlord. Anyone transacting with Landlord shall have the right to rely on the accuracy of the statements contained in the instrument, which is signed by Tenant pursuant to this ARTICLE 42.

### ARTICLE 43 - Recording

Tenant shall not record this Lease, a memorandum, "short form" or other reference to this Lease, without the written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.

### ARTICLE 44 - Force Majeure

If either Party is delayed, hindered or prevented from the performance of an obligation because of strikes, lockouts, labor troubles, the inability to procure materials, power failure, restrictive governmental laws or regulations, riots, insurrection, war or another reason not the fault of the Party delayed (collectively, "Force Majeure"), but not including financial inability, the performance shall be excused for the period of delay. The period for the performance shall also be extended for a period equal to the period of delay. Nothing in this ARTICLE 44 shall excuse Tenant from the prompt payment of rental, additional rental or other payments.

Notwithstanding anything in this Lease contained to the contrary, Tenant shall be relieved of its obligations to operate its business in the Leased Premises, to take possession of the Leased Premises and to pay Rent to Landlord during any period of time during which Tenant or the Shopping Center is not open to the public for business following an act of God or Force Majeure event (including, without limitation, COVID-19 or other pandemics, viral infections, or other widespread disease or pestilence) or similar event outside of the reasonable control of Tenant and the occurrence of which renders it impracticable for Tenant to be open and operate in the Leased Premises and/or accept possession (as determined by Tenant in its reasonable discretion). In addition, Tenant shall not be required to accept possession of the Leased Premises until ninety (90) days after the Shopping Center has reopened for business following a closure for any of the reasons described in this paragraph.

### ARTICLE 45 - Construction of Lease

Tenant has read and understands this Lease. The rule of construction that a document should be construed most strictly against the Party which prepared the document shall not be applied, because both Parties have participated in the preparation of this Lease.



## ARTICLE 46 - Security Deposit

[INTENTIONALLY DELETED]

## ARTICLE 47 - Captions

Captions are for convenience and reference only. The words contained in the captions shall not be deemed to explain, modify, amplify or aid in the interpretation, construction or meaning of this Lease. The use of masculine or neuter genders shall include the masculine, feminine and neuter genders. The singular form shall include the plural if the context requires. "Landlord" and "Tenant" means "Landlord" and "Tenant" and "their agents and employees", unless the context requires otherwise.

## ARTICLE 48 - Severability

If any provision of this Lease or any paragraph, sentence, clause, phrase or word is judicially or administratively held invalid or unenforceable, that shall not affect, modify or impair any other paragraph, sentence, clause, phrase or word. The Parties acknowledge that certain charges, fees and other payments are deemed "additional rental" in order to enforce Landlord's remedies, and shall not be construed to be "rent" if rent controls are imposed.

## ARTICLE 49 - Objection to Statements

Intentionally omitted.

## ARTICLE 50 - Liability of Landlord

Landlord's liability under this Lease or arising out of the relationship of the Parties shall be limited to Landlord's interest in the Shopping Center as well as the rents, profits and proceeds derived therefrom. Judgments rendered against Landlord shall be satisfied solely out of the proceeds of the sale of Landlord's interest in the Shopping Center which have been received by Landlord. No personal judgment shall apply against Landlord upon extinguishment of its rights in the Shopping Center. A personal judgment shall not create a right of execution or levy against any of Landlord's other assets. The provisions of this ARTICLE 50 shall inure to Landlord's successors and assigns. These provisions are not designed to relieve Landlord from the performance of its obligations under this Lease, but to limit the personal liability of Landlord in case of a judgment against Landlord. Tenant's right to obtain injunctive relief or specific performance or to have any other right or remedy which may be awarded Tenant by law or under this Lease shall not be limited however. No personal liability is assumed by nor shall at any time be enforceable against Landlord and under no circumstances shall Landlord be liable for injury to Tenant's business or for any loss of income or profit therefrom.

## ARTICLE 51 - No Option

The submission of this Lease is not a reservation of or option for the Leased Premises or any other space in the Shopping Center, and vests no right in Tenant. This Lease shall become effective only upon proper execution and delivery by the Parties.

## ARTICLE 52 - Execution of Documents

Intentionally omitted.



## ARTICLE 53 - Corporate Tenant

If Tenant is or will be a corporation or partnership or limited liability company of any kind, the persons executing this Lease on behalf of Tenant covenant and represent that Tenant is a duly incorporated or duly qualified (if foreign) corporation or partnership, as the case may be (including without limitation a limited liability corporation and a limited liability partnership) and is authorized to do business in the State where the Shopping Center is located (evidence shall be supplied Landlord upon request). Tenant also covenants and represents that the person or persons, partner or member executing this Lease on behalf of Tenant is (if a corporation) an officer of Tenant, and is (if a corporation or partnership of any kind) authorized to sign and execute this Lease.

## ARTICLE 54 - Printed Provisions

The printed provisions of this Lease and written or typed additions shall be given equal weight for the interpretation of this Lease. The deletion of any portion of this Lease shall not create an implication regarding the intent of the Parties, and this Lease shall be read and interpreted as if the deleted portion had never been in this Lease.

## ARTICLE 55 - Entire Agreement

This Lease is the only agreement between the Parties for the Leased Premises. An amendment, modification or supplement to this Lease shall not be effective unless it is in writing and executed by the Parties.

## ARTICLE 56 - No Third-Party Rights

This Lease shall not confer rights or benefits, including third-party beneficiary rights or benefits to anyone that is not a named party to this Lease, including any individual, corporation, partnership, trust, unincorporated organization, governmental organization or agency or political subdivision.

## ARTICLE 57 - Financial Statements

Intentionally omitted.

## ARTICLE 58 - Other Locations

Intentionally omitted.

## ARTICLE 59 - Tenant's Failure

This Lease shall be governed by the laws of the State in which the Shopping Center is located and shall be deemed made and entered into in the county in which the Shopping Center is located. If Tenant fails to comply with and perform any of its covenants, conditions or agreements, Landlord shall have the right, but not be obligated, to perform the covenants, conditions or agreements. Tenant shall pay to Landlord within thirty (30) days following Tenant's receipt of written notice from Landlord thereof, as additional rental, a sum equal to the amount spent by Landlord for the performance. If Landlord performs any covenants, conditions or agreements, Landlord, its agents or employees, subject to ARTICLE 22, may enter the Leased Premises. That entry and performance shall not constitute an eviction of Tenant in whole or in part, nor relieve Tenant from the performance of the covenants, conditions and agreements.



## ARTICLE 60 - Ownership

(a)      If the ownership of the Shopping Center is in a Real Estate Investment Trust, then Landlord and Tenant agree that Minimum Annual Rental, Percentage Rental and all additional rental paid to Landlord under this Lease (collectively referred to in this Article as "Rent") shall qualify as "rents from real property" within the meaning of Section 856(d) of the Internal Revenue Code of 1986, as amended (the "Code") and the U.S. Department of Treasury Regulations (the "Regulations"). Should the Code or the Regulations, or interpretations of them by the Internal Revenue Service contained in Revenue Rulings, be changed so that any Rent no longer qualifies as "rent from real property" for the purposes of Section 856(d) of the Code and the Regulations, other than by reason of the application of Section 856(d)(2)(B) or 856(d)(5) of the Code or the Regulations, then Rent shall be adjusted so that it will qualify (provided however that any adjustments required pursuant to this Article shall be made so as to produce the equivalent (in economic terms) Rent as payable prior to the adjustment).

(b)      Any services which Landlord is required to furnish pursuant to the provisions of this Lease may, at Landlord's option, be furnished from time to time, in whole or in part, by employees of Landlord or Landlord's affiliates or by one or more third parties hired by Landlord or Landlord's affiliates. Tenant agrees that upon Landlord's written request it will enter into direct agreements with the parties designated by Landlord to provide such services, provided that no such contract shall result in Tenant having to pay, in the aggregate, more money for the occupancy of the Leased Premises under the terms of this Lease, or Tenant's receiving fewer services or services of a lesser quality than it is otherwise entitled to receive under the Lease.

## ARTICLE 61 - Special Provisions

(a)      Relocation of the Leased Premises.  Intentionally omitted.

(b)      Options to Extend.

         (i)      Subject to the terms and conditions of this ARTICLE 61(b), Landlord hereby grants to Tenant the options (each an "Option") to extend the initial Term of this Lease for three (3) consecutive periods of five (5) years each (each an "Option Period"). All terms, provisions, obligations and rights set forth in this Lease shall apply to each Option Period, except (A) this ARTICLE 61(b) shall not apply to increase the number of Option Periods, (B) Minimum Annual Rental and Percentage Rental shall be adjusted at the commencement of each applicable Option Period as set forth in Reference Provision 1.07 and Reference Provision 1.09, and (C) Landlord shall have no obligation to pay the Construction Allowance described in Reference Provision 1.18. After the exercise of any Option, all references in this Lease to the Term or the Term hereof shall be considered to mean the Term as so extended, and all references to the termination or end of the Term hereof shall be considered to mean the termination or end of the Term as so extended. Tenant's right to exercise each Option is subject to:

         (ii)      The following conditions precedent:

         (A)      This Lease shall be in full force and effect at the time notice of exercise is given, and on the last day of the then applicable Term hereof.

         (B)      Tenant shall not be in default under any term or provision of this Lease at the time notice of exercise is given, beyond any and all applicable notice and cure periods provided for in this Lease.

         (C)      Intentionally omitted.

         (D)      Tenant's successful exercise of the Option to extend the Term for the first Option Period shall be a condition precedent to Tenant's exercise of the Option to extend the Term for the second Option Period.

         (E)      Tenant's successful exercise of the Option to extend the Term for the second Option Period shall be a condition precedent to Tenant's exercise of the Option to extend the Term for the third Option Period.



(iii)     Compliance with the following procedure for exercise:

(A)     Tenant shall, not less than one hundred eighty (180) days prior to the last day of the then applicable Term hereof, give Landlord written notice exercising the applicable Option.

(B)     At the request of Landlord, Tenant shall execute an amendment or other written memorandum hereof, acknowledging the fact that the applicable Option has been exercised to effect such extension of the Term hereof.

(iv)     Except for any Permitted Transactions, the Option may not be exercised or assigned involuntarily by or to any person or entity other than Tenant, nor shall the Option be assignable apart from this Lease, without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

### ARTICLE 62-Counterparts

This Lease may be executed in one or more counterparts, including any facsimile or other electronic version of same, each of which shall be deemed an original, but all of which when taken together shall constitute one agreement. Any facsimile or other electronic signature shall constitute a valid and binding method for executing this Lease. Executed counterparts of this Lease exchanged by facsimile transmission or other electronic means shall be fully enforceable.

### ARTICLE 63- Landlord Waiver of Lien

Landlord hereby waives any and all lien rights it may have, statutory or otherwise, concerning the personal property or fixtures of Tenant which shall be considered personal property for purposes of this Lease, and Landlord gives Tenant and any mortgagee of Tenant the right to remove all or any portion of the same from time to time prior to the expiration or earlier termination of the Term, whether before or after a default under this Lease, in Tenant's and/or Tenant's mortgagee's sole discretion and without Landlord's consent.

[SIGNATURES ON NEXT PAGE]

IN WITNESS WHEREOF, the Parties hereto have executed this Lease as of the Commencement Date.

**LANDLORD:**

**BROADSTONE LAND, LLC,**
a California limited liability company

By: _____

Its: _____

**TENANT:**

**CHARMING CHARLIE MARKETS INC,**
a Delaware corporation

By: *Stephen F. Lovell* _____

Its: _____**President & COO**_____

## EXHIBIT A

### PLANS OF LEASED PREMISES





## EXHIBIT A-1

## NO KIOSK ZONE and NO JEWELRY KIOSK ZONE

1. No Jewelry Kiosk Zone: 75' radius from demising walls of Leased Premises. (see below for graphical depiction)

2. No Kiosk Zone: The area bounded by: (i) the storefront, (ii) the lines projected at 90 degrees from the point of the storefront that is 12 feet on either side of the the front door of the Leased Premises, and (iii) the storefront of the tenant premises situated directly across from the storefront of the Leased Premises. (see below for graphical depiction)



## **EXHIBIT B**

### **SITE PLAN**



## EXHIBIT B-1

### NO-BUILD/NO CHANGE AREA

### (labeled as Tenant Control Area)



## EXHIBIT C-L

## DESCRIPTION OF LANDLORD/TENANT WORK

## LIFESTYLE TENANTS

### PALLADIO AT BROADSTONE

### FOLSOM, CALIFORNIA

Tenant accepts the Leased Premises in its "as-is" condition, provided that the Premises is structurally and mechanically sound, water tight, free of seismic, structural or latent defects, free of Hazardous Materials and in compliance with all applicable laws (including but not limited to any Americans with Disabilities Act compliance with respect to any access points to the Premises). Tenant, at Tenant's expense, shall complete any improvements that may be required for Tenant's use of the Leased Premises. If Tenant's design is not feasible with the existing utility locations, such as mechanical, electrical, plumbing or fire protection, any alterations to the existing utility locations shall be completed by Tenant at Tenant's expense subject to Landlord's prior approval, which approval shall not be unreasonably withheld, conditioned or delayed. All such work shall be in accordance with this EXHIBIT "C-L", EXHIBIT "L-W", the Tenant Criteria Manual for Palladio at Broadstone, the Tenant Signage Criteria Manual for Palladio at Broadstone and other information contained within the Tenant Package referenced below. If there is any conflict between the Tenant Criteria Manual and the Tenant Signage Criteria Manual with respect to signage, then the Tenant Signage Criteria Manual shall control. All work to be performed by Landlord in delivering the Leased Premises to Tenant shall be limited to those items expressly set forth in this EXHIBIT "C-L", EXHIBIT "L-W" and ARTICLE 2 of the Lease as work to be performed by Landlord. For the avoidance of any doubt, if Landlord is not required to perform any work, then all references to Landlord's Work or work to be performed by Landlord as set forth in this EXHIBIT "C-L", or elsewhere in this Lease, shall not be applicable to or binding on Landlord. Notwithstanding anything to the contrary set forth herein, Landlord acknowledges and agrees that Tenant shall not be required to prepare or submit a set of drawings since Tenant will only be performing a cosmetic remodel at the Premises. In no event shall Tenant be required to obtain any permits unless required by the local municipality to commence or complete Tenant's initial work.

### A. TENANT PACKAGE

Tenant Package: Landlord shall provide to Tenant a Tenant Package to better identify the Leased Premises and provide details in describing conditions of the shell structure. This package may contain such items as:

a. Lease exhibit drawing indicating approximate Leased Premises.

b. Base building construction documents as prepared by a registered architect and licensed engineer of the state in which the Shopping Center is located of the Leased Premises including architectural, structural, mechanical, electrical and plumbing details of Landlord's construction. Dimensional floor plan drawings, if available. Tenant acknowledges it shall not rely upon such drawings and must field verify physical dimensions and conditions in the Leased Premises prior to submittal of final plans and during Tenant's Work (defined in ARTICLE 2 of the Lease.)

c. Tenant Criteria Manual and the Tenant Signage Criteria Manual containing Tenant-required drawing submission information, sign criteria, architectural, electrical and mechanical information necessary for the preparation of Tenant's plans, typical detail sheets, and other information.

### B. TENANT PLAN SUBMITTAL REQUIREMENTS

1.  **Tenant Preliminary Concept Drawings**

    Tenant shall provide preliminary concept drawings indicating the proposed tenant improvements for the Leased Premises. These drawings are required for confirmation and coordination with Landlord's scope of work for base building construction. The Tenant's preliminary concept drawings shall consist of, but not be limited to, schematic architectural floor plan, fixture plan, storefront elevation and section, color and material samples and color rendering.

2.  **Tenant Working Drawings**

    Tenant shall provide working drawings consisting of architectural, mechanical, electrical, plumbing, structural, life safety, specifications and supporting calculation data, prepared by a registered architect and licensed engineer of the state in which the Shopping Center is located as deemed necessary by Landlord. Refer to Tenant Package for details.

3.  **Tenant Plan Submittal & Additional Requirements**

    a.  By the submittal date for the Tenant preliminary plans and specifications specified in the Reference Provisions, Tenant agrees to notify Landlord of the identity and mailing address of the licensed architect engaged by Tenant for the preparation of plans for Tenant's Work. At the same time Tenant, at Tenant's expense, shall cause Tenant's architect to prepare and deliver to Landlord for Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed, one (1) preliminary drawing submittal for Tenant's Work, adhering to the requirements as described in the Tenant Package.

    b.  If Tenant does not furnish Landlord with the identity of Tenant's architect or furnish Landlord with drawings and specifications or furnish Landlord with drawings and specifications by the required date, Landlord shall have the right, in addition to any other right or remedy it may have at law or in equity, to cancel and terminate this Lease by written notice to Tenant. Landlord shall in addition to all other remedies, be entitled to retain and have recourse to any bond, deposit or advance rental previously deposited by Tenant under this Lease as liquidated damages.

    c.  By the submittal date for final plans and specifications specified in the Reference Provisions, Tenant, at Tenant's expense, shall cause Tenant's architect to prepare and deliver to Landlord for Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed, three (3) sets of final working drawings and specifications for Tenant's Work, adhering to the requirements as described in the Tenant Package.

    d.  Landlord shall review Tenant's drawings and specifications and notify Tenant within 15 days of their receipt if they do not meet with Landlord's approval. Tenant shall, within 10 days of the receipt of notification, revise and resubmit the drawings and specifications. When Landlord has approved Tenant's drawings and specifications, Landlord shall initial and return one (1) set of approved drawings to Tenant. That set shall show the date of Landlord's approval, and shall be made a part of this Lease as **EXHIBIT "P"**.

    e.  If any changes and/or revisions are made in Tenant's working drawings and specifications after Landlord's initial approval, Tenant shall deliver to Landlord one set of revised working drawings and specifications for additional approval, which approval shall not be unreasonably withheld, conditioned or delayed.

    f.  No approval by Landlord shall be valid unless signed in writing by Landlord or Landlord's representative.

    g.  Tenant shall prepare its plans and perform Tenant's Work in compliance with Landlord's requirements, governing statutes, ordinances, regulations, codes and insurance rating boards. Landlord's approval

does not relieve Tenant of its obligation to complete Tenant's Work in accordance with the terms of the Lease, nor of the necessity of Tenant's compliance with the laws, rules, regulations and ordinances of local governing authorities.

h.   Any approval by Landlord or Landlord's architect shall neither obligate Landlord in any manner whatsoever with respect to the finished product, design and/or construction by Tenant nor be deemed to be a modification or amendment to the provisions of the Lease. Any deficiency in design or construction, with or without prior approval of Landlord, shall be solely the responsibility of Tenant. Tenant shall be solely responsible for corrections in Tenant's Work and its working drawings and specifications required by governmental authority.

i.   Notwithstanding anything to the contrary contained in this Lease, Tenant shall comply with the Americans with Disabilities Act of 1990 ("ADA"), and any amendment to the ADA, as well as applicable state, local laws, regulations, ordinances and independent inspections as they apply to the interior nonstructural portions of the Premises.

j.   Intentionally omitted.

## C.   STRUCTURE

1.   Building Shell

   a.   Except as provided in EXHIBIT "L-W" with respect to restaurant users and pad tenants, Landlord shall provide a concrete floor slab within the interior of the Leased Premises as defined in EXHIBIT "L-W".

   Such concrete slab shall be installed in accordance with the requirements as described in the Tenant Criteria Manual. If Tenant's requirements exceed the designed live load, Tenant shall furnish Landlord with load information prepared by a licensed structural engineer. At Landlord's option, Landlord may, at Tenant's expense, submit structural information to its engineer for verification.

   b.   Tenant is responsible for maintaining the integrity of the concrete slab. Any alteration to Landlord's slab or new slab construction shall be executed in accordance with the requirements described in the Tenant Criteria Manual.

   c. ·  Upper and lower level suspended slab floor penetrations shall be core-drilled; no saw cutting or trenching is permitted. All floor penetrations shall be sleeved and sealed as required in the Tenant Criteria Manual.

   d.   Structural modifications and/or additions by Tenant to Landlord's structure are subject to Landlord's prior approval, which approval shall not be unreasonably withheld, conditioned or delayed. Tenant shall submit structural calculations, which have been prepared by a licensed structural engineer, to Landlord for review by Landlord's engineer, at Tenant's expense.

2.   Roof Penetrations

   Roof penetrations by Tenant shall not be allowed except as permitted by the Tenant Criteria Manual. Penetrations, flashing and patching of the roofing system shall be made by Landlord's roofing contractor, subject to Landlord's prior approval, which approval shall not be unreasonably withheld, conditioned or delayed, at Tenant's expense. Any structural framing or structural calculations required by Landlord as a result of Tenant's roof penetrations shall be performed at Landlord's option by Landlord's contractor, at Tenant's expense. Any associated curbs, rails, skids, etc. which can impact the roof system shall be designed in accordance with the manufacturer's recommendations and installed by Landlord's approved roofing contractor, at Tenant's expense.

EXHIBIT C-L
3

3.  Waterproof Membrane

All food tenants, high water use tenants such as beauty salons, pet stores, etc. whose design includes water being present, such as in kitchens or restrooms, shall install and maintain a waterproof membrane approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed, throughout the Leased Premises. A water test may be required to be performed by Tenant. Tenant is responsible for maintaining liquid-tight capacities of the floor and other boundaries of the Leased Premises.

4.  Fireproofing

Landlord shall provide fire retardant material, if required, per code, on its structure within the Leased Premises as defined in EXHIBIT "L-W". Tenant shall be required to protect fireproofing and damage to fireproofing shall be repaired by Tenant as necessary to meet the requirements and recommendations of applicable code and local inspectors, at Tenant's expense.

## D. EXTERIOR STOREFRONTS AND FAÇADES

1.  Neutral Piers and Bulkhead

Landlord shall provide neutral surfaces or structural columns at or near the lease line separating Tenant storefront construction from another adjacent space. The exterior storefront area will be left open for Tenant construction between the edges of the Landlord provided neutral surfaces.

2.  Additional Storefront Facade Requirements

a.  Landlord has established design criteria regulating materials and construction of the storefronts and signage so they contribute to the overall design concept of the Shopping Center. In order to contribute to this theme, the overall storefront design must conform to the design criteria contained in the Tenant Criteria Manual. Landlord has the right to reject storefronts which do not meet the design criteria, and to accept and approve unusual designs that deviate from the required criteria, all at Landlord's reasonable discretion.

b.  Tenant is responsible for constructing complete exterior storefronts, including any framing, glazing, doors, insulation, finishes, parapets/cornices and awnings. All exterior storefronts shall be composed of weather-tight components including any necessary flashing, sealing and other waterproofing measures. Tenant's storefront(s) shall extend to the full height as specified in the Tenant Criteria Manual and as approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed. Tenant shall design, engineer and properly connect its construction to Landlord's bulkhead as required for Tenant's scope of work. Refer to the Tenant Criteria Manual for additional information and details. Tenant shall be solely responsible for the repair of damage it causes to Landlord's finish material or adjacent tenant storefronts.

c.  Tenant's storefronts shall be structurally engineered and be self-supporting. Limited lateral bracing is permitted from Landlord's structure. The storefront or any part of Tenant's construction cannot be suspended from Landlord's bulkhead, framing or structure.

## E. DEMISING WALLS AND EXITS

1.  Demising Walls

a.  Landlord shall provide demising walls as described in EXHIBIT "L-W".

b.  Tenant is responsible for furnishing gypboard on all demising partitions and surfaces in accordance with code and as described in the Tenant Criteria Manual. Tenants whose traditional use and

operations generate moderate or high sound levels shall insulate their demising walls and ceiling against sound transmission as described in the Tenant Criteria Manual.

c.   Tenants are prohibited from allowing music or other sounds to emanate from their space into an adjacent tenant space or into the Shopping Center common area.  Tenants who generate sound levels greater than 40 decibels, or as otherwise deemed necessary by Landlord, shall insulate their space against sound transmission. Methods to prevent sound transmission must be thoroughly detailed on Tenant's plans and is subject to Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed, as described in the Tenant Criteria Manual.

d.   Tenant is responsible for providing Landlord with anticipated load and weight calculations for any wall hung fixtures.  If Landlord deems necessary, Tenant shall provide backing and bracing support to demising walls to compensate for loading imposed by Tenant's wall-hung fixtures at Tenant's expense.

e.   Tenant is responsible for the construction of any wall in which an expansion joint occurs. The construction of such wall shall be in accordance with acceptable construction design practices and applicable codes.

2.   Service Doors

Tenant is responsible for furnishing and installing a service door connecting to service corridors or Shopping Center exterior service areas unless noted otherwise in EXHIBIT "L-W".  The door shall comply with applicable code requirements and Landlord requirements as described in the Tenant Criteria Manual.

3.   Exit Requirements

Except as provided in EXHIBIT "L-W", Tenant is responsible for providing all exit requirements and exit identifications within the Leased Premises in accordance with requirements of applicable codes and subject to approval by the local building authority.

## F.   INTERIOR FINISHES, FURNISHINGS AND EQUIPMENT

1.   Floor Finish

Tenant is responsible for all floor finish covering materials for the Leased Premises and shall make a smooth level transition with Landlord's paving material at the lease/closure line.  Tenant shall protect and repair any damage to Landlord's floor finish material, at Tenant's expense.  Tenant is solely responsible for waterproofing its exterior slab and façade construction against water infiltration.

2.   Walls Finish

Tenant is responsible for the installation of finished walls on the demising partitions, including any necessary additional supports, wall blocking, fire taping and wall finishes, at Tenant's expense.

3.   Ceilings

Ceiling height limitations are created by existing conditions and floor-to-floor heights vary throughout the Shopping Center.  Where building conditions permit, higher ceilings may be allowed with the written approval of Landlord, which approval shall not be unreasonably withheld, conditioned or delayed.  Any relocation of or modification to existing piping, conduit and/or ductwork necessitated by Tenant's installation of a ceiling shall be at Tenant's expense.  If the area above the ceiling is a return air plenum, ceilings are required throughout the Leased Premises including, without limitation, stock and toilet rooms.

4.   Access Panels

Tenant is responsible for providing access panels throughout the Leased Premises. Tenant shall at minimum provide 24" x 24" flush mount access panels in the ceiling within the Leased Premises at dampers, valves, cleanouts, HVAC equipment and elsewhere as required by Landlord or as required by code in order to provide access to the equipment.

5. Furnishings and Equipment

Tenant is responsible for furnishing and installing all fixtures, furnishings, equipment, shelving, trade fixtures, leasehold improvements, interior decorations, graphics, signs, mirrors, coves and decorative light fixtures and other special effects, as first approved and permitted by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed, and in accordance with all applicable federal, state, local laws, regulations and ordinances.

## G.   SIGNAGE AND AWNINGS

Tenant Signage and Awning Submittal

a. Tenant shall submit signage and awning (if applicable) manufacturer's shop drawings to Landlord depicting signage, lettering dimensions, overall dimensions, color, materials, mounting details, quantities and location(s) of the signage and/or awning in relation to each elevation, as described in the Tenant Criteria Manual and the Tenant Signage Criteria Manual, as applicable. Tenant is responsible for the proper structural design and support for all such elements. Signs, permits and related or resulting construction shall be Tenant's responsibility. All signs and awnings shall be installed under the supervision of Landlord's on-site representative. Tenant's contractor(s) shall repair any damage caused by their work.

b. Landlord's final written approval, which approval shall not be unreasonably withheld, conditioned or delayed, is required prior to sign and awning fabrication. Tenant shall not be permitted to open for business in the Leased Premises without a sign that has been approved in writing by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed, and which conforms to applicable building and electrical codes.

## H.   HEATING, VENTILATION, AIR-CONDITIONING

1. Landlord provided Heating, Ventilation and Air Conditioning System, "HVAC System"

Landlord may provide, at its option, the HVAC system to the Leased Premises, as defined in EXHIBIT "L-W" and the Tenant Criteria Manual. In the alternative, if the HVAC is to be installed by Tenant, Landlord may specify the HVAC System (manufacturer and model number) to be installed in the Leased Premises as well as the HVAC contractor selected by Landlord to install such HVAC System to the RTU curb installed by Landlord. Except as provided herein, Tenant is responsible for design and installation, at its sole expense, of the mechanical system within the Leased Premises from Landlord's distribution point.

2. Tenant provided Roof Top Unit, "RTU System"

a. In the event Landlord does not provide the HVAC system, Tenant is required to design and install the RTU System to the Leased Premises as more fully described in EXHIBIT "L-W", the Tenant Criteria Manual and as approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed.

b. Landlord may provide, at its option, universal roof supports for roof-mounted equipment.   Tenant shall reimburse Landlord for all associated costs.

c. Tenant may, at its sole expense, upon prior written approval of Landlord, which approval shall not be unreasonably withheld, conditioned or delayed, install and operate a supplemental RTU System on the roof of the Shopping Center as more fully described in EXHIBIT "L-W", the Tenant Criteria Manual and as approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed. The RTU System shall supplement, and not replace, any existing air conditioning unit, and shall be compatible with the Landlord's provided air conditioning system in all respects including, but not limited to, roof integrity, structure, electrical systems air flow, electrical load, life safety and alarm systems and utility capacity.

d. Tenant shall locate the RTU System and provide structural modifications in order to comply with the Shopping Center's structural load limits. Tenant shall submit structural calculations, which have been prepared by a licensed structural engineer, to Landlord for review by Landlord's engineer, at Tenant's expense. Landlord may require modifications to Tenant's design and construction.

e. Tenant shall not install or operate the RTU System without the prior written approval of Landlord, which approval shall not be unreasonably withheld, conditioned or delayed. Tenant shall not enter the roof without prior permission from a representative of Landlord.

f. Tenant shall supply Landlord with maintenance agreements, plans and specifications for the installation and operation of the RTU System.

g. Intentionally omitted.

3. Additional Tenant Requirements

a. Tenant is responsible for providing the mechanical system within the Leased Premises, including but not limited to maintenance, supply metal ductwork, grilles, registers, electrical wiring, controls, heating, heat detection and circuitry necessary for the satisfactory operation of an air conditioning system. Refer to Tenant Criteria Manual for details.

b. Tenant is responsible for the design of all ductwork and accessories for air distribution in accordance with the procedures described in the American Society of Heating, Refrigerating, and Air Conditioning Engineering Guide ("ASHRAE"), and in accordance with the latest methods recommended in the Sheet Metal and Air Conditioning Contractors National Association ("SMACNA") low velocity duct manual, and as otherwise set forth by code.

c. In the event Landlord has designated a pre-approved mechanical contractor, Tenant will be required to use Landlord's contractor for the purchase and installation of Tenant's HVAC unit, heating & cooling equipment and HVAC curb, all at Tenant's sole expense. Refer to Tenant Criteria Manual for details.

d. Tenant is responsible for providing the Leased Premises with its own thermostat(s) in accordance with the requirements of the Tenant Criteria Manual.

e. Tenant shall provide plans, specifications and calculations required in connection with the installation and operation of Tenant's HVAC System. Any review of the plans, specifications and calculations performed by Landlord or Landlord's engineer, as Landlord deems necessary, shall be at Tenant's expense.

f. Tenant is required to route HVAC condensation lines as directed by code and the Shopping Center on-site representative.

g. Tenant is responsible for providing Landlord copies of air test and balance reports upon completion of work.

h.   Tenant shall reimburse Landlord, at Landlord's option, for any measurement system(s) required by Landlord for measuring Tenant's consumption of conditioned air.

i.   Except as otherwise provided for in EXHIBIT "L-W" and the Tenant Criteria Manual, Landlord may provide, at its option, a smoke evacuation and control system within the Leased Premises.

j.   Tenant's HVAC System and related rooftop equipment must be compatible with Landlord's safety/smoke exhaust system. Alterations to and interface with Landlord's life safety/smoke exhaust system shall be by Landlord's contractor at Tenant's sole expense.

k.   Tenant may be required to provide and install, at Tenant's expense, heat or smoke detectors within the Leased Premises to shut down the heating, air conditioning and ventilation whenever an abnormal condition is detected. In addition, these devices may be required by local code authorities as part of the fire prevention smoke removal system. Refer to Tenant Criteria Manual for details.

l.   Landlord shall have the right to require Tenant to cease operation of the Tenant's HVAC System, if it is causing damage to any of the structural or mechanical elements of the Shopping Center, interfering with or diminishing any service provided by Landlord or others, or interfering with any other tenant's business.

## I.   TOILET EXHAUST SYSTEM

Toilet Exhaust Systems

Tenant is required to design and install the exhaust system for the Leased Premises, per code and as defined in EXHIBIT "L-W" and the Tenant Criteria Manual.

## J.   SPECIAL EXHAUST AND MAKE-UP AIR SYSTEMS

1.   Special Exhaust Systems

Odors produced by tenants such as food service, beauty salons, pet shops, etc. must be exhausted to the atmosphere through a tenant-furnished exhaust system. Tenant shall design and install an engineered exhaust and make-up air system to maintain a negative pressure in the Leased Premises to keep odors from disturbing Landlord, customers and other tenants. The location and minimum distance of exhaust fans from any air intakes shall be directed by Landlord and in accordance with applicable code. Refer to Tenant Criteria Manual for details.

2.   Make-up Air Systems

Make-up air systems from as referenced in 1 above shall be furnished and installed by Tenant, upon Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed.

3.   Exhaust Discharge

a.   Tenant is responsible for providing mushroom-type exhaust discharge outlets. All roof-mounted equipment shall be approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed, and installed on curbs per the specifications in the Tenant Criteria Manual. All roof flashing shall be performed by Landlord's roofing contractor at Tenant's expense. Projections above 3'-0" will require approval by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed, and may require additional screening by Tenant.

b.   Tenant shall provide a residue trough grease containment system, approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed, on all roof-mounted grease

exhaust discharge equipment. The containment system shall be cleaned and replaced on a regular basis.

4. Damper Control and Interlock

Tenant shall provide damper controls with automatic fan shutdown and interlock to maintain the original design air balance approved by Landlord and in accordance with applicable code. The control system must be able to shut down its fans in case of fire.

## K. UTILITIES

1. Electric Service

   a. Landlord shall provide the main electric distribution system as described more fully in EXHIBIT "L-W" and the Tenant Criteria Manual.

   b. Landlord shall provide an empty electrical conduit to the Leased Premises and associated electrical equipment serving the Leased Premises as described in EXHIBIT "L-W".

   c. Landlord has sized the transformers and electrical system using a combined design load of 15 volt-amperes per square foot. If Tenant requires a connected load in excess of 15 volt-amperes per square foot, then same may be installed at Tenant's expense, upon Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed. Tenant shall pay to Landlord the following amount for such excess load within ten (10) days after billing, based upon the following schedule or rates:

   Excess Volt-Amperes

   | | |
   |---|---|
   | 3,001 - 10,000 volt-amperes | $500 |
   | 10,001 - 20,000 volt-amperes | $500 plus $0.04/volt-amperes |
   | 20,001 - 50,000 volt-amperes | $900 plus $0.33/volt-amperes |
   | 50,001 - 100,000 volt-amperes | $1,900 plus $0.30/volt-amperes |
   | Excess of 100,000 volt-amperes | $3,400 plus $0.10/volt-amperes |

2. Tenant Electrical Requirements

   a. Tenant is responsible for providing a complete electrical system from Landlord's distribution point within the Leased Premises. This shall include but not be limited to all necessary labor, branch and main circuit breakers, panels, transformers, connection to HVAC power supply, temperature controls, and connection to Landlord's smoke detector or smoke evacuation system, if required.

   b. Tenant shall pull copper conductors in conduit and make final connections at Landlord's electrical distribution panel. Landlord may require, at its option, Tenant to contract directly with Landlord's electrical contractor to make final connections to Landlord's electrical equipment. Conductors shall be continuous with no splices between the switchgear in the distribution room and panels within the Leased Premises.

   c. Tenant's electrical engineer shall include an electrical riser line diagram and a complete electrical panel schedule (quantities and sizes of lamps, appliances, signs, water heaters, etc.), indicating individual and total demand of all electrical loads.

   d. Electrical materials and equipment shall be new and installed per code and shall bear the Underwriters Laboratories label. All wire must be copper.

    e.   Lighting fixtures shall be furnished and installed by Tenant, and shall be of a type approved by applicable codes. Recessed fixtures in furred spaces shall be connected by a flexible conduit and "AF" wire and run to a branch circuit outlet box which is independent of the fixture. Fluorescent ballast shall have individual non-resetting overload protection.

    f.   Panel board, furnished and installed by Tenant, for lighting and power within the Leased Premises shall be equal to type NLAB class panels, and shall meet the requirements of applicable code.

    g.   A floor-mounted transformer shall be furnished and installed by Tenant, as required.

3.   **Water Service**

    Landlord shall provide a cold water supply stub at or near the boundary of the Leased Premises as defined in EXHIBIT "L-W".

4.   **Sanitary Service**

    Landlord shall provide a sanitary sewer stub at or near the boundary of the Leased Premises defined in EXHIBIT "L-W".

5.   **Vent Stub**

    Tenant shall install the plumbing vent stacks within the Leased Premises as defined in EXHIBIT "L W".

6.   **Tenant Plumbing Requirements**

    a.   Tenant is responsible for providing a complete plumbing system from Landlord's point of service within the Leased Premises. This shall include but not be limited to, all necessary labor, connections to supply stubs, piping, vents, clean-outs, fixtures, etc. necessary for the satisfactory operation of a plumbing system.

    b.   Lower Level – Tenant is responsible for connecting to Landlord's sewer stubs where provided. Upper Level – Tenant is responsible for providing the floor penetrations for connecting plumbing to sanitary sewer stubs. All floor penetrations shall be sleeved and sealed as required in the Tenant Criteria Manual to prevent the penetration of odors or liquids to any space below the Leased Premises. Floor penetrations shall be core-drilled; no saw cutting is permitted. All horizontal sanitary sewer lines shall be installed above the ceiling of a lower level tenant and the lines shall be insulated to prevent condensation.

    c.   Tenant is responsible for providing cleanouts in accordance with applicable codes.

    d.   If Tenant's design is not feasible with the existing utility locations, any alterations to the existing utility locations shall be completed by Tenant at Tenant's expense in accordance with the Tenant Criteria Manual and subject to Landlord's prior approval, which approval shall not be unreasonably withheld, conditioned or delayed.

    e.   Where more than one tenant is required to attach to a single sanitary and or vent stub, the first installing tenant shall install a plugged "Y" branch fitting for future connections, at such tenant's expense. Tenant shall run piping to the nearest stack and connect to the opening provided by Landlord.

7.   **Water Meter**

    Tenant is responsible for connecting at the point of service and installing, if required by Landlord or required by Tenant's specific use of the Leased Premises as provided in the Tenant Criteria Manual, either an accessible water meter or accessible remote readout and extending service according to Tenant's

requirements and in accordance with all applicable codes, utility company requirements and the Tenant Criteria Manual.

8.  Water Heaters

Tenant is responsible for providing electric water-heaters for domestic water usage in the Leased Premises. Electric water-heaters shall be automatic and shall be limited to 12-gallon capacity or as per code. Water heaters must have a pressure relief valve discharge piped to the nearest drain in the Leased Premises.

9.  Toilet Facilities

Tenant is responsible for providing toilet facilities in compliance with ADA and all applicable local building codes within the Leased Premises, and shall provide and maintain a Landlord approved waterproof membrane, which approval shall not be unreasonably withheld, conditioned or delayed, at Tenant's expense. A minimum of one water closet, one lavatory and one cleanout, in accordance with code, is required in the Leased Premises.

10. Natural Gas Service

If natural gas service is available from the local utility company, Landlord shall arrange for the installation of the meter banks and mains at the designated locations throughout the Shopping Center. All piping, associated work and meter for extension of services to the Leased Premises shall be provided by Tenant, at Tenant's expense, in accordance with applicable code, and subject to Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed.

11. Telephone

Landlord shall arrange with the telephone company to install telephone service to the main telephone terminal. Landlord shall provide an empty conduit with pull string or a raceway from the main telephone terminal to the Leased Premises as defined in EXHIBIT "L-W". All telephone work for extension of services to the Leased Premises shall be provided by Tenant, at Tenant's expense, in accordance with applicable code, and subject to Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed.

## L.   SPECIAL FOOD TENANT REQUIREMENTS

1.  Intentionally omitted.

## M.   FIRE PROTECTION SYSTEM

1.  Tenant Sprinkler System

    a.  Landlord shall provide a fire protection grid system in the Leased Premises pursuant to EXHIBIT "L-W".

    b.  Tenant shall design and install an engineered wet sprinkler fire protection system within the Leased Premises. Tenant shall be required to use Landlord's contractor for such work at Tenant's expense.

    c.  Tenant's fire protection system shall comply with the requirements of the applicable building codes, fire marshal and be approved by Landlord's insurance carrier. Any modifications or additions to the sprinkler system, main relocation, or installation of any necessary sprinkler heads shall be engineered, fabricated and installed by Tenant at Tenant's expense. Refer to Tenant Criteria Manual for details.

    d.   Tenant's sprinkler drawings and hydraulic calculations shall be prepared by a licensed engineer of the state in which the Shopping Center is located. Drawings are subject to Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed.

    e.   Intentionally omitted.

2.   <u>Tenant Fire Alarm System</u>

    a.   Landlord shall provide a connection for a fire alarm system within or adjacent to the Leased Premises as defined in <u>EXHIBIT "L-W"</u>. In the event Landlord completes final fire alarm system hookup, it shall be at Tenant's expense. Refer to Tenant Criteria Manual for details.

    b.   Tenant may be required to design and install an engineered fire alarm system within the Leased Premises. Tenant's fire alarm system shall be compatible with Landlord's system and comply with the requirements of the applicable building codes, fire marshal and be approved by Landlord's insurance carrier. Refer to Tenant Criteria Manual for details.

    c.   Tenant's fire alarm drawings shall be prepared by a licensed engineer of the state in which the Shopping Center is located. Drawings are subject to Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed.

3.   <u>Tenant Fire Extinguishers</u>

Tenant shall provide and install fire extinguishers in the Leased Premises. The number of extinguishers provided by Tenant shall be as required by applicable building codes, fire marshal and be approved by Landlord's insurance carrier.

## N.   CONSTRUCTION REQUIREMENTS

1.   <u>Construction Deposit</u>

Intentionally omitted.

2.   <u>Construction Barricade</u>

Landlord requires Tenant to erect a barricade that complies with Shopping Center standards at the start of Tenant's Work, at Tenant's expense. Tenant's barricade may not be dismantled without Landlord's prior approval, which approval shall not be unreasonably withheld, conditioned or delayed.

3.   <u>Construction Trash Removal</u>

Tenant is responsible for trash removal during construction, fixturing and stocking at Tenant's expense. Tenant shall break its boxes down and place its trash daily in the containers provided. Trash accumulation shall not be permitted overnight in the Leased Premises, Joint Use Areas or service corridors. Compliance with Landlord's recycling program is mandatory.

4.   <u>Temporary Electric</u>

Landlord may provide, at its option, temporary electrical service in general areas during construction. Tenant shall request, in writing, permission to connect to the temporary service and distribute temporary service to the Leased Premises in accordance with applicable code. Tenant should plan to use generators for Tenant's Work.

5.   <u>Temporary Toilets</u>

**EXHIBIT C-L**
12

Landlord may provide Tenant's contractors to use in common with other contractors working in the Shopping Center temporary toilet facilities.

6.  **Traffic Control**

Landlord shall provide traffic control to coordinate potential conflicts with construction traffic and between construction traffic and other traffic in the Shopping Center.

7.  **Contractor Requirements**

a.  Before Tenant or anyone on behalf of Tenant, including, Tenant's contractor may commence any work in the Leased Premises, Tenant's contractor must attend a mandatory pre-construction meeting at the Shopping Center with Landlord's Field Tenant Coordinator and/or Project Manager (the "Pre-Construction Meeting"). At the Pre-Construction Meeting, (i) Tenant's contractor will be provided with construction guidelines, reasonable and non-discriminatory rules and regulations, and other construction-related requirement, (ii) Tenant's contractor shall pay all fees required herein or the Tenant Criteria Manual to be paid at the Pre-Construction Meeting, and (iii) Tenant's contractor shall provide Landlord with all required pre-construction documents. Such documents shall include but not be limited to a copy of building permit, Certificate of Insurance, a California issued contractor's license, and any other documents outlined in the Tenant Criteria Manual.

b.  Tenant shall ensure that all Tenant contractors are bondable and licensed in the state where the Shopping Center is located.

c.  Tenant's contractor or subcontractor shall not post signs in any part of the Shopping Center, on construction barricades or in the Leased Premises without approval from Landlord, which approval shall not be unreasonably withheld, conditioned or delayed.

d.  All supplies necessary for construction, fixturing or merchandising the store must be delivered through designated truck docks and down the service corridors.

e.  The contractor may perform "noisy" construction, such as jack hammering, saw cutting, core drilling, etc., only during hours approved by the Landlord's on-site representative, which approval shall not be unreasonably withheld, conditioned or delayed. The Landlord's on-site representative will terminate any construction activity that they deem excessively noisy or dusty or which is disruptive to the normal operations of the adjacent tenants and/or the Shopping Center.

f.  Tenant's contractor shall obtain Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed, regarding all drilling, welding or other attachment to Landlord's structural system. Approval by Landlord shall be in writing before the start of Tenant's Work, and must be clearly identified on Tenant's drawings. Landlord approval of the drawings does not relieve Tenant's contractor of the responsibility to make a request in writing prior to starting Tenant's Work.

g.  Tenant's contractor shall supply fire extinguishers during construction, in accordance with code.

h.  The chargeback fees set forth in this EXHIBIT "C-L" are based on good faith estimates available in 2007. If higher or lower amounts are called for in the Tenant Criteria Manual, such amounts called for in the Tenant Criteria Manual shall apply to such charges.

8.  **Tenant's Work**

a.  Tenant shall conform to and comply with all federal, state, county and local laws, ordinances, permits, reasonable and non-discriminatory rules and regulations in the performance of Tenant's Work or in the performance of any alterations, additions or modifications.

b. Tenant's Work shall be coordinated with Landlord's Work as well as with the work of other tenants in the Shopping Center so that Tenant's Work shall not interfere with or delay completion of other construction in the Shopping Center.

c. In the event Tenant's Work and Landlord's Work shall progress simultaneously, Landlord shall not be liable for any injury to person or damage to property of Tenant, or of Tenant's employees, licensees or invitees from any cause whatsoever occurring upon or about the Leased Premises, and Tenant shall and will indemnify, defend and save Landlord harmless from any and all liability and claims arising out of or connected with any injury or damage. Tenant acknowledges that these provisions become effective beginning upon the date Tenant or its agents first enter the Leased Premises. This obligation to indemnify shall include reasonable and actual attorneys' fees and other reasonable costs, expenses and liabilities incurred by Landlord and its attorneys from the first notice that any claim or demand is to be made or may be made.

d. Intentionally omitted.

e. Intentionally omitted.

f. Tenant's Work shall be subject to inspection by Landlord during the course of construction for the purpose of determining the quality of the workmanship and adherence to Landlord requirements. Tenant shall require its contactor to cooperate with Landlord and correct any deficiencies noted by Landlord. All work performed by Tenant during the Term of the Lease shall be performed in accordance with this Lease, all exhibits thereto, the Tenant Design Manual and as directed by Landlord's Representative.

g. All work by Tenant, including repair work, shall be performed in a first-class workmanlike manner and shall be in a good and usable condition at completion. Such performance obligation includes, without limitation, securing the Leased Premises from both vandalism and damage by weather during construction at the end of each work day. Tenant shall require any person performing work to guarantee that the work is free from any and all defects in workmanship and materials for one (1) year from the date of completion. Tenant shall also require any such person to be responsible for the replacement or repair, without additional charge, of work done or furnished by or through such person which shall become defective within one (1) year after substantial completion of the work. The correction of work shall include, without additional charge, all expenses and damages in connection with the removal, replacement or repair of any part of work which may be damaged or disturbed. All warranties or guarantees for materials or workmanship on or regarding Tenant's Work shall be contained in the contract or subcontract. The contract shall be written so that all warranties and guarantees shall inure to the benefit of both Landlord and Tenant, as their respective interests appear, and so that either Party can directly enforce the contract.

h. In the event Tenant or Tenant's contractor fails to perform Tenant's Work, or any part of Tenant's Work, in a manner satisfactory to Landlord within 10 days after receipt of Landlord's punch list, Landlord shall have the right, in addition to and not in lieu of Landlord's other rights and remedies, to perform the work and Tenant shall pay Landlord for costs incurred by Landlord in such performance.

## O.   INSURANCE REQUIREMENTS

Tenant's contractor must fulfill the following insurance requirements, and shall maintain at no expense to Landlord:

a. Workers' Compensation Insurance within statutory limits and Employer's Liability Insurance with limits of not less than $1,000,000.00 per person for each accident, or disease.

b. General Liability Insurance with limits of not less than $5,000,000 combined single limit for bodily injury and property damage.

EXHIBIT C-L
14

c.  Motor Vehicle Liability Insurance in the contractor's name, including owned, non-owned, leased and hired car coverage with limits of not less than $2,000,000 combined single limit per occurrence for bodily injury and property damage.

d.  Tenant shall cause each of its contractors to agree to name Landlord, the parents, subsidiaries and affiliates of Landlord and if Landlord elects, any owner or other occupant in or adjoining the Shopping Center, as Additional Insureds on contractor's Commercial General Liability Insurance and Motor Vehicle Liability Insurance.  In addition to the insurance Tenant is required to maintain under ARTICLE 19, Tenant shall maintain Builders Risk Insurance including water damage and earth movement for the full replacement cost of Tenant's Work.

e.  Each of Tenant's contractors shall also, to the fullest extent permitted under the law, protect, defend, save harmless and indemnify Landlord, the parents, subsidiaries and affiliates of Landlord, and if Landlord elects, any owner or other occupant in or adjoining the Shopping Center, and their employees, officers and agents against any and all liability claims, demands or expenses incurred on account of any injury or damage, alleged or real, arising out of or in any way connected with any act or omission to act on the part of the indemnitor.

f.  Certificate evidence of the required insurance shall be furnished to Landlord before the start of Tenant's Work.  Insurance carriers shall have an AM Best's rating of A-VII or better, and shall be registered or authorized to do business in the state in which the Shopping Center is located.

## P.  GENERAL

1.  Landlord's Accessibility

Landlord, Tenant or any local utility company shall have the right, subject to Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed, to run utility lines, pipes, ducts, etc. above the Leased Premises.  It shall be Tenant's responsibility to provide flush-mounted access panels in its finished work where required by Landlord.

2.  Additional Landlord's Work

Landlord shall have the right to charge Tenant for certain improvements and other work performed by Landlord or caused to be performed by Landlord at Tenant's request within the Leased Premises although they may not be itemized in the Lease.  This work shall be paid for by Tenant as additional rental upon notice by Landlord.  Landlord has no duty however to do any work which Landlord is not specifically and expressly required to perform under this Lease or which, under any provisions of this Lease, Tenant may be required to perform.  The performance of work by Landlord shall not constitute a waiver of Tenant's default in failing to perform the work.

3.  Hazardous Materials

Tenant shall comply with any existing or future city, state, county or federal regulations or legislation regarding the control of pollution. Tenant shall not use or install, nor shall permit its contractors to use or install, any building materials containing asbestos or other Hazardous Material.  Upon expiration of the Term or the earlier termination of this Lease, Tenant shall provide Landlord with a statement signed by Tenant that the Leased Premises do not contain any Hazardous Material.  If Tenant fails to do so, Landlord shall have the right to have the Leased Premises inspected for the presence of Hazardous Material, and if Hazardous Materials are present in the Leased Premises, to take all actions which are necessary to return the Leased Premises to the condition it was in prior to the presence of Hazardous Material in the Leased Premises, all at Tenant's expense.  This obligation by Tenant shall survive the Expiration Date or earlier termination of this Lease and shall survive any transfer of Landlord's interest in the Shopping Center.

4.  Tenant's Refuse

Tenant is responsible for keeping the Leased Premises, the corridor, or arcade adjacent to the Leased Premises broom clean and free of trash.

5.   Certificate of Occupancy

Tenant is responsible for obtaining a Certificate of Occupancy promptly following completion of Tenant's Work, and shall promptly forward a copy of it to Landlord prior to Tenant opening for business in the Leased Premises. Tenant shall not be permitted to open for business without a Certificate of Occupancy. Upon completion of Tenant's Work or any alterations under ARTICLE 12, Tenant shall submit an original contractor's notarized affidavit, all subcontractors' original notarized affidavits and original notarized final waivers of lien, as well as any original notarized lien waivers that Landlord may require from contractors, subcontractors, laborers, and material suppliers. The documents must be in a form and detail satisfactory to Landlord.

6.   Lien Prevention

a.   Neither Landlord nor any mortgage lender of Landlord shall be liable for any labor or materials furnished to Tenant upon credit, and no mechanics or other lien for labor or materials shall attach to or affect any interest of Landlord or the mortgage lender in the Leased Premises or the Shopping Center. Nothing in this Lease shall be deemed or construed to constitute Tenant as Landlord's agent or contractor for the performance of Tenant's Work. Tenant acknowledges that Tenant's Work is to be performed solely for the benefit of Tenant. Nothing in this Lease shall be construed as constituting the consent or request of Landlord to any contractor for the performance of labor or the furnishing of any materials for Tenant, nor as giving Tenant authority to contract as the agent of or for the benefit of Landlord.

b.   If Landlord's insurance premium or real estate tax assessment increases as a result of Tenant's improvements to the Leased Premises, Tenant shall pay the increase as additional rental within thirty (30) days following Tenant's receipt of written notice from Landlord thereof.

7.   Square Footage Calculations.

The calculations of the dimensions and square footage of the Leased Premises are from the centerline of interior partitions, from the outside face for exterior walls, and from the full thickness of corridor and shaft walls. No deductions are allowed for the space occupied by columns, interior partitions, or other interior construction or equipment installed or placed in the Leased Premises. The Leased Premises shall not include any space above the bottom of the structural framework supporting the upper level or roof of the Shopping Center, as the case may be, or below the floor level of the Leased Premises.

## EXHIBIT D

## USE RESTRICTIONS

The Leased Premises shall not be used for any of the following uses unless specifically permitted in this **EXHIBIT D:**

1.  The presentation of first run theatrically released films or the display of any films that were originally theatrically released where (a) there is customer seating for the express purpose to view such displayed film, and/or (b) customers pay to view such displayed film.

2.  (a)  (1) a cooking school or cooking classes; (2) any health club, fitness center, weight room, gymnasium or the like; (3) any restaurant (including any natural or organic foods restaurant such as O'Naturals), salad bar, delicatessen, any other business that sells any prepared foods (including pizza, salad, sandwiches or soups) for on or off premises consumption, bar, coffee store and/or coffee bar, or juice and/or smoothie bar; (4) any salon (or other business) that provides hair treatments (haircuts, hair coloring, permanents, etc.), manicures, facials, massages or similar services; or (5) the sale of produce, meat, poultry, seafood, dairy, cheese, cereals, grains, fruits and vegetables, frozen foods, grocery products, bulk foods, gourmet foods, bakery goods, alcoholic beverages (including beer and wine), body care products, cosmetics, health care items, beauty aids, plants, flowers, vitamins, medicinal herbs, naturopathic or homeopathic remedies, nutritional supplements, coffee beans, smoothies and/or fresh fruit drinks, ice cream, frozen yogurt and/or gelato.

    (b)  Notwithstanding the foregoing, the provisions shall not:

    (i)  Prohibit "incidental sales" of any of the prohibited items described in (a) by any tenant in the Shopping Center. For purposes of the foregoing, a tenant shall be deemed to be conducting only "incidental sales" of such prohibited items only if the aggregate floor area in such tenant's premises devoted to the display of such items (other than vitamins, medicinal herbs, naturopathic or homeopathic remedies, and nutritional supplements) does not exceed the lesser of (1) five percent (5%) of the rentable area of such tenant's premises or (2) 200 square feet. Notwithstanding the foregoing, however, the sale of vitamins, naturopathic or homeopathic remedies and/or nutritional supplements by any tenant in the Shopping Center is expressly prohibited.

3.  The Leased Premises shall not be used for the sale of frozen yogurt.

4.  The Leased Premises shall not be used for the sale of Japanese-style cuisine.

5.  The Leased Premises shall not be used for the sale of pizza.

6.  The Leased Premises shall not be used as a sit-down bakery and café, and the retailer operating under the trade name "Boudin's" is prohibited.

7.  No more than 200 square feet of floor area of the Leased Premises shall be used for the sale, or display and offer for sale, of wall décor (which includes pictures, wall art, mirrors and such similar items, but does not include paint or wall paper) and lamps.

8.  The Leased Premises shall not be used for therapeutic massage.

9.  The Leased Premises shall not be used for providing manicures and pedicures.

10. The Leased Premises shall not be used for retail or wholesale banking operations, including, without limitation, receiving deposits, offering checking accounts, making loans (including, without limitation home mortgage loans and automobile loans), issuing credit and/or debit cards, providing automated teller machines, or selling securities (e.g., stocks and mutual funds) to the general public, whether accomplished by means of

full service, express service, or motorbank facilities, automated teller machines or other self-service banking devices or otherwise.

11.     The Leased Premises shall not be used as a hair salon.

12.     The Leased Premises shall not be used for providing massage, yoga, guided mediation services or Ayurveda well-being services.

13.     The Leased Premises shall not be used for the operation of a facility that licenses, subleases, or otherwise grants use rights with respect to suites within the Leased Premises, to independent beauty, health or spa professionals.

14.     No more than 200 square feet of floor area of the Leased Premises shall be used for the sale of boxed chocolates.

15.     The Leased Premises shall not be used for the sale of any of the following: (a) whole or ground coffee beans, (b) espresso, espresso-based drinks or coffee-based drinks, (c) tea or tea-based drinks, (d) brewed coffee or (e) blended beverages, including, without limitation, those containing the following: ice, coffee, espresso, or tea.

16.     The Leased Premises shall not be used for the provision of day care or any other child care service.

17.     The Leased Premises shall not be used for the sale of closet and garage storage systems, including cabinets.

18.     The Leased Premises shall not be used for the sale of men's suits.

19.     The Leased Premises shall not be used for a general dental practice or a general dental practice that focuses on pediatric dentistry.

20.     The Leased Premises shall not be used for the operation of a gym or fitness facility or studio.

21.     The Leased Premises shall not be used for the operation of a Competing Business (defined below) for the Protected Use (as defined below). As used in this Paragraph 21, "Protected Use" shall mean: (a) the operation of a store which sells (i) books, magazines, periodicals, and newspapers in print; (ii) books, magazines, periodicals, and newspapers on tape, disk, CD-ROM, DVD, Blu-ray disc, electronic books and other electronic or digital reading devices and/or any other media; computer software and computer games, as well as any items which are technological evolution of any of the foregoing items; or (iii) vinyl recorded music [collectively, all of the items described in clauses (i), (ii) and (iii) preceding being referred to in this Paragraph 21 as the "Exclusive Items"], or any of them; and (b) the operation of a newsstand or magazine rack, regardless of size and regardless of whether the same is operated as a "stand-alone" business (including, but not limited to, any kiosk or so-called "pop-up" store) or as an incidental part of another tenant's or occupant's primary business (for convenience of reference in this Paragraph 21, a "Newsstand"). "Books on any other media" for purposes of this Paragraph 21 shall exclude CD-ROM software designed for computers and which are not primarily works of fiction or non-fiction containing, with respect to works of fiction, the traditional elements of a novel such as characters, plot, theme and/or conflict. As used in this Paragraph 21, "Competing Business" shall mean a business which (A) devotes 500 square feet or more of display area (inclusive of allocable aisle space) within its premises for one or more of the Exclusive Items, (B) derives ten percent (10%) or more of its total gross sales from one or more of the items constituting the Exclusive Items and/or (C) devotes more than ten percent (10%) of display area (inclusive of allocable aisle space) within its premises for, or derives more than ten percent (10%) of its total gross sales from, the operation of a Newsstand.

22.     Air-controlled mattresses shall not be stocked, displayed, sold or offered for sale from the Leased Premises.

23.     The Leased Premises shall not be used for the operation of a restaurant that sells Greek food typically served in Greek-themed restaurants.

24.     The Leased Premises shall not be used for the sale of electric bicycles.

25.     The Leased Premises shall not be used for the sale of any or all of the following items: flooring, floor coverings, tile, stone, and/or mosaics.

26.     Leased Premises shall not be used by: (a) the entity currently doing business under the trade name "Sephora" or (b) any other business that generates more than 25% of its Net Sales from the sale of cosmetics.

27.     The Leased Premises shall not: (a) use the word "BBQ" as part of its trade name; (b) sell sauced meats slow cooked over an open fire; or (c) operate such premises substantially in the same format as "Sauced BBQ & Spirits" or "Lucille's Smokehouse Bar B Que".

28.     The Leased Premises shall not sell Mexican cuisine.

29.     The Leased Premises shall not be used for the sale of mattresses and/or waterbeds.

30.     The Leased Premises shall not sell bagels or breakfast sandwiches.

31.     The Leased Premises shall not be used for the provision of laser hair removal services, Cool Sculpting procedures or Botox procedures.

32.     The Leased Premises shall not sell poke style fish offerings.

33.     The Leased Premises shall not sell plant, fruit, vegetable, or nut based cold press juice cleanses.

34.     The Leased Premises shall not operate as a stretching studio.

35.     The Leased Premises shall not be used as a Brazilian or Argentinian themed steakhouse that serves grilled meats carved table-side.

**EXHIBIT E**

[INTENTIONALLY DELETED]

**EXHIBIT L-W**

**LANDLORD WORK LETTER**
**For**
**CHARMING CHARLIE**

**PROJECT: PALLADIO AT BROADSTONE**

I. **LANDLORD SCOPE:** Landlord shall provide the Leased Premises to Tenant in their as-is, where-is condition as of the Commencement Date, provided that the Premises is structurally and mechanically sound, water tight, free of seismic, structural or latent defects, free of Hazardous Materials and in compliance with all applicable laws (including but not limited to any Americans with Disabilities Act compliance with respect to any access points to the Premises). The term "Base Building Condition" shall mean an "empty shell" consisting of the following:

A. **Structure:** A structurally sound and watertight building shell in accordance with Landlord's base building construction documents.

B. **Floor System:** Furnish and install exposed, smooth, watertight concrete slab at a single elevation in accordance with the Landlord's base building construction documents. A slab leave-out will be provided that is 10'-0" in depth (front to back) and the width of the tenant Leased Premises, held 2'-0" from the demising line at each side. Such leave-out shall be located by Landlord as far towards the rear of the building as reasonable, in coordination with other Landlord back of house spaces. At restaurant and/or food service establishments, slabs will not be provided in Leased Premises. In such cases, Landlord will provide a compacted pad only, prepared in accordance with Landlord's geotechnical report, to accommodate Tenant's under slab utility work.

C. **Storefronts:** Exterior facades consisting of vertical neutral surfaces and bulkhead in accordance with the Landlord's base building construction documents. The area of the façade(s) vertically between grade and neutral bulkhead and horizontally between neutral piers will be left open for Tenant's storefront construction. Tenants shall refer to the Tenant Criteria Manual for this Shopping Center for specific design requirements.

D. **Demising Walls:** Light gauge metal studs only are provided between tenants and will be centered on the lease line of the Leased Premises in accordance with the Landlord's base building construction documents and Lease Outline Drawing (LOD). Metal studs will be extended from concrete slab to the underside of the deck or structure and be plumb to industry standards. Landlord will furnish and install drywall at partitions dividing the Leased Premises from adjacent service corridors on service corridor side only. Landlord will not provide miscellaneous framing or metal stud bracing and metal furring at concrete and/or concrete masonry unit ("CMU") demising walls.

E. **Clear Heights:** 14'-0" minimum to the underside of the structure.

F. **Insulation:** At exterior metal framed walls only. Where exterior wall is of concrete or (CMU) construction, insulation and\or metal furring will not be provided by Landlord.

G. **Common Facilities:** All site-related hardscape, landscaping, amenities, lighting, parking and trash enclosures in accordance with Landlord's base building construction documents.

H. **HVAC:** One (1) universal roof equipment curb and one (1) utility curb for the Leased Premises to receive Tenant's equipment. Where a 2nd floor exists above the Leased Premises, Landlord shall provide vertical sleeves and/or shafts from the roof to the Leased Premises.

I. **Electrical:** One (1) empty min 2" electrical conduit, with pull string to a point within the Leased Premises from Landlord's main switchgear room. A meter base (for separately metered service) and breaker will be furnished at Landlord's main switchgear for Tenant's use - refer to the Tenant Criteria Manual for additional details. Electrical service will be 277/480 volt, Landlord will not provide conductor wiring or temporary electricity to the Leased Premises. Tenants are required to contract with Landlord's electrical subcontractor to make the final connection to Landlord's electrical equipment. Tenant loads are based on the following:

   1. A normal retail tenant load of 15 watts maximum per square foot of leased area.
   2. A quick service food tenant load of 60 watts maximum per square foot of leased area.
   3. A restaurant tenant load of 60 watts maximum per square foot of leased area.

4. Kiosk loads 40 amps @ 120 volts.

J. <u>Water</u>: One (1) ¾ inch min. domestic water supply stub with capped valve to a point within the Leased Premises.

K. <u>Sanitary</u>: One (1) 4 inch minimum sanitary connection below grade to a point within the Leased Premises. Tenant to furnish and install all vent construction from within Leased Premises through roof in single story buildings.

L. <u>Gas</u>: Landlord may arrange for the installation of meter banks and mains at the designated locations throughout the Shopping Center. Location(s) will be shown on Landlord's base building construction documents.

M. <u>Fire Protection</u>: A shell grid system throughout the Leased Premises with upright fire sprinkler heads shall be installed. Any modifications or additions to the shell grid system required as a result of Tenant's plans shall be at Tenant's sole expense. Tenant shall use Landlord's fire protection contractor for any modifications to the shell grid system required by Tenant's plans.

N. <u>Fire Alarm</u>: One (1) fire alarm system connection junction box at a point within Leased Premises from Landlord's central fire alarm system panel, details of which are more fully described in the Tenant Criteria Manual.

O. <u>Communications</u>: Two (2) empty 2 inch conduit with pull string, one for telephone and one for communications, from Landlord's telephone/communications distribution point to a point within the Leased Premises.

II. **TENANT SCOPE:** Tenant shall provide the following and complete all required construction of the Leased Premises at Tenant's expense. Tenant improvements are to be constructed in accordance with all applicable codes, Landlord requirements and Tenant's final plans as approved by Landlord:

A. <u>Floor System</u>: Design, engineer, furnish and install concrete floor slab construction in the Leased Premises at food service and restaurant uses in accordance with Landlord's requirements as identified in the base building construction documents and Tenant Criteria Manual. Where building slab is provided, Tenant shall be permitted to cut slab where necessary for Tenant's utility connections. Tenant shall infill where cuts were made and shall adhere to specific requirements in the Tenant Criteria Manual.

B. <u>Storefronts</u>: Design, engineer and construct exterior storefront(s) in accordance with specific design requirements as outlined in the Tenant Criteria Manual. Storefront(s) shall be weather tight and shall include, but not be limited to, engineered design, framing, base curbs, finishes, storefront systems, glazing, flashing, entry doors and awnings or canopies. Storefronts must be entirely self-supported and meet all building code and wind loading requirements. Landlord's structure is for lateral support only.

C. <u>Signage</u>: Furnish and install all interior and exterior Tenant identification signage in accordance with specific design requirements as outlined in the Tenant Criteria Manual and the Tenant Signage Criteria Manual, as applicable. Tenant is responsible for all blocking requirements related to signage.

D. <u>Exterior Flooring</u>: Tenant storefronts shall be required to be set back from base building's main wall façade to provide visual relief and architectural articulation. As it is within Tenant's Leased Premises, Tenant is responsible to provide exterior flooring/paving at such set-backs and also at Tenant's entry door(s), which is required to be recessed. Such exterior finish shall relate to Tenant's identity and be submitted for Landlord review and approval, which approval shall not be unreasonably withheld, conditioned or delayed, as part of storefront design review.

E. <u>Service/Exit Doors</u>: Furnish and install all service and/or exit doors and frames and hardware servicing the Leased Premises as required by building code. Where service/exit doors enter into Landlord's corridor, such doors shall be fully recessed in an alcove built by Tenant to meet all applicable exiting code and ADA requirements. If any existing conduit, fixtures or utilities need to be relocated due to Tenant's door placement it will be relocated by Landlord at Tenant's expense. Exterior exit doors will be provided by Landlord at location selected by Landlord. Any requests to relocate door(s) as shown on Landlord's base building construction documents shall be negotiated on a case by case basis. Any costs incurred for such relocation shall be assumed by Tenant.

F. <u>Interior Finishes and Construction</u>: Furnish and install all miscellaneous metal stud bracing and framing, drywall, interior partitions, ceilings, finishes, fixtures and equipment within the Leased Premises. All Tenant improvements shall be self-supporting and meet requirements in Tenant Criteria Manual.

**EXHIBIT L-W**

2

G. Awnings, Canopies, and Exterior Light Fixtures: Furnish and install all awnings and/or canopies and exterior light fixtures not provided as part of the base building construction and as specified in the Tenant Criteria Manual. Tenant is required to submit shop drawings, sealed and signed by an engineer licensed in the state of California, for all awning and canopies must be designed to be supported solely by Tenant's storefront construction. Tenant's exterior mounted fixtures shall be U.L. listed for wet locations. Cut sheets and shop drawings shall be submitted to Landlord for review and approval, which approval shall not be unreasonably withheld, conditioned or delayed.

H. Insulation: Furnish and install throughout Leased Premises as required to meet all applicable codes and Landlord's requirements.

I. HVAC: Furnish and install a complete HVAC system for the Leased Premises including, but not limited to, roof equipment curbs, a package unit system and/or roof mounted condensers, condenser lines, electrical hook-ups, fan coil units, VAV boxes, main and distribution ductwork, exhaust systems, connections, thermostats, controls, tie-ins, diffusers, grilles, programming and start up as required for a fully operational and code compliant system. Tenants shall refer to the Tenant Criteria Manual for specific HVAC requirements to integrate tenant HVAC design with Landlord base building. Tenant shall be required to use Landlord's contractor for providing and installing the roof curb adapter and roof-top HVAC units.

J. Electrical: Furnish and install a complete and fully operational electrical system for the Leased Premises, including, but not limited to, meters, conductors, wiring, disconnect switches, transformer, electrical panels, conduit and all electrical devices and distribution. Tenant is responsible for installing systems to meet all local utility requirements and making all arrangements with local utility or provider for service. Tenant shall pay all charges for electricity used by it and supplied by Landlord, public utility or public authority, or any other person, firm or corporation.

K. Water: Furnish and install all domestic water plumbing systems meters, waterproof membranes and fixtures throughout the Leased Premises. Tenant is responsible for installing systems to meet all local utility requirements and making all arrangements with local utility or provider for service. Tenant is responsible for all costs associated with water usage for Leased Premises regardless of supplier.

L. Sanitary: Furnish and install all sanitary, waste and vent piping throughout the Leased Premises to provide a fully operational system.

M. Gas: If available from Landlord and the local utility, complete gas distribution from Landlord's point of distribution to the Leased Premises. Tenant shall be responsible for connecting to the gas service, furnishing and installing gas piping, gas meter and devices and contacting the local utility and establishing service. Tenant is responsible for all costs associated with gas usage for Leased Premises regardless of supplier.

N. Fire Protection: Any and all fire protection improvements, alterations, expansions, or deletions beyond that which has been provided by Landlord shall be by Tenant. Such modifications must meet all code and building official requirements and obtaining said approval shall be the Tenant's responsibility. Tenant is required to use Landlord's fire protection contractor.

O. Fire Alarm: Furnish and install all components including, but not limited to, duct and/or smoke detection devices, speakers, strobes, horns, etc. to provide a fully operational system – refer to the Tenant Criteria Manual for additional details. Tenant is required to contract directly with Landlord's designated fire alarm contractor for fire alarm installation work as outlined in the Tenant Criteria Manual.

P. Communications: Furnish and install complete telephone, data and security systems and devices from Landlord's point of distribution throughout the Leased Premises to provide a fully operational system. Tenant is responsible for installing systems to meet all local utility requirements and making final connections to Landlord's telephone and communications distribution point.

Q. Roof Penetrations: Any and all necessary modifications to Landlord base building roofing shall be submitted to Landlord for review and approval, which approval shall not be unreasonably withheld, conditioned or delayed. Work shall be performed only by Landlord's roofing contractor.

R. Barricade: Furnish and install barricade(s) per the Tenant Criteria Manual throughout the duration of Tenant's construction. Tenant is responsible to coordinate installation, relocation and removal with Landlord's on-site representative to allow for Landlord coordination of sitework per Landlord's published construction schedule.

EXHIBIT L-W
3
Charming Charlie Lease v7

## __EXHIBIT P__

### INTENTIONALLY OMITTED

## EXHIBIT Q

## LEASE CONFIRMATION CERTIFICATE

This LEASE CONFIRMATION CERTIFICATE is executed as of this ___ day of _____, 2021 by and between BROADSTONE LAND, LLC, a California limited liability company ("Landlord"), and CHARMING CHARLIE MARKETS INC, a Delaware corporation ("Tenant").

### WITNESSETH:

A. WHEREAS, on _____, 20__, Landlord and Tenant entered into that certain Lease (the "Lease"), for those certain premises located in the Palladio at Broadstone ("Shopping Center") in the City of Folsom, County of Sacramento, and State of California. Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Lease.

B. WHEREAS, pursuant to the Lease, the parties have agreed to execute a written statement (the "Lease Confirmation Certificate") setting forth, among other things, the Rental Commencement Date and Expiration Date.

NOW, THEREFORE, Tenant and Landlord hereby state as follows:

1. Rental Commencement Date:                          _____

2. Expiration Date of initial Term:                      _____

3. First day of first Option Period (if exercised):      _____

4. First day of second Option Period (if exercised):     _____

5. First day of third Option Period (if exercised):      _____

6. Last day of third Option Period (if exercised):       _____

This Lease Confirmation Certificate is intended to determine the various dates and time periods referenced above based on the formulae and other substantive provisions contained in the Lease in light of the actual attendant facts and circumstances that have come to pass. In no event is this Lease Confirmation Certificate intended to modify any substantive provision of the Lease, and in the event of a conflict between the terms of the Lease and this Lease Confirmation Certificate, the terms of the Lease shall control.

This Lease Confirmation Certificate may be executed in several counterparts, each of which may be deemed an original, and all such counterparts together shall constitute one and the same Lease Confirmation Certificate.

[SIGNATURES ON NEXT PAGE]

IN WITNESS WHEREOF, the parties have executed this Lease Confirmation Certificate as of the date and year first above written.

**LANDLORD:**

**BROADSTONE LAND, LLC,**
a California limited liability company

By: _____

Its: _____

**TENANT:**

**CHARMING CHARLIE MARKETS INC,**
a Delaware corporation

By: _____

Its: _____

EXHIBIT Q

## EXHIBIT R

### CONFIRMATION OF DELIVERY AND PUNCH LIST

Pursuant to the Lease dated _____ 2021, by and between BROADSTONE LAND, LLC, ("**Landlord**"), and CHARMING CHARLIE MARKETS INC, a Delaware corporation ("**Tenant**"), Landlord delivered the Leased Premises commonly known as _____ (store address) on _____.

Tenant has inspected the Leased Premises and has noted on the attached copy of **Exhibit C** to the Lease Tenant's Punch List of deficiencies in Landlord's Work as of this date. Additional work, if any required for the Landlord's Work to comply with Legal Requirements or with the terms and conditions of the Lease may be added to this Punch List.

_____  A.  The Punch List work designated (*) materially interferes with the completion of Tenant's Work and/or with Tenant's preparation of Leased Premises for business, or otherwise materially impacts Tenant's ability to conduct business on the Leased Premises. As a result, Tenant shall not be deemed to have accepted the Leased Premises until such time as such Punch List items have been completed and Tenant's obligation to pay Minimum Annual Rental, Percentage Rental and additional rental shall be extended beyond the Rental Commencement Date as set forth in the Lease.

_____  B.  Although the Punch List work, or a portion of the Punch List work, does not currently materially interfere with Tenant's Work, pursuant to the Lease, Landlord must promptly and diligently prosecute completion of this work. Tenant reserves the right to assert a claim for delay damages in the event Landlord's failure to complete such work interferes with Tenant as provided in Section A above, or otherwise delays Tenant in opening for business in the Leased Premises.

Please confirm in writing your schedule for commencement and completion of this work.

**TENANT:**

**CHARMING CHARLIE MARKETS INC,**
a Delaware limited liability company

By:_____
Its:     Construction/Project Manager

Date:



EXHIBIT B

Kevin J. Holl, SBN 124830
**GORDON-CREED, KELLEY,**
**HOLL, ANGEL & SUGERMAN, LLP**
50 California Street, 34th Floor
San Francisco, California 94111
Tel: (415) 421-3100
Fax: (415) 421-3150
holl@gkhs.com

Attorneys for Defendant
CHARMING CHARLIE MARKET, INC.

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SACRAMENTO

| | |
|---|---|
| BROADSTONE LAND, LLC, a California limited liability company,<br><br>    Plaintiff,<br><br>  vs.<br><br>CHARMING CHARLIE MARKET, INC., a Delaware corporation; and DOES 1 – 10, inclusive,<br><br>    Defendants. | Case No. 34-2022-00318917<br><br>**NOTICE OF REMOVAL OF CIVIL ACTION** |

You are here by notified that on June 24, 2022, a Notice of Removal of Civil Action was filed in the United States District Court for the Eastern District of California. A true and correct copy of the Notice of Removal of Civil Action is attached hereto. The Notice of Removal was filed in reference to Cause No. Case No. 34-2022-00318917; *Broadstone Land, LLC. Vs. Charming Charlie Markets Inc. and Does 1-10*, then pending in the Superior Court the County of Sacramento, California.

//

//

//

//

1   Dated: June 24, 2022

2

3

4   By:

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GORDON-CREED, KELLEY,
HOLL, ANGEL & SUGERMAN, LLP

Kevin J. Holl
Attorneys for Defendant
CHARMING CHARLIE MARKET, INC.

## **PROOF OF SERVICE**

I declare that I am employed in San Francisco, California.  I am over the age of 18 years and not a party to the within action; my business address is 50 California Street, 34th Floor, San Francisco, California, 94111.

On June 24, 2022, I served the within: **NOTICE OF REMOVAL OF CIVIL ACTION** on the parties in the within action at the address below listed by the following means:

☒ **(BY E-MAIL or ELECTRONIC MAIL:** Based on the California Rules of Court, April 17, 2020 Emergency Rule 12, and in accordance with Code of Civil Procedure Section 1010.6 – service of these documents is via electronic mail only. My electronic service address is linda@gkhs.com, and I caused the document(s) to be sent to the persons at the electronic service address(es) listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

KIRK E GIBERSON, ESQ.
HEFNER, STARK & MAROIS, LLP
2150 RIVER PLAZA DRIVE # 450
SACRAMENTO, CA 95833
kgiberson@hsmlaw.com

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this Declaration was executed on June 24, 2022, at Concord, California.

_____
Linda J. Halperin